## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MITCHELL DORFMAN, derivatively on behalf of MGP INGREDIENTS, INC., | |
| Plaintiff, | **Case No.:** |
| v. | |
| AUGUSTUS C. GRIFFIN, THOMAS K. PIGOTT, BRANDON M. GALL, DAVID J. COLO, JAMES L. BAREUTHER, TERRENCE P. DUNN, ANTHONY P. FOGLIO, LYNN H. JENKINS, GEORGE W. PAGE, JR., KAREN L. SEABERG, and M. JEANNINE STRANDJORD, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MGP INGREDIENTS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Mitchell Dorfman ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant MGP Ingredients, Inc. ("MGP" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Augustus C. Griffin, Thomas K. Pigott, Brandon M. Gall, David J. Colo, James L. Bareuther, Terrence P. Dunn, Anthony P. Foglio, Lynn H. Jenkins, George W. Page, Jr., Karen L. Seaberg, and M. Jeannine Strandjord (collectively, the "Individual Defendants," and together with MGP, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of MGP, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange

1

Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MGP, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by MGP's directors and/or officers from August 2, 2018 through the present (the "Relevant Period").

2.      MGP is a Kansas-based producer and supplier of starch food ingredients and premium distilled spirits, including bourbon, whiskey, vodka, gin, and industrial alcohol.

3.      In the past, the whiskeys sold by the Company were predominantly unaged rye whiskeys, which the Company's customers would barrel and age themselves. Starting in 2015, however, as part of a five-year growth strategy, MGP began barreling and aging its own whiskey, which the Company anticipated would sell for as much as three times the price of the Company's unaged whiskey.

4.      In late 2018, as the Company's aged whiskey inventory neared its ready-to-sell date, the Individual Defendants began touting the value of the Company's aged whiskey and the significant boost that sales of aged whiskey would purportedly provide to the Company's growth and income.

5.     After four years of aging, the Company's aged whiskey became ready to sell in early 2019. Thereafter, the Individual Defendants continued to represent to the investing public that aged whiskey sales would be a "key driver" of growth for the Company, and that there was strong demand for the Company's aged whiskey, as evidenced by significant sales that the Company had purportedly already closed.

6.     In reality, there was little basis for the Individual Defendants' optimistic representations. Despite claiming to have significant insight into consumer demand for aged whiskey and related trends in the whiskey market as a whole, the Individual Defendants in fact completely misgauged demand for the Company's aged whiskey, and throughout the Relevant Period struggled to make any significant sales, let alone at the favorable price points they promised to investors.

7.     The truth emerged gradually in a series of press releases and conference calls throughout the remainder of 2019 and during the beginning of 2020. First, on May 1, 2019, the Company disclosed disappointing quarterly financial results, which the Individual Defendants attempted to blame on the timing of certain sales. On this news, the price of the Company's stock dropped by roughly 23%, falling from $87.87 per share at the close of trading on April 30, 2019, to $67.79 per share at the close of trading on May 1, 2019.

8.     On July 31, 2019, the Company announced lackluster financial results for the second fiscal quarter of 2019 as well, along with a reduction in the Company's fiscal 2019 guidance, owing to poor aged whiskey sales. Despite this, the Individual Defendants continued to assert that the Company was on track to reach its forecasted sales figures. On this news, the price of the Company's stock dropped by over 25%, plunging from $67.14 per share at the close of trading on July 30, 2019, to $49.99 per share at the close of trading on July 31, 2019.

9.      On October 31, 2019, the Company disclosed yet more disappointing quarterly results, again due to meager sales of aged whiskey. As before, the Individual Defendants reiterated that they possessed a clear line of sight into demand for aged whiskey, and expected the Company to meet its revised 2019 guidance. On this news, the price of the Company's stock dropped by almost 12%, falling from $48.49 per share at the close of trading on October 30, 2019, to $42.89 per share at the close of trading on October 31, 2019.

10.      On January 17, 2020, the Company issued its preliminary full year 2019 financial results, revealing that the Company was far from reaching the fiscal 2019 guidance that the Individual Defendants had reaffirmed to the market only two months before the end of that fiscal year. Indeed, in the Company's earnings release issued that day, Defendant Griffin admitted that the Company did not have the "line of sight we believed we had to these aged sales." On this news, the price of the Company's stock plummeted by over 27%, falling from $52.78 per share at the close of trading on January 16, 2020, to $38.18 per share at the close of trading on January 17, 2020.

11.      Not long afterward, on February 11, 2020, the Company announced that Defendant Augustus C. Griffin ("Griffin") would be stepping down as the Company's Chief Executive Officer ("CEO") on May 21, 2020, to be replaced in that role by Defendant David J. Colo ("Colo").

12.      At last, on February 26, 2020, the Company announced its fourth quarter and full year financial results for 2019, disclosing that the Company had indeed failed to meet its 2019 guidance by a wide margin, largely due to the Company's failure to achieve much of the aged whiskey sales forecasted by the Individual Defendants. On this news, the price of the Company's stock fell from $31.80 per share at the close of trading on February 25, 2020, to $28.42 per share

at the close of trading on February 26, 2020, representing a total decline of over 67% from a high of $88.06 per share during the Relevant Period.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

16.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual

Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in lucrative insider sales, netting proceeds of approximately $3.48 million. Approximately 90,814 shares of the Company's common stock were repurchased during the Relevant Period for over $6.08 million. As the Company's stock was actually only worth $28.42 per share during that time, the price at closing on February 26, 2020, the Company overpaid by over $3.5 million in total.

17.     In light of the Individual Defendants' misconduct, which has subjected MGP, its CEO, its Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the District of Kansas (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of MGP's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

20.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

25.     Venue is proper in this District because MGP and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of MGP common stock. Plaintiff has continuously held MGP common stock at all relevant times.

### Nominal Defendant MGP

27.     MGP is a Kansas corporation with its principal executive offices at 100 Commercial Street, Box 130, Atchison, Kansas 66002. MGP's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MGPI."

### Defendant Griffin

28.     Defendant Griffin has served as the Company's CEO since July 2014, and as President from July 2014 until March 2020. On February 11, 2020, the Company announced that Defendant Griffin would be retiring as CEO on May 21, 2020. According to the Company's Schedule 14A filed with the SEC on April 9, 2019 (the "2019 Proxy Statement"), as of March 25, 2019, Defendant Griffin beneficially owned 86,878 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Griffin owned approximately $6.87 million worth of MGP stock.

29.     For the fiscal year ended December 31, 2018, Defendant Griffin received $2,153,228 in compensation from the Company. This included $595,001 in salary, $741,458 in stock awards, $778,055 in non-equity incentive plan compensation, and $38,714 in all other compensation.

30.     The 2019 Proxy Statement stated the following about Defendant Griffin:

Mr. Griffin has served as President and Chief Executive Officer since July 2014. Immediately prior to joining MGP, he served as Executive Vice President of Marketing for Next Level Spirits, a northern California-based producer, importer, and distributor of premium wine and spirits brands. Between November 2011 and March 2013, Mr. Griffin served as brand and business consultant for Nelson's

8

Green Brier, Tennessee. He served for 24 years with Brown-Forman Corporation in increasingly important brand management and general management roles, where he ultimately became Senior Vice President and Global Managing Director in charge of the company's flagship Jack Daniel's business in 2008. The Company believes Mr. Griffin's qualifications to serve on the Board include extensive alcohol beverage industry experience and expertise and the insights he brings from his service as our President and Chief Executive Officer.

**Defendant Pigott**

31.     Defendant Thomas K. Pigott ("Pigott") served as the Company's CFO and Vice President of Finance from September 2015 until he resigned on March 29, 2019. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Pigott beneficially owned 12,589 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Pigott owned approximately $996,041 worth of MGP stock.

32.     For the fiscal year ended December 31, 2018, Defendant Pigott received $1,119,828 in compensation from the Company. This included $390,000 in salary, $346,284 in stock awards, $357,313 in non-equity incentive plan compensation, and $26,231 in all other compensation.

**Defendant Gall**

33.     Defendant Brandon M. Gall ("Gall") has served as the Company's CFO and Vice President of Finance since April 1, 2019, and as the Company's Corporate Controller since June 2018.

34.     The Company's website stated the following about Defendant Gall:[1]

Brandon Gall has served as Vice President of Finance and Chief Financial Officer since April 2019. He has served as MGP's Corporate Controller since June of 2018. During his seven-year tenure with the Company, Gall has advanced through a steady progression of leadership roles, including Director of Financial Planning &

---

[1]      https://www.mgpingredients.com/about-mgp/our-people/executive-leadership/brandon-gall.html (last visited April 29, 2020).

Analysis, Director of Supply Chain Finance, Director of Business Development and most recently, Corporate Controller.

Brandon holds a bachelor's degree of business administration from Miami University and an MBA from the University of Chicago. Gall is also a certified CPA.

**Defendant Colo**

35.     Defendant Colo has served as the Company's President and Chief Operating Officer ("COO") since March 16, 2020, and as a Company director since August 2015. On February 11, 2020, the Company announced that Defendant Colo would assume the role of CEO on May 21, 2020. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Colo beneficially owned 8,065 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Colo owned approximately $638,102 worth of MGP stock.

36.     For the fiscal year ended December 31, 2018, Defendant Colo received $110,500 in compensation from the Company. This included $271 in fees earned or paid in cash and $110,229 in common stock.

37.     The 2019 Proxy Statement stated the following about Defendant Colo:

Mr. Colo served as President, Chief Executive Officer and a director of SunOpta, Inc. from February 2017 to February 2019. He served as Executive Vice President and Chief Operating Officer of Diamond Foods, Inc. from 2013 until March 2016. He joined Diamond Foods in 2012 as Executive Vice President of Global Operations and Supply Chain. For the three years prior to joining Diamond Foods, Mr. Colo served as an independent industry consultant focusing on organizational optimization and planning. From 2003 to 2005, he served as President of ConAgra Food Ingredients. Before his employment at ConAgra Foods, Mr. Colo spent several years with Nestle-Purina Pet Care Company in roles of increasing responsibility, including Vice President of Supply for the company's Golden Products Division, and Vice President of Store Brands and Venture Development. He also served two years as President of the American Dehydrated Onion and Garlic Association. The Company believes that Mr. Colo's qualifications to serve on the Board include his extensive management experience and his experience in the food industry.

**Defendant Bareuther**

38.     Defendant James L. Bareuther ("Bareuther") has served as a Company director since May 2016. He also serves as the Chair of the Human Resources and Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Bareuther beneficially owned 2,979 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Bareuther owned approximately $235,698 worth of MGP stock.

39.     For the fiscal year ended December 31, 2018, Defendant Bareuther received $104,000 in compensation from the Company. This included $55,840 in fees earned or paid in cash and $48,160 in common stock.

40.     The 2019 Proxy Statement stated the following about Defendant Bareuther:

Mr. Bareuther served as Chief Operating Officer of Brown-Forman Corporation from 2003 until his retirement in 2010. At Brown-Forman, he was responsible for the company's spirits and wine business in more than 140 countries across the globe. Prior to joining Brown-Forman as Director of U.S. sales in 1994, Mr. Bareuther was Executive Vice President of Sales and Marketing for the Seagram Classics Wine Company in New York and California. He previously worked for Beringer Vineyards, a leading wine firm in Napa Valley, California. He is a former three-term Chairman of the Distilled Spirits Council of the United States ("DISCUS"), a national trade association based in Washington, D.C. representing producers and marketers of distilled spirits sold in the United States and around the world. He has served as a director of First Beverage Group since 2012 and as chairman of the board of directors since April 2014. Additionally, Mr. Bareuther has served on the board of directors of Luna Winery since 2013 and served on the board of directors of Windy Hill Spirits from 2012 until its sale in 2016. The Company believes that Mr. Bareuther's qualifications to serve on the Board include his extensive expertise and experience in the alcohol beverage industry.

### Defendant Dunn

41.     Defendant Terrence P. Dunn ("Dunn") has served as a Company director since May 2014. He also serves as the Chair of the Nominating and Governance Committee, and as a member of the Audit Committee and Human Resources and Compensation Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Dunn beneficially owned 58,210 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Dunn owned approximately $4.6 million worth of MGP stock.

42.     For the fiscal year ended December 31, 2018, Defendant Dunn received $108,000 in compensation from the Company. This included $234 in fees earned or paid in cash and $107,766 in common stock.

43.     The 2019 Proxy Statement stated the following about Defendant Dunn:

Mr. Dunn served as President and Chief Executive Officer of J.E. Dunn Construction Group Inc. (formerly known as Dunn Industries) from 1989 until his retirement in 2015. Since 1989, he has also served as a director of J.E. Dunn Construction Group. J.E. Dunn Construction Group Inc. is headquartered in Kansas City, Missouri, and is the holding company for commercial contractor and construction company affiliates across the nation, including J.E. Dunn Construction Company. He has served as a director of Kansas City Southern since 2007. Mr. Dunn served as a director of Commerce Bank of Kansas City from 1993 until 1997, H&R Block Bank from 2007 until 2009, and UMB Financial Corp. from 2003 to 2017. Mr. Dunn brings significant board and governance experience from his service as past director of the board of the Federal Reserve Bank of Kansas City from 1998 until 2003 and from serving on the boards of directors of businesses having operations within the Company's geographic footprint. He also has extensive management skills as the former chief executive of a large construction company having offices throughout the United States, operations experience in project management with responsibilities for budgeting, and in the management of significant growth of his company in geographic scope and volume over the past 20 years. The Company believes that Mr. Dunn's qualifications to serve on the Board include his extensive executive experience in managing a capital intensive business, as well as his experiences and expertise in corporate finance and accounting, strategic planning, executive compensation matters and his board leadership skills.

**Defendant Foglio**

44.     Defendant Anthony P. Foglio ("Foglio") has served as a Company director since May 2014. He also serves as a member of the Audit Committee and Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Foglio beneficially owned 38,261 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Foglio owned approximately $3.02 million worth of MGP stock.

45.     For the fiscal year ended December 31, 2018, Defendant Foglio received $106,500 in compensation from the Company. This included $76,570 in fees earned or paid in cash and $29,930 in common stock.

46.     The 2019 Proxy Statement stated the following about Defendant Foglio:

Mr. Foglio's career spans over 40 years in the alcohol beverage industry. From 2010 to 2017 he served as a partner of Anchor Brewers and Distillers, and has served as chairman of and partner its successor entity, Hotaling & Co., since 2017. From 2008 until 2010, he served as the Chairman of Preiss Imports, which merged into Anchor Brewers and Distillers. He served as the Chairman of Skyy Spirits, LLC from 2006 to 2008 and as the President and CEO of Skyy Spirits from 1998 to 2006. Mr. Foglio helped Skyy Spirits become a multi-brand portfolio, spanning a variety of categories, including vodkas, tequilas, rums, gins, whiskeys, cordials, liqueurs and distinctive Campari brands. During his career, Foglio has fostered profitable growth and development of world-renowned brands including SKYY Vodka, 1800 Tequila, Smirnoff Vodka, Bailey's Irish Cream, Jose Cuervo Tequila, and J & B Scotch, and is now leading the focus within the craft spirits world via Hotaling & Co. The Company believes that Mr. Foglio's qualifications to serve on the Board include his extensive expertise and experience in the alcohol beverage industry and management of the growth and development of multi-brand portfolios.

**Defendant Jenkins**

47.     Defendant Lynn H. Jenkins ("Jenkins") has served as a Company director since January 2019. She also serves as a member of the Audit Committee, Human Resources and Compensation Committee, and Nominating and Governance Committee.

48.     The 2019 Proxy Statement stated the following about Defendant Jenkins:

Ms. Jenkins was elected to the Board of the Company on January 31, 2019. Ms. Jenkins is a certified public accountant who served nearly 20 years in elective office. Her professional career begin in public accounting. She represented the 2nd Congressional District of Kansas in the U.S. House of Representatives from 2009 until her retirement at the end of her term in 2019. She previously served as the Kansas State Treasurer from 2003 to 2008, in the Kansas Senate from 2000 to 2002, and in the Kansas House of Representatives from 1999 to 2000. The Company believes that Ms. Jenkins accounting background as well as her extensive experience in government qualify her for service on the Board.

**Defendant Page**

49.     Defendant George W. Page, Jr. ("Page") served as a Company director from 2014 until he resigned on April 9, 2019. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Page beneficially owned 38,261 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Page owned approximately $3.02 million worth of MGP stock. Additionally, as of March 25, 2019, Defendant Page owned 18 shares of the Company's preferred stock, which represented 4.1% of the Company's outstanding shares of preferred stock on that date.

50.     For the fiscal year ended December 31, 2018, Defendant Page received $103,500 in compensation from the Company. This included $73,570 in fees earned or paid in cash and $29,930 in common stock.

51.     The Company's Schedule 14A filed with the SEC on April 9, 2018 (the "2018 Proxy Statement") stated the following about Defendant Page:

Mr. Page has, since 2013, served as an independent consultant for valve marketing and engineering design at Page Solutions. He has extensive general management experience, as well as experience leading product development, engineering, manufacturing, operations, and sales. From 1998 until 2012, he served as the Engineering Director of Spence Engineering at Circor International Inc., a company that designs, manufactures, and markets valves and other highly-engineered products used in the energy, aerospace and industrial markets. He also held various management positions at Fisher Instruments / H.D. Baumann Assoc. Ltd., a global

designer, manufacturer and supplier of control valves and regulators, from 1992 until 1998. Mr. Page served as the President and Chairman of the Board of Center for Graphic Communications, Inc., a commercial printing company, from 1988 until 1992. Mr. Page is the cousin of Karen L. Seaberg. The Company believes that Mr. Page's qualifications to serve on the Board include his business and educational experiences.

**Defendant Seaberg**

52.     Defendant Karen L. Seaberg ("Seaberg") has served as the Chairman of the Board since December 2014, and as a Company director since May 2009. She also serves as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Seaberg beneficially owned 3,767,480 shares of the Company's common stock, which represented 22.1% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Seaberg owned approximately $298 million worth of MGP stock.  Additionally, as of March 25, 2019, Defendant Seaberg owned 297 shares of the Company's preferred stock, which represented 68% of the Company's outstanding shares of preferred stock on that date. Defendant Seaberg's majority ownership of the Company's preferred stock affords her control over the election of the Company's Class B directors.

53.     For the fiscal year ended December 31, 2018, Defendant Seaberg received $134,500 in compensation from the Company. This included $268 in fees earned or paid in cash and $134,232 in common stock.

54.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seaberg made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 9/25/2018 | 1,546 | $77.75 | $120,201 |
| 9/27/2018 | 2,435 | $60.03 | $146,173 |
| 9/28/2018 | 24,427 | $60.72 | $1,483,207 |
| 12/10/2018 | 3,225 | $79.22 | $255,484 |
| 12/12/2018 | 7,644 | $78.69 | $601,506 |
| 3/15/2019 | 11,175 | $78.33 | $875,337 |

55.     Thus, in total, before the fraud was exposed, she sold 50,452 Company shares on inside information, for which she received over $3.48 million. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

56.     The 2019 Proxy Statement stated the following about Defendant Seaberg:

Ms. Seaberg has been Chairman of the Board of the Company since December 2014 and a director since 2009. Ms. Seaberg is a member of the Heartland chapter of National Association of Corporate Directors and the Kansas City chapter of WomenCorporateDirectors (WCD). She has been an executive travel agent and minority owner of Travel Center of Atchison for 31 years. Ms. Seaberg is active in civic affairs at both the local and national level. She was instrumental in the creation of Atchison's $4.2 million Riverfront Park in 2004 and was the Kansas Governor's Chair for the national Lewis and Clark Bicentennial Commemoration in 2002-2006, bringing one of 15 national events to Atchison, Leavenworth and Kansas City in 2004. She also served on the Lewis & Clark Trail Heritage Foundation board, a national not-for-profit based in Great Falls, MT, from 2003 to 2007 and as its national president from 2007 to 2008. Ms. Seaberg has been the chair of the annual Amelia Earhart Festival since 1997, which brings over 40,000 people to Atchison every year in July. Ms. Seaberg served on the Atchison Hospital Board from 1990 to 2004, and presently serves on the Board of the Cray Medical Research Organization at the University of Kansas Medical Center, Kansas City, Kansas. She also serves as a board member of the national Lewis and Clark Trust and is chair of the Atchison Amelia Earhart Foundation. In 2015, she was recipient of the Hall of Fame award from the Chamber of Commerce and the Vision of Excellence award from the Santa Fe Depot Trustees in Atchison, Kansas. She is the cousin of George W. Page, Jr. The Company believes that Ms. Seaberg's qualifications to serve on the Board include her business and civic experience and organizational skills, her knowledge of the Company and the industries in which it operates, her familiarity with the community in which the Company operates and her significant stock ownership.

**Defendant Strandjord**

57.     Defendant M. Jeannine Strandjord ("Strandjord") has served as a Company director since December 2013. She also serves as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Strandjord beneficially owned 42,873 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $79.12, Defendant Strandjord owned approximately $3.39 million worth of MGP stock.

58.     For the fiscal year ended December 31, 2018, Defendant Strandjord received $117,500 in compensation from the Company. This included $65,353 in fees earned or paid in cash and $52,147 in common stock.

59.     The 2019 Proxy Statement stated the following about Defendant Strandjord:

Ms. Strandjord has over 40 years of financial management experience and was employed in three different and diverse industries after starting in public accounting on the audit staff of Ernst and Whinney in 1968. For 20 years, beginning in 1985, she held several senior financial and related senior management roles at Sprint Corporation. She managed the successful transformation and restructuring of Sprint as Chief Integration Officer from 2003 until 2005 when she retired. She was Senior Vice President and Chief Financial Officer of Global Solutions, a $9 billion division, from 1998 until 2003 and was Controller and Treasurer for Sprint Corporation from 1986 to 1998. Ms. Strandjord has been a director of American Century Mutual Funds (for six registered investment companies) since 1994. From 1996 through May 2012, she was a director of DST Systems, Inc., where she chaired the Audit Committee and sat on the Compensation Committee and Governance and Nominating Committee. Ms. Strandjord has been a director of Euronet Worldwide, Inc. ("Euronet") since 2001. Ms. Strandjord was Euronet's Lead Independent Director from 2010 to 2014 and continues to be the Chairman of Euronet's Audit Committee. The Company believes that Ms. Strandjord's qualifications to serve on the Board include her experience on the boards of various other public companies, as well as her background in finance, corporate governance, restructuring, talent management, and compensation and benefits.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers, directors, and/or fiduciaries of MGP and because of their ability to control the business and corporate affairs of MGP, the Individual Defendants owed MGP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGP in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MGP and its shareholders so as to benefit all shareholders equally.

61.     Each director and officer of the Company owes to MGP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MGP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.     To discharge their duties, the officers and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MGP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MGP's Board at all relevant times.

65.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MGP were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGP's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MGP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MGP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGP's operations would comply with all applicable laws and MGP's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.     Each of the Individual Defendants further owed to MGP and the shareholders the duty of loyalty requiring that each favor MGP's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.    At all times relevant hereto, the Individual Defendants were the agents of each other and of MGP and were at all times acting within the course and scope of such agency.

69.    Because of their advisory, executive, managerial, and directorial positions with MGP, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by MGP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

73.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who are directors of MGP, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MGP and was at all times acting within the course and scope of such agency.

## MGP'S CODE OF CONDUCT

76.     The Company's Code of Conduct provides that it is "applicable to all of our directors, designated officers (as defined below) and other officers and employees of MGP Ingredients, Inc. ("MGPI") and its subsidiaries."

77.     In a section titled, "Accurate and Timely Periodic Reports," the Code of Conduct states the following:

> MGPI is a public company that is committed to providing investors with full, fair, accurate, timely and understandable disclosure in the periodic reports that it is required to file and in other public communications that it makes. MGPI expects our designated officers and others responsible for such matters to:
>
> - comply with generally accepted accounting principles at all times;
> - maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;
> - maintain books and records that accurately and fairly reflect our transactions;

- prohibit the establishment of any undisclosed or unrecorded funds or assets;
- maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
- present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.

No one should engage in "off the record" transactions and each of you should report accurately and completely all financial transactions to the appropriate accounting department personnel.

78.    In a section titled, "Compliance with the Law," the Code of Conduct states the

following, in relevant part:

If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and written Company policies that you should be particularly reminded of because of the nature of the Company's business.

* * *

Personal Use of Company Property. Do not use Company property for your own personal interest unless that use has been properly authorized. Company property includes many things such as automobiles, confidential Company information, business opportunities that belong to the Company, and the like. A use is properly authorized only if it has been approved by one or more Company officers who have authority to grant such approval. Do not seek permission from someone whom you know does not have the authority to grant it. As a corollary, do not grant permission if you do not have authority to do so.

* * *

Trading in the Company's Stock. You are subject to the terms of the Company's Insider Trading Policy.

79.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading . Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.     Founded in 1941 in Atchison, Kansas, MGP is a producer and supplier of starch ingredients and distilled alcohol. The Company has two reportable segments: Ingredients Solutions, which handles the Company's production and sale of starch ingredients, including wheat starches and proteins for use in a variety of food products, and  Distillery Products, through which the Company produces and sells food grade alcohol, such as bourbon, whiskey, vodka, and gin, as well as distillery co-products, including fuel grade alcohol and corn oil.

81.     Historically, much of the whiskey sold by the Company was unaged rye whiskey distillate, which the Company's customers would barrel and age, and then sell to consumers.

82.     In early 2015, the Company announced five new key strategies the Company would implement to grow its revenue. One of these strategies involved expanding the Company's whiskey business by building up a stock of aged whiskey to sell to customers.

83.     In connection with this strategy, during 2015, MGP began barreling and storing a significant amount of its whiskey distillate. The whiskey was expected to age for approximately four years, at which point the Company would begin selling the whiskey on the market, at a higher premium than the Company's unaged whiskey distillate would sell for.

**False and Misleading Statements**

***August 2, 2018 Press Release and Conference Call***

84.     On August 2, 2018, the Company issued a press release containing the Company's financial results for the second fiscal quarter of 2018. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release stated that the Company's "conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

85.     The press release also quoted Defendant Griffin, who discussed the Company's aged whiskey inventory as follows:

> We continue to invest to take full advantage of these key consumer trends and are now pleased to announce that based on continued strong demand for our premium American Whiskeys, we are making significant additional capital investments in our barrel warehouse program. Our projected investment in this program has been increased to approximately $51.8 million in capital expenditures, up from approximately $33.8 million. This increased investment will enable us to meet the long-term storage needs of both our new distillate customers and our own aging whiskey inventory. ***Our investment in aged whiskey inventory continues to grow, and has now reached $73.0 million, at cost. A portion of the sizable increase in our inventory from last quarter reflects stronger anticipated sales of our premium American Whiskey products in the second half of the year***.

(Emphasis added.)

86.     That same day, the Company also held a conference call to discuss the Company's financial results. During the call, Defendant Griffin stated that the following, in relevant part:

Longer term, we are assessing the best approach to provide structure to very unstructured market for aged whiskey. We continue to have positive discussions with existing and prospective customers about the potential for this product. Despite the lower growth we experienced in the first half of the year, our projections for sustainable growth in premium beverage alcohol remain in line with our strategic plan.

### November 1, 2018 Press Release and Conference Call

87.     On November 1, 2018, the Company issued a press release containing the Company's financial results for the third fiscal quarter of 2018. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release repeated that the Company's "conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

88.     That same day, the Company also held a conference call to discuss the Company's financial results. During the call, in response to an analyst questioning whether there was any change in the value of the Company's aged whiskey inventory, Defendant Griffin stated that "we're feeling increasingly confident in both the demand for that inventory and the pricing for that inventory," and that the Company had not "seen anything that would change our view of the value of that inventory."

### December 13, 2018 Investor Conference

89.     On December 13, 2018, the Company held a conference for analysts and investors, during which the Company's management discussed the Company's aged whiskey inventory and sales and growth estimates. Analysts from SunTrust Robinson Humphrey ("SunTrust") reported that members of the Company's management asserted that the Company "could sell the entire inventory at the 3x multiple tomorrow if needed," and that the Company had a "good line of sight [in]to the unallocated inventory that is not already spoken for." SunTrust analysts also indicated

that Company management claimed that "[i]ndustry demand had outpaced supply for several years and the company has no knowledge of any other independent distiller that was putting away excess inventory four years ago."

### *February 27, 2019 Press Release and Conference Call*

90.     On February 27, 2019, the Company issued a press release containing the Company's fourth fiscal quarter and full year 2018 financial results. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release disclosed positive sales growth, and announced the Company's guidance for 2019, which exceeded that of the prior year, stating the following:

- Consolidated net sales increased 18.9% to $104.9 million, as a result of double-digit growth in both premium beverage alcohol and the Ingredient Solutions segment.

    * * *

- Consolidated operating income increased 16.9% to $50.1 million, as a result of strong sales growth and improved operating performance in both the Distillery Products and Ingredient Solutions segments.

    * * *

- 2019 net sales growth is projected in the mid-single-digit percentage range versus 2018, subject to some volatility due to the current conditions in the industrial alcohol market.

    * * *

- The Company's estimate of growth in operating income in 2019 is 15% to 20% off of the higher than expected 2018 results.

    * * *

- Earnings per share are forecasted to be in the $2.55 to $2.65 range.

91.     The press release also quoted Defendant Griffin as follows:

> "***Both of our business segments continue to benefit from favorable consumer trends, and our strategic plan has us well positioned to fully capture the potential these trends offer***.  Our 2018 results reflect both the strength of that positioning and the momentum we are building as we continue to execute against that plan," Griffin added.  "2018 saw strong gross profit growth in both our business segments and significant progress against our key strategic initiatives.  We increased our aging whiskey inventory to $76.4 million, at cost, reflecting a 16.2% increase as compared to the prior year. We continued to expand our warehouse capacity to make sure we are well positioned to support the growth of the American Whiskey category and we continued to take a disciplined approach to our MGP brands initiative, adding both new brands and additional markets.  ***We are confident that our strategy and investments have us well positioned, and will provide us the resources we need, to deliver strong growth in 2019 and beyond***," concluded Griffin.

(Emphasis added.)

92.     That same day, the Company held a conference call to discuss the Company's financial results. During the call, Defendant Griffin stated the following regarding demand for the Company's aged whiskey:

> ***Due to the sustained robust growth of the American Whiskey category, we continue to see strong demand for aged whiskey as customers seek to fill inventory gaps driven by higher-than-expected consumer demand***.  Throughout the year, we continue to leverage limited sales of aged whiskey to support our existing partnerships and attract new customers for our new distillate products.
>
> \* \* \*
>
> 2019 marks the next phase of our deployment of this inventory.  We will begin selling both more aged whiskey and older aged whiskey.  ***We will continue to work with our current and prospective customers and are pleased with our progress implementing this initiative.  As a result of sales already transacted and ongoing discussions with customers in the craft segment, multinational and national brand owners as well as the export market, we are confident that we have visibility to the aged sales we need to deliver against this year's guidance***.

(Emphasis added.)

93.     Also during the call, the following exchange took place between Defendant Griffin and an analyst regarding the Company's stated guidance:

[Analyst:] I wanted to ask about the guidance for 2019 and specifically the commentary around this is the year where we're going to start to see some more meaningful deployment of aged whiskey. . . .

[Defendant Griffin:] . . . As I said, 2019 is really the next phase of this deployment. . . . [S]ales of aged whiskey will be a key driver of our growth in '19. **We have started contracting that. We have started transacting it.** In terms of how we'll fall out over the year, we will try to provide color on that, much as we did with the fourth quarter when we said the vast amount was due to new distillates. So we'll try to provide color on what's driving our revenue growth. . . . **[W]e feel very confident that we have visibility to the aged sales we need to deliver the guidance this year, and it will continue to be a driver of our growth going forward in future years.**

\* \* \*

[Analyst:] And if I look at your guidance for '19, . . . is it fair to say that . . . covers part of what you've contracted for so far but does not include all . . . of the class of 2015 inventory?

[Defendant Griffin:] **It includes us selling the aged whiskey we need to deliver our guidance.** . . . And so as opposed to focusing on sweeping out the warehouse of all 4-year-old, that wouldn't be prudent. **So we will judge the market, use it judiciously, use it to make sure we deliver the guidance and get them** – if pricing is still great and we can sell more, we will. But we're not going to focus on emptying the warehouse at all costs just to do that. So we'll constantly look at the market. **We feel confident we have the levers, both for this year and future years, to continue to drive that growth.**

(Emphasis added.)

### February 27, 2019 Form 10-K

94.     Also on February 27, 2019, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Griffin, Pigott, Colo, Bareuther, Dunn, Foglio, Jenkins, Page, Seaberg, and Strandjord, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Griffin and Pigott attesting to the accuracy of the financial statements contained therein, the disclosure of any

material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

95.     In a section discussing the risks facing the Company, the 2018 10-K detailed various factors that *could* cause the Company to inaccurately gauge demand for its aged whiskey, leading to a surplus of inventory and other negative impacts on the Company's prospects, implying that such risks had not already materialized. The 2019 10-K stated the following:

> There is an inherent risk in determining the quantity of maturing stock of aged distillate to lay down in a given year for future sales as a result of changes in consumer demand, pricing, new brand launches, changes in product cycles, and other factors. Demand for products ***could*** change significantly between the time of production and the date of sale. ***It may be more difficult to make accurate predictions regarding new products and brands***. Inaccurate decisions and/or estimations ***could*** lead to an inability to supply future demand or lead to a future surplus of inventory and consequent write-down in the value of maturing stocks of aged distillate. As a result, our business, financial condition, or results of operations ***could*** be materially adversely affected.

(Emphasis added.)

96.     The 2018 10-K also stated the following with respect to the Company's internal controls:

> With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission. As a result of this assessment, management has concluded that the Company's internal control over financial reporting as of December 31, 2018 was effective.
>
> * * *
>
> There has been no change in the Company's internal control over financial reporting required by Exchange Act Rule 13a-15 that occurred during 2018 that has materially affected, or is reasonably likely to materially affect MGP Ingredients, Inc.'s internal control over financial reporting.

*April 9, 2019 Proxy Statement*

97. On April 9, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

98. The 2019 Proxy Statement stated that the Company's Code of Conduct was one of the Company's "key governance documents," and that the Company's Audit Committee was responsible for monitoring compliance with the Code of Conduct.

99. The 2019 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

100. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

101.    The statements in ¶¶ 84–96 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

*May 1, 2019 Press Release and Conference Call*

102.    On May 1, 2019, the Company issued the Company issued a press release containing the Company's financial results for the first fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed disappointing results for the quarter, including a decrease in gross profits, despite an increase in sales, stating the following:

- Consolidated sales increased 1.3% to $89.1 million, reflecting growth in both the Ingredient Solutions and Distillery Products segments.

- Consolidated gross profit decreased 12.1% to $16.7 million, as gross profit declined in both the Ingredient Solutions and Distillery Products segments.

- Consolidated operating income decreased 18.1% to $8.5 million.

103.   Despite these results, the press release confirmed the Company's previously issued 2019 guidance, stating the following, in relevant part:

MGP is confirming the following guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018, subject to some volatility due to the current conditions in the industrial alcohol market.

* * *

- The Company's estimate of growth in operating income in 2019 is 15% to 20% off of the higher than expected 2018 results.

* * *

- Earnings per share are forecasted to be in the $2.55 to $2.65 range.

104.   The press release also quoted Defendant Griffin as follows:

"Our results for the quarter are lighter than we would have liked and reflect both order timing and headwinds to our business. ***However, we do not believe they are the result of any changes to underlying consumer trends or our position in the market,***" said Gus Griffin, president and CEO of MGP Ingredients. "***We have reviewed our outlook for the remainder of the year and are confidently confirming our previous guidance***."

"***Aged sales reflect lower volumes but higher pricing as we transition from selling lighter aged whiskey inventory to older whiskey inventory. We expect both parts of our brown goods business to return to growth over the remainder of the year as a result of stronger demand and continued strong pricing***," continued Griffin.

(Emphasis added.)

105.   That same day, the Company held a conference call to discuss the Company's financial results, during which Defendant Griffin continued to reaffirm the Company's 2019 guidance. During the call, the following exchange took place between an analyst and Defendant Griffin:

[Defendant Griffin:] [O]ur results were lighter than we would have liked.  Our results for this quarter reflect both headwinds to our business and customer order timing.  ***However, we do not believe they are the result of any changes in underlying consumer trends or our position in the market.  As a result and after a detailed review of our outlook for the remainder of the year, we are confidently confirming our previous annual guidance***.

* * *

[Defendant Griffin:] ***We continue to see strong demand and pricing for our products and are confident in our ability to deliver against our annual guidance***.

* * *

[Analyst:] [D]oes that also tie into – I know a big tranche of what was put away 4 years ago occurred in the second quarter.  So does that in part say we're holding back on selling that until it gets to full aged and there's more to come kind of in 2Q and beyond that?

[Defendant Griffin:] Yes.  First of all, we are very confident in the plan we have to sell that.  And as we've mentioned in the past, we don't give a number of how much we're going to sell.  ***That is our lever to make sure we deliver our annual guidance.  And we're comfortable that both the volume demand and pricing is there for us to be able to use that lever to deliver on it*** . . . .  ***So we're very comfortable that this aged whiskey will fill out over the year***.  We talked about the ramp-up accelerating.  ***And we're very comfortable and confident that it will ramp up over the year as we planned***.

(Emphasis added.)

106.    On this news, the price of the Company's stock dropped from $87.87 per share at the close of trading on April 30, 2019, to $67.79 per share at the close of trading on May 1, 2019 on heavy volume, representing a loss in value of approximately 23%.

**June 28, 2019 SunTrust Report**

107.    On June 28, 2019, SunTrust released an analyst report commenting favorably on the Company's 2019 guidance and aged whiskey sales, based on representations made by Defendants Griffin and Gall during investor roadshows. The report stated the following, in relevant part:

We recently travelled with CEO Gus Griffin and CFO Brandon Gall of MGPI to meet with investors. We came away from the meetings encouraged that *1) the issues that tripped up 1Q have not carried over into 2Q* . . . .

* * *

[W]e continue to believe that the company could have posted $3-$4 in EPS in 2019 if it chose to monetize its entire available inventory *and it still should easily exceed the current guidance in our opinion*. . . .

* * *

MGPI has not seen any cutbacks in orders from existing customers like it saw in 2Q18 . . . . This implies that the company should face a highly favorable comp for whiskey sales in the current quarter . . . . [W]e expect aged whiskey sales to accelerate as the first major tranche of inventory was not put away until 2Q15 (meaning it didn't hit maturity until 2Q19).

(Emphasis added.)

### July 31, 2019 Press Release and Conference Call

108. On July 31, 2019, the Company issued a press release containing the Company's financial results for the second fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed that the Company had again experienced disappointing results for the quarter due to poor aged whiskey sales, stating the following:

- Consolidated sales increased 2.5% to $90.5 million, reflecting growth in both the Distillery Products and Ingredient Solutions segments.

- Consolidated gross profit increased 0.4% to $19.5 million, as a decline in Distillery Products gross profit was more than offset by gains in Ingredient Solutions.

- Consolidated operating income decreased 2.3% to $10.9 million.

109. The press release also disclosed that the Company would be revising its 2019 guidance, stating the following:

MGP is revising its guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018.

* * *

- The Company's estimate of growth in operating income in 2019 is 10% to 20%.

* * *

- Earnings per share are forecasted to be in the $2.55 to $2.75 range inclusive of our new, lower projected effective tax rate.

110.    The press release also quoted Defendant Griffin as follows:

"While we are pleased with the improved results for most parts of our business, sales of aged whiskey have lagged our expectations. ***We remain confident in both the long-term demand for, and the value of this inventory, and expect to see a significant increase in sales of aged whiskey over the remainder of the year***. However, we believe there is some possibility we might have difficulty completing transactions for all of our projected sales of aged whiskey by the close of the year," said Gus Griffin, president and CEO of MGP Ingredients. "As a result, we are revising our guidance for the full year to include that possibility."

"While we are still not where we would like to be in terms of year to date operating income growth, we have seen a significant recovery in most areas of our business. ***We remain confident in our long-term strategy and remain well-positioned against strong macro consumer trends***," stated Griffin. "***We expect to report an improved performance over the back half of the year and are off to a strong start in the third quarter***. Our warehouse expansion plan remained on track during the quarter, allowing us to increase our storage capacity and complete the project by the end of 2020. Additionally, our investment in aged whiskey inventory has now reached $85.5 million, at cost, an increase of $6.0 million from the first quarter 2019 as we continue to see long-term value in building this inventory.

(Emphasis added.)

111.    That same day, the Company held a conference call to discuss the Company's financial results, during which Defendant Griffin affirmed the Company's revised 2019 guidance as follows:

Our operating income declined over 2% as sales of aged whiskey lagged our expectations. ***Despite the slow start to the year for sales of aged whiskey, we remain confident in both the long-term demand for and the value of this inventory and expect to see a significant increase in sales of aged whiskey over the remainder of the year***. However, we believe there is some possibility we might have difficulty completing transactions for all of our projected sales of aged whiskey by the close of the year. As a result, we are revising our guidance for the full year to include that possibility.

\* \* \*

Sales of aged whiskey were down for the quarter and continue to trail last year. . . . While sales of aged whiskey are below our expectations year-to-date, ***we expect to see a significant increase in these sales over the remainder of the year. Several orders failed to transact at the end of the quarter, highlighting both the longer-term demand and the inherent challenges in implementing this strategy. As we progress through the implementation of this strategy, we are beginning to better understand the timing of demand and obstacles to transacting customers' orders***.

\* \* \*

We continue to see a diverse group of customers for our aged whiskey, ***and our visibility to when those sales will be finalized improves throughout the year***. ***We are off to a good start to the back half of the year, having already recorded actual sales or received purchase orders for about 12% of our projected sales of aged whiskey for the remainder of the year. Additionally, we are in active, ongoing discussions with specific customers for another approximately 60% of those projected sales. This visibility, coupled with the continued solid trends of the category, gives us confidence for strong aged sales growth in the back half of the yea***r.

(Emphasis added.)

112. Also during the call, the following exchange took place between an analyst and

Defendant Griffin regarding the Company's aged whiskey sales:

[Analyst:] Let's dive straight to aged. Something clearly has happened from last quarter to this quarter in terms of you were very confident that the aged sales would enable you to get to the guidance to now you're adding a lower end to the guidance. And clearly, the stock today tells you people don't believe that you can actually sell the product. So I'm just trying to understand, best case scenario, . . . the company has been surprised by how complex this process is in terms of placing the barrels and it eventually will happen. Worst-case scenario, customers are now pushing back and saying, "No, we're not going to pay 3x." So is there any way to give us comfort in the near term that you're selling anything at 3x? Or that it's more to the former versus the latter?

[Defendant Griffin:] Yes.  Great question and it's obviously, the crux of the matter.  So first of all, we're selling less aged this year so far.  We plan to sell more aged than last year.  We're selling less volumetric ***but we're selling older whiskey and we are consistently hitting our target, which is 3x.  We're consistently achieving to that or above that.***

(Emphasis added.)

113.    On this news, the price of the Company's stock dropped from $67.14 per share at the close of trading on July 30, 2019, to $49.99 per share at the close of trading on July 31, 2019 on increased volume, representing a loss in value of over 25%.

### October 31, 2019 Press Release and Conference Call

114.    On October 31, 2019, the Company issued a press release containing the Company's financial results for the third fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed yet more disappointing sales and profits for the quarter, stating the following:

- Consolidated sales decreased 4.6% to $90.7 million, reflecting a decline in the Distillery Products segment, which was partially offset by sales growth in the Ingredient Solutions segment.

- Consolidated gross profit decreased 4.1% to $18.8 million, due to declines in the Ingredient Solutions and Distillery Products segments.

- Consolidated operating income decreased 3.4% to $11.6 million.

115.    The press release also confirmed the Company's previously revised 2019 guidance, stating the following:

MGP is confirming the following guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018.

* * *

- The Company's estimate of growth in operating income in 2019 is 10% to 20%, inclusive of the above described resolution of certain legal matters.

* * *

- Earnings per share are forecasted to be in the $2.55 to $2.75 range.

116.    The press release also quoted Defendant Griffin as follows:

"While the overall American whiskey market remains robust, and our position within that market is still very strong, *timing and volatility of customers' orders continues to be a challenge this year*," said Gus Griffin, president and CEO of MGP Ingredients.  "*As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible*.  These issues affected sales of both new distillate and aged whiskey inventory.  Despite this, we did have a very strong quarter for sales of aged whiskey, selling both more whiskey and older whiskey, as customers continue to need our inventory to launch new brands, fill holes in their inventory and support brand acquisitions.  We believe these customer needs will be ongoing.  *While we are certainly behind where we would like to be at this point in the year, we are off to a strong start to the fourth quarter, and we are confident in our line of sight to the sales required to deliver against our full year guidance*."

(Emphasis added.)

117.    That same day, the Company held a conference call to discuss the Company's financial results, during which Defendant Griffin once again affirmed the Company's 2019 guidance and its purported visibility into customer demand for aged whiskey as follows:

While the overall American whiskey market remains robust and our position within that market is still very strong, timing and volatility of customers' orders continue to be a challenge this year.  As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible.  These issues have affected sales of both new distillate and aged whiskey inventory throughout the year. . . . *While we are behind where we'd like to be at this point in the year, we're off to a strong start to the fourth quarter and we are confident in our line of sight to sales required to deliver against our full year guidance.*

* * *

And while we experienced some delays earlier in the year, *we are now seeing the type of demand we anticipated when we initiated this investment.*

Our decision in 2015 to begin investing in putting away whiskey for aging was a key part of our long-term strategy.  While we are now starting to see the sales piece of this strategy ramp-up, it is important to understand the success of this strategy to date in terms of customer recruitment and financial return.  We believe our willingness to make significant strategic sales of lightly aged whiskey over the past few years has been instrumental in the development of our large and diverse customer base.  And we have achieved pricing in line with our 3x model as we have executed this strategy.

*Our aged whiskey inventory has us well positioned to meet future demand.  We now believe that other than what is reserved to support the future growth of our own brands, we will have very minimal 2015 vintage inventory remaining at the end of the year*.  We are also confident that any remaining inventory from that year will continue to increase in value.  As we have said all year, sales of aged whiskey will be the key determinant of our ability to deliver against our full year guidance and that continues to be the case.  *We are confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales.*

* * *

While we are not where we would like to be in terms of year-to-date operating income growth, *we are confident in our ability to achieve our full year guidance.*

(Emphasis added.)

118.    Also during the call, the following exchange took place between an analyst and

Defendant Griffin regarding the Company's aged whiskey sales:

[Analyst:] [T]he reiterating of the full year guidance . . . would imply a pretty nice double-digit increase in sales here in the fourth quarter, along with a reallynice increase in gross margin.  Just wondering what you can tell us, Gus, about your confidence in that. . . .

[Defendant Griffin:] Sure.  As oppose[d] to after the second quarter when we gave you the percentages by how much had been transacted and how much we're in discussions with and how much had been targeted with, we've progressed that quite a bit.  And so now we're really down to about a dozen customers that we're dealing with.  *We are in active ongoing discussions with them, specific customers for specific inventory to deliver those sales.  The majority of them, the vast majority of them are existing customers.  We don't need them all to come through.  And we feel -- so we feel very good about that outlook.  And that's why we're so confident in our ability to reconfirm our guidance.*

(Emphasis added.)

40

119.    On this news, the price of the Company's stock dropped from $48.49 per share at the close of trading on October 30, 2019, to $42.89 per share at the close of trading on October 31, 2019 on heavier than normal volume, representing a loss in value of approximately 12%.

***January 17, 2020 Press Release***

120.    On January 17, 2020, the Company issued a press release containing the Company's preliminary full year financial results for 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed that the Company was not even close to meeting the 2019 guidance that the Individual Defendants had reaffirmed only several months prior, and with only two months remaining in the Company's 2019 fiscal year at that time. The press release stated the following:

[MGP], a leading supplier of premium distilled spirits and specialty wheat proteins and starches, reported today that based on preliminary financial information, it expects to deliver the following financial results for the full year ended December 31, 2019:

- Sales of approximately $362 million.

* * *

- Operating income expected to be in the range of $46-$48 million.

* * *

- Earnings per share expected to be in the range of $2.20-$2.30.

121.    The press release also quoted Defendant Griffin as follows:

"***The shortfall versus our previously communicated guidance is the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter***," said Gus Griffin, president and CEO of MGP Ingredients.

"*While this shortfall is disappointing, particularly given the line of sight we believed we had to these aged sales, we do not believe it reflects weakness in the overall American Whiskey category, our overall position in that market or the potential long-term value of our aged whiskey inventory. We are currently conducting additional analysis to better understand the aged whiskey market, and, going forward, we will continue to refine our strategies and tactics to improve the sales predictability and management of this important piece of our business*."

(Emphasis added.)

122.     On this news, the price of the Company's stock dropped from $52.78 per share at the close of trading on January 16, 2020, to $38.18 per share at the close of trading on January 17, 2020 on heavy volume, representing a loss in value of over 27%.

123.     Analysts reacted strongly over the course of the next several days to the Company's disappointing results. On January 17, 2020, SunTrust lowered its price target for MGP stock from $80 to $55, and issued a report on the Company stating the following:

> *We are lowering our rating on MGPI to Hold from Buy following significantly worse than expected preliminary 4Q19 results*.  4Q sales are expected to be $92M (down 12.6% YoY) well below our estimate of $126M.  4Q EPS is expected to be in the range of $0.69-$0.79 vs. our estimate of $1.09.  We are reviewing our estimates but, admittedly, have little faith in our prior estimates following today's announcement.
>
> * * *
>
> *We cannot fully understand how the company whittled away the opportunity over the past 12 months*.  *We started with the belief that the company would start to sell its fully aged inventory* (first put away in 2015) and easily exceed its $2.50-$2.60 EPS guidance.  *Instead it missed four consecutive quarters, including today's announcement, and doesn't seem to have sold any of its fully aged inventory in 2019.*

(Emphasis added.)

124.     On January 21, 2020, Craig-Hallum Capital Group similarly curtailed its price target for MGP stock from $90 down to $40, and issued a report commenting on the Company's prospects and the Individual Defendants' representations as follows:

> Year-End Guidance for 2019 Did Not Age Well. Management Reports Preliminary FY19 Numbers Below Analyst Estimates. Downgrading From BUY To HOLD And Reducing Price Target From $90 To $40.
>
> * * *
>
> Management issued a press release providing preliminary FY19 results which came in well below previously issued guidance and our estimates. ***The shortfall came due to management's unsuccessful attempt at transacting a large portion of the aged whiskey sales they had previously forecasted for 4Q . . . . During the 3Q earnings call management said it was off to a strong start to Q4 and thus reiterated guidance, implying double-digit growth for Q4.*** This was largely due to expected strength in a combination of sales in October and large sales anticipated in November and December adding they did not need all of its Nov/Dec sales to hit guidance.

(Emphasis added.)

125.    On February 11, 2020, not long after the Company released its dismaying preliminary financial results for the year, the Company announced that Defendant Griffin would be stepping down from the role of CEO effective May 21, 2020, and would be succeeded by Defendant Colo.

126.    The statements referenced in ¶¶ 102–105, 107–112, 114–118, and 120–121 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain

internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

*February 26, 2020 Press Release and Conference Call*

127.     Finally, on February 26, 2020, the Company issued a press release containing the Company's fourth quarter and full year financial results for 2019, revealing that the Company had indeed fallen significantly short of its 2019 guidance on practically every metric. The press release disclosed that the Company had failed to complete a significant amount of the aged whiskey sales that the Individual Defendants had previously forecasted, stating the following:

- Consolidated sales decreased 11.8% to $92.5 million, as a result of a decline in Distillery Products segment sales, which was partially offset by an increase in Ingredient Solutions segment sales.
- Consolidated gross profit decreased 15.8% to $21.6 million, due to lower Distillery Products segment gross profits, partially offset by an increase in Ingredients Solutions segment gross profits.
- Consolidated operating income decreased 2.2% to $16.3 million, due to lower sales and gross profit, partially offset by lower incentive compensation expense.
- Earnings per share ("EPS") increased to $0.76 per share from $0.69 per share, due to lower income tax expense, partially offset by lower operating income.

128.     The press release quoted Defendant Griffin, who indicated that the Company would be reducing its forecast for aged whiskey sales in the future, stating the following:

"We are certainly disappointed in our results, both for the quarter and the year; however, we do not believe these results reflect significant changes in key consumer trends affecting the categories in which we compete, or significant changes in our competitive position within those categories," said Gus Griffin, president and CEO of MGP Ingredients. "While we remain very confident about the long-term potential of our business, we also realize that we must continually refine the effectiveness of our tactical execution and the pace of our strategic implementation. We believe we have learnings from this year that will help us in both these areas."

* * *

"Despite the lower than anticipated sales of aged whiskey in 2019, we still believe in the long-term value of our aged whiskey inventory. Sales of lightly aged whiskey in earlier years, and older aged whiskey in more recent years, have been both a strong customer recruitment tool and a key profit contributor. We believe sales of aged whiskey will continue to play both those roles going forward. However, *due to the inherent volatility in predicting sales of aged whiskey, and lower projections for the volumetric growth of the aged whiskey market, particularly in the U.S., we are reducing our forecast for predictable ongoing annual volume growth in our sales of aged whiskey*. The reduced outlook does not diminish our confidence in the long-term demand for our aged whiskey inventory but reflects the difficulty in forecasting aged whiskey sales in a particular year."

(Emphasis added.)

129.    That same day, the Company held a conference call to discuss the Company's financial results. During the call, Defendant Griffin disclosed that "we fell significantly short of our guidance due to us being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter."

130.    Also during the call, the following exchange took place between Defendant Griffin and an analyst:

[Analyst:] I wanted to ask about the aged whiskey transactions that failed to materialize in the fourth quarter.  Can you give us a little bit more color on the nature of those transactions . . . ?

* * *

[Defendant Griffin:] [A]t the end of the third quarter, we've stated very confidently that we thought we were going to transact the required number of sales to hit our guidance for the full year.  We said it was less than a dozen. . . .  [M]ost of them were established customers.  *We were very confident we were further along in the transaction process and so forth.  We learned some hard lessons in December.*

Some of the issues we've had in the past, funding came up, delays, people pushing off, things that we thought they were certainly going to – do happen. We had 1 sale just evaporate. Sometimes, we sell to a company who sells to somebody else. Some of the smaller customers might like to deal only with 1 supplier.  *So in essence, it's a customer of a customer. . . .  [S]ince it was a customer of a customer, was that really a viable sale to begin with?  We certainly thought so.*

And then . . . we had people put off because they'd found other temporary solutions. . . .

45

> *I think the key takeaway from that was we realized that there's continual things that we can't control, and so . . . we are not going to include things that are unpredictable in our forecast.*

(Emphasis added.)

131.    On this news, the price of the Company's stock fell once more, from $31.80 per share at the close of trading on February 25, 2020, to $28.42 per share at the close of trading on February 26, 2020 on high volume, representing a loss in value of approximately 11%.

## Repurchases

132.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $6.08 million to repurchase approximately 90,814 shares of its own common stock at artificially inflated prices.

133.    According to the Company's quarterly report on Form 10-Q filed with the SEC on November 1, 2018, during September 2018, the Company purchased 1,821 shares of its common stock for approximately $141,746, at an average price of $77.84 per share.

134.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during September 2018 was approximately $89,994.

135.    According to the 2018 10-K, during October 2018, the Company purchased 1,468 shares of its common stock for approximately $109,351, at an average price of $74.49 per share.

136.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during October 2018 was approximately $67,631.

137.     According to the Company's quarterly report on Form 10-Q filed with the SEC on May 1, 2019, during January 2019, the Company purchased 45,235 shares of its common stock for approximately $3.04 million, at an average price of $67.32 per share.

138.     As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during January 2019 was approximately $1.75 million.

139.     According to the Company's quarterly report on Form 10-Q filed with the SEC on May 1, 2019, during February 2019, the Company purchased 31,761 shares of its common stock for approximately $2.42 million, at an average price of $76.25 per share.

140.     As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during February 2019 was approximately $1.51 million.

141.     According to the Company's quarterly report on Form 10-Q filed with the SEC on July 31, 2019, during April 2019, the Company purchased 6 shares of its common stock for approximately $474, at an average price of $79.14 per share.

142.     As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during April 2019 was approximately $304.

143.     According to the Company's quarterly report on Form 10-Q filed with the SEC on October 31, 2019, during July 2019, the Company purchased 12 shares of its common stock for approximately $760, at an average price of $63.36 per share.

144.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during July 2019 was approximately $419.

145.    According to the Company's annual report on Form 10-K filed with the SEC on February 26, 2020, during November 2019, the Company purchased 456 shares of its common stock for approximately $20,469, at an average price of $44.89 per share.

146.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during November 2019 was approximately $7,510.

147.    According to the Company's annual report on Form 10-K filed with the SEC on February 26, 2020, during December 2019, the Company purchased 11 shares of its common stock for approximately $506, at an average price of $46.09 per share.

148.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during December 2019 was approximately $194.

149.    According to the Company's quarterly report on Form 10-Q filed with the SEC on April 30, 2020, during February 2020, the Company purchased 10,044 shares of its common stock for approximately $342,199, at an average price of $34.07 per share.

150.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during February 2020 was approximately $56,749.

151.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $3.5 million.

## DAMAGES TO MGP

152.    As a direct and proximate result of the Individual Defendants' conduct, MGP has lost and expended, and will lose and expend, many millions of dollars.

153.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company and its CEO, CFO, and former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

154.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

155.    Such losses include the Company's overpayment by approximately $3.5 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

156.    As a direct and proximate result of the Individual Defendants' conduct, MGP has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

157.    Plaintiff brings this action derivatively and for the benefit of MGP to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MGP, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

158.    MGP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159.     Plaintiff is, and has continuously been at all relevant times, a shareholder of MGP. Plaintiff will adequately and fairly represent the interests of MGP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

160.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

161.     A pre-suit demand on the Board of MGP is futile and, therefore, excused. At the time of filing of this action, the Board consisted of, and at the time of the filing of this amended complaint, the Board consists of the following nine individuals: Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord (the "Director-Defendants"), along with non-party Kerry Walsh Skelly (together, the "Directors"). Plaintiff needs only to allege demand futility as to five of these nine Directors.

162.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $3.5 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially

false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164.    Additional reasons that demand on Defendant Griffin is futile follow. Defendant Griffin has served as the Company's CEO since July 2014, and as President from July 2014 until March 2020. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Griffin with his principal occupation, and he receives handsome compensation as described above, including $2,153,228 during the fiscal year ended December 31, 2018. Defendant Griffin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those made during conference calls and contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted director, Defendant Griffin conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Griffin is a defendant in the Securities Class Actions. Thus, for these reasons, too, Defendant Griffin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Colo is futile follow. Defendant Colo has served as the Company's President and COO since March 16, 2020, and as a Company director since August 2015. Thus, as the Company admits, he is a non-independent director. Defendant Colo has received and continues to receive compensation for his roles with the Company as

described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Colo signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Colo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Bareuther is futile follow. Defendant Bareuther has served as a Company director since May 2016. He also serves as the Chair of the Human Resources and Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. Defendant Bareuther has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bareuther signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Bareuther breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Dunn is futile follow. Defendant Dunn has served as a Company director since May 2014. He also serves as the Chair of the Nominating and Governance Committee, and as a member of the Audit Committee and Human Resources and Compensation Committee. Defendant Dunn has received and continues to receive

compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dunn signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Dunn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.    Additional reasons that demand on Defendant Foglio is futile follow. Defendant Foglio has served as a Company director since May 2014. He also serves as a member of the Audit Committee and Nominating and Governance Committee. Defendant Foglio has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Foglio signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Foglio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Jenkins is futile follow. Defendant Jenkins has served as a Company director since January 2019. She also serves as a member of the Audit Committee, Human Resources and Compensation Committee, and Nominating and Governance Committee. As a trusted Company director, she conducted little, if any, oversight of

the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Jenkins signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Jenkins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170.   Additional reasons that demand on Defendant Seaberg is futile follow. Defendant Seaberg has served as the Chairman of the Board since December 2014, and as a Company director since May 2009. She also serves as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. Defendant Seaberg has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $3.48 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Seaberg signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Seaberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.   Additional reasons that demand on Defendant Strandjord is futile follow. Defendant Strandjord has served as a Company director since December 2013. She also serves as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. Defendant Strandjord has received and

continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Strandjord signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Strandjord breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

172.    Additional reasons that demand on the Board is futile follow.

173.    As described above, Defendant Seaberg directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Seaberg received proceeds of approximately $3.48 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to her, and excused.

174.    Additionally, each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

175.    Defendants Colo, Bareuther, Dunn, Foglio, Jenkins, and Strandjord (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

176.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Griffin and Bareuther both served in a variety of senior roles at Brown-Forman Corporation between 1994 and 2010, including as Senior Vice President and as COO, respectively. Additionally, Defendant Seaberg is the cousin of Defendant Page. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

177.    Demand in this case is excused as to Defendants Jenkins and Strandjord, along with non-party Kerry Walsh Skelly (the "Class B Directors"), because they are beholden to and controlled by Defendant Seaberg, whose 68% ownership of the Company's preferred stock provides her with effective control over the continued employment of the Company's Class B

Directors. Thus, the Class B Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Seaberg's control over them.

178.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

179.    MGP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MGP any part of the damages MGP suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

180.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

181. The acts complained of herein constitute violations of fiduciary duties owed by MGP officers and directors, and these acts are incapable of ratification.

182. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MGP. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MGP, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

183. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MGP to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

184. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

185.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

187.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

189.   Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

190.   Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

191.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including election of directors, ratification of the Company's independent auditor, and advisory approval of executive compensation.

192.   The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord, which allowed them to continue breaching their fiduciary duties to MGP.

193.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

194.    Plaintiff on behalf of MGP has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MGP. Not only is MGP now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon MGP by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging MGP.

197.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

198.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue

and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGP not misleading.

199.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by MGP. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

200.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

201.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

202.    Plaintiff on behalf of MGP has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

203. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

204. The Individual Defendants, by virtue of their positions with MGP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MGP and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MGP and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

205. Plaintiff on behalf of MGP has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

206. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MGP's business and affairs.

208. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MGP.

210.    In breach of their fiduciary duties owed to MGP, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company and its management did not have meaningful visibility into consumer demand for aged whiskey or relevant market trends; (2) the Company struggled to find customers interested in the Company's aged whiskey inventory, and had yet to make any significant sales of its aged whiskey at the prices that the Individual Defendants represented to investors; (3) as a result of the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

211.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

212.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

213.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in lucrative insider sales, netting proceeds of approximately $3.48 million.

214. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

215. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

216. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218.    Plaintiff on behalf of MGP has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGP.

221.    The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from MGP that was tied to the performance or artificially inflated valuation of MGP, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

222.    Plaintiff, as a shareholder and a representative of MGP, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

223.    Plaintiff on behalf of MGP has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

225.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused MGP to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

226.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

227.    Plaintiff on behalf of MGP has no adequate remedy at law.

### PRAYER FOR RELIEF

228.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of MGP, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MGP;

(c)     Determining and awarding to MGP the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing MGP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MGP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> 2.  a provision to permit the shareholders of MGP to nominate at least five candidates for election to the Board; and

> 3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding MGP restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 11, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Brent LaPointe
Brent LaPointe (KSD Bar No.:78539)
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: blapointe@rosenlegal.com
          pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

DocuSign Envelope ID: 45526B47-3750-4531-A4AA-7844E5B3B371

# VERIFICATION

I, Mitchell Dorfman, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this date of ___5/8/2020_____.

DocuSigned by:

*Mitchell Dorfman*

93D19A2F4883479...

Mitchell Dorfman