## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MITCHELL DORFMAN, derivatively on behalf of MGP INGREDIENTS, INC., | |
| Plaintiff, | **Case No.: 2:20-cv-02239** |
| v. | **DEMAND FOR JURY TRIAL** |
| AUGUSTUS C. GRIFFIN, THOMAS K. PIGOTT, BRANDON M. GALL, DAVID J. COLO, JAMES L. BAREUTHER, TERRENCE P. DUNN, ANTHONY P. FOGLIO, LYNN H. JENKINS, GEORGE W. PAGE, JR., KAREN L. SEABERG, and M. JEANNINE STRANDJORD, | |
| Defendants, | |
| and | |
| MGP INGREDIENTS, INC., | |
| Nominal Defendant. | |

### VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Mitchell Dorfman ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant MGP Ingredients, Inc. ("MGP" or the "Company"), files this Verified Amended Shareholder Derivative Complaint against Individual Defendants Augustus C. Griffin, Thomas K. Pigott, Brandon M. Gall, David J. Colo, James L. Bareuther, Terrence P. Dunn, Anthony P. Foglio, Lynn H. Jenkins, George W. Page, Jr., Karen L. Seaberg, and M. Jeannine Strandjord (collectively, the "Individual Defendants," and together with MGP, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of MGP, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange

1

Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MGP, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by MGP's directors and/or officers from August 2, 2018 through the present (the "Relevant Period").

2.      MGP is a Kansas-based producer and supplier of starch food ingredients and premium distilled spirits, including bourbon, whiskey, vodka, gin, and industrial alcohol.

3.      From 2000 through 2019, the popularity of American whiskey and Kentucky-based bourdon, especially, boomed. Accordingly, the whiskey market saw a steady increase each year during this time. MGP capitalized on this trend in 2011, when it purchased the historic Seagram's distillery in Indiana. Prior to 2015, the Company's whiskey offerings predominately consisted of unaged rye whiskeys, which the Company's customers would barrel and age themselves. Indeed, through the 2010s, MGP built a name for itself for manufacturing such sourced whiskey, dubbed by the Company as "new distillate." Numerous distilling company's, many small startups, and even larger companies in the industries purchased new distillate from the Company for their own selling and/or aging purposes. Many of these companies used the Company's sourced whiskey as

a stopgap, while their own whiskeys aged. In 2015, however, as part of a five-year growth strategy, MGP began barreling and aging its own whiskey, which the Company anticipated would sell for as much as three times the price of the Company's unaged whiskey, and would increase MGP's profit margins. MGP ultimately invested over $90 million in its stock of aged whiskey, and in the following years, the Individual Defendants touted the value of the Company's aged whiskey to investors at practically every turn.

4.      In late 2018, as the Company's aged whiskey inventory neared its ready-to-sell date, the Individual Defendants began ramping up their promotion of the Company's aged whiskey and the significant boost that MGP's related anticipated sales would purportedly provide to the Company's growth and income. Based on cost, the Company valued its investment strategy at $73 million as of August 2, 2018, according to a press release issued by the Company the same day. By that point, the Company's distilled spirits sales accounted for 80% of MGP's revenue. With its new strategy to sell its own aged whiskey, the Company sought to increase this proportion even further. Among other things, the Individual Defendants represented, and continued to represent throughout the Relevant Period: (1) their confidence in the demand for and the pricing of the Company's aged whiskey; (2) the Company's "positive discussions" with both existing and potential customers regarding aged whiskey; (3) the "detailed forecasting" that had been conducted on MGP's customers, which purportedly bolstered the Individual Defendants' confidence in their line of sight into sales of aged whiskey; and (4) that the Company had already begun "contracting" and "transacting" portions of its aged whiskey inventory.

5.      However, during this same time period, certain market trends—which were well-known to the Individual Defendants, yet left unaddressed with and concealed from the public—had caused competition in the aged whiskey arena to increase dramatically, rendering the

Company's planned foray into aged whiskey potentially disastrous. These trends included the transformation of many of MGP's former customers into competitors, as well as the entry of larger, more established distillers into the aged whiskey market. Many of these entities also had certain competitive advantages—such as attractive brand names, or facilities located in Kentucky, the heartland of whiskey production in the U.S.—that MGP simply could not match. Companies that had utilized MGP's sourced whiskey as a stopgap while their own whiskey aged were also ready to sell those products to the market by 2019, and the Company faced immense pricing pressure from its customers who had purchased more whiskey from the Company than they ended up needing at the same time that MGP was beginning to sell its own inventory. These customers, in their attempts to offload the excess inventory sold barrels of whiskey at significantly reduced prices (around $1,400-$1,500 per barrel) compared to MGP's initial offerings at $2,100 per barrel.

6.     As such, there was little basis for the Individual Defendants' optimistic representations. Despite the simultaneous increase in competition that would foreseeably impact the Company's planned expansion into the aged whiskey market, the Individual Defendants continued to tout MGP's strong positioning for accelerated growth. Over the course of the Relevant Period, the Company raised the valuation of its aged whiskey inventory from $73 million to $95 million. Analysts and investors reacted positively, as the Company neared its long-awaited entry into the aged whiskey market. Although the Individual Defendants claimed to have significant insight into consumer demand for the Company's aged whiskey and related trends in the whiskey market as a whole, when the Company's aged whiskey inventory became ready to sell in early 2019, the Company struggled to make any significant sales, let alone at the favorable price points the Individual Defendants promised to investors.

7.     The truth emerged gradually in a series of press releases and conference calls beginning in May 2019 and continuing through the beginning of 2020. First, on May 1, 2019, the Company disclosed disappointing quarterly financial results for the first quarter ended March 31, 2019, which the Individual Defendants attempted to blame on the timing of certain sales.

8.     On this news, the price of the Company's stock dropped by roughly 23%, falling from $87.87 per share at the close of trading on April 30, 2019, to $67.79 per share at the close of trading on May 1, 2019. Still, the Individual Defendants continued to reassure investors that the Company's sales would accelerate over the year.

9.     Yet, on July 31, 2019, the Company announced lackluster financial results for the second fiscal quarter of 2019 as well, along with a reduction in the Company's fiscal 2019 guidance, owing to poor aged whiskey sales. Despite this, the Individual Defendants continued to assert that the Company was on track to reach its forecasted sales figures, with Defendant Augustus C. Griffin ("Griffin"), the Company's Chief Executive Officer ("CEO") claiming that the Company was "in active, ongoing discussions with specific customers for another approximately 60% of those projected sales."

10.     On this news, the price of the Company's stock dropped by over 25%, plunging from $67.14 per share at the close of trading on July 30, 2019, to $49.99 per share at the close of trading on July 31, 2019.

11.     Negative news about MGP's failed aged whiskey experiment continued to ensue. On October 31, 2019, the Company disclosed yet more disappointing quarterly results, again due to meager sales of aged whiskey. As before, the Individual Defendants reiterated that they possessed a clear line of sight into demand for aged whiskey, and expected the Company to meet its revised 2019 guidance.

12.     On this news, the price of the Company's stock dropped by almost 12%, falling from $48.49 per share at the close of trading on October 30, 2019, to $42.89 per share at the close of trading on October 31, 2019.

13.     On January 17, 2020, the Company issued its preliminary full year 2019 financial results, revealing that the Company was approximately $30 million short and far from reaching the fiscal 2019 guidance that the Individual Defendants had reaffirmed to the market only two months before the end of that fiscal year. Indeed, in the Company's earnings release issued that day, Defendant Griffin admitted that the Company did not have the "line of sight we believed we had to these aged sales."

14.     On this news, the price of the Company's stock plummeted by over 27%, falling from $52.78 per share at the close of trading on January 16, 2020, to $38.18 per share at the close of trading on January 17, 2020.

15.     Not long afterward, on February 11, 2020, the Company announced that Defendant Griffin would be stepping down as the Company's CEO on May 21, 2020, to be replaced in that role by Defendant David J. Colo ("Colo").

16.     At last, on February 26, 2020, the Company announced its fourth quarter and full year financial results for the year ended December 31, 2019, disclosing that the Company had indeed failed to meet its 2019 guidance by a wide margin, largely due to the Company's failure to transact "a large portion of the aged whiskey sales" that the Individual Defendants had forecasted.

17.     On this news, the price of the Company's stock fell over 10%, from $31.80 per share at the close of trading on February 25, 2020, to $28.42 per share at the close of trading on February 26, 2020, wiping out $57 million in market capitalization, and representing a total decline

of over 60% during the Relevant Period. In total, the Company's market capitalization experienced a decline of over $1 billion.

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

19.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

21.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in lucrative insider sales, netting proceeds of approximately $3.48 million. Approximately 90,814 shares of the Company's common stock were repurchased during the Relevant Period for over $6.08 million. As the Company's stock was actually only worth $28.42 per share during that time, the price at closing on February 26, 2020, the Company overpaid by over $3.5 million in total.

22.     In light of the Individual Defendants' misconduct, which has subjected MGP, its former CEO, and its former Chief Financial Officer ("CFO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the District of Kansas (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefited from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or

independent directors, a majority of MGP's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

30.     Venue is proper in this District because MGP and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

31.     Plaintiff is a current shareholder of MGP common stock. Plaintiff has continuously held MGP common stock at all relevant times.

### Nominal Defendant MGP

32.     MGP is a Kansas corporation with its principal executive offices at Cray Business Plaza, 100 Commercial Street, Box 130, Atchison, Kansas 66002. MGP's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MGPI."

### Defendant Griffin

33.     Defendant Griffin served as the Company's CEO and President from July 2014 until he resigned from his positions with the Company on May 21, 2020. According to the Company's Schedule 14A filed with the SEC on May 19, 2020 (the "2020 Proxy Statement"), as of May 4, 2020, Defendant Griffin beneficially owned 121,809 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Griffin owned approximately $4.69 million worth of MGP stock.

34.     For the fiscal year ended December 31, 2018, Defendant Griffin received $2,153,228 in compensation from the Company. This included $595,001 in salary, $741,458 in stock awards, $778,055 in non-equity incentive plan compensation, and $38,714 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Griffin received $1,568,011 in compensation from the Company. This included $655,000 in salary, $778.050 in

stock awards, $96,785 in non-equity incentive plan compensation, and $38,176 in all other compensation.

35.     The Company's Schedule 14A filed with the SEC on April 9, 2019 (the "2019 Proxy Statement") stated the following about Defendant Griffin:

> Mr. Griffin has served as President and Chief Executive Officer since July 2014. Immediately prior to joining MGP, he served as Executive Vice President of Marketing for Next Level Spirits, a northern California-based producer, importer, and distributor of premium wine and spirits brands. Between November 2011 and March 2013, Mr. Griffin served as brand and business consultant for Nelson's Green Brier, Tennessee. He served for 24 years with Brown-Forman Corporation in increasingly important brand management and general management roles, where he ultimately became Senior Vice President and Global Managing Director in charge of the company's flagship Jack Daniel's business in 2008. The Company believes Mr. Griffin's qualifications to serve on the Board include extensive alcohol beverage industry experience and expertise and the insights he brings from his service as our President and Chief Executive Officer.

**Defendant Pigott**

36.     Defendant Thomas K. Pigott ("Pigott") served as the Company's CFO (or principal financial officer) and Vice President of Finance from September 2015 until he resigned on March 29, 2019. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Pigott beneficially owned 12,589 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Pigott owned approximately $485,683 worth of MGP stock.

37.     For the fiscal year ended December 31, 2018, Defendant Pigott received $1,119,828 in compensation from the Company. This included $390,000 in salary, $346,284 in stock awards, $357,313 in non-equity incentive plan compensation, and $26,231 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Pigott received $479,213 in compensation from the Company. This included $113,114 in salary, $356,928 in stock awards, and $9,171 in all other compensation.

**Defendant Gall**

38.     Defendant Brandon M. Gall ("Gall") has served as the Company's CFO and Vice President of Finance since April 1, 2019, and as the Company's Corporate Controller since June 2018. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Gall beneficially owned 20,348 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Gall owned approximately $785,025 worth of MGP stock.

39.     For the fiscal year ended December 31, 2019, Defendant Gall received $530,209 in compensation from the Company. This included $256,692 in salary, $235,787 in stock awards, $20,280 in non-equity incentive plan compensation, and $17,450 in all other compensation.

40.     The Company's website stated the following about Defendant Gall:[1]

Brandon Gall has served as Vice President of Finance and Chief Financial Officer since April 2019. He has served as MGP's Corporate Controller since June of 2018. During his seven-year tenure with the Company, Gall has advanced through a steady progression of leadership roles, including Director of Financial Planning & Analysis, Director of Supply Chain Finance, Director of Business Development and most recently, Corporate Controller.

Brandon holds a bachelor's degree of business administration from Miami University and an MBA from the University of Chicago. Gall is also a certified CPA.

**Defendant Colo**

41.     Defendant Colo has served as the Company's President and CEO since May 21, 2020, and as a Company director since August 2015. He previously served as the Company's President and Chief Operating Officer ("COO") from March 16, 2020 through May 21, 2020. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Colo beneficially owned

---

[1]https://www.mgpingredients.com/about-mgp/our-people/executive-leadership/brandon-gall.html (last visited July 23, 2020).

14,818 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Colo owned approximately $571,678 worth of MGP stock.

42.     For the fiscal year ended December 31, 2018, Defendant Colo received $110,500 in compensation from the Company. This included $271 in fees earned or paid in cash and $110,229 in common stock. For the fiscal year ended December 31, 2019, Defendant Colo received $152,000 in compensation from the Company. This included $121 in fees earned or paid in cash and $151,879 in common stock.

43.     The 2020 Proxy Statement stated the following about Defendant Colo:

Mr. Colo was appointed as the President and Chief Operating Officer of the Company in March 2020 and will become the Company's Chief Executive Officer in May 2020, upon the retirement of Mr. Griffin. Previous to that, he served as President, Chief Executive Officer and a director of SunOpta, Inc. from February 2017 to February 2019. He served as Executive Vice President and Chief Operating Officer of Diamond Foods, Inc. from 2013 until March 2016. He joined Diamond Foods in 2012 as Executive Vice President of Global Operations and Supply Chain. For the three years prior to joining Diamond Foods, Mr. Colo served as an independent industry consultant focusing on organizational optimization and planning. From 2003 to 2005, he served as President of ConAgra Food Ingredients. Before his employment at ConAgra Foods, Mr. Colo spent several years with Nestle-Purina Pet Care Company in roles of increasing responsibility, including Vice President of Supply for the company's Golden Products Division, and Vice President of Store Brands and Venture Development. He also served two years as President of the American Dehydrated Onion and Garlic Association. The Company believes that Mr. Colo's qualifications to serve on the Board include his extensive management experience, his experience in the food industry, and the insights he brings from his service as an officer of the Company.

**Defendant Bareuther**

44.     Defendant James L. Bareuther ("Bareuther") has served as a Company director since May 2016. He also serves as the Chair of the Human Resources and Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Bareuther

13

beneficially owned 4,522 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Bareuther owned approximately $174,458 worth of MGP stock.

45.    For the fiscal year ended December 31, 2018, Defendant Bareuther received $104,000 in compensation from the Company. This included $55,840 in fees earned or paid in cash and $48,160 in common stock. For the fiscal year ended December 31, 2019, Defendant Bareuther received $148,000 in compensation from the Company. This included $62,396 in fees earned or paid in cash and $85,604 in common stock.

46.    The 2020 Proxy Statement stated the following about Defendant Bareuther:

Mr. Bareuther served as Chief Operating Officer of Brown-Forman Corporation from 2003 until his retirement in 2010. At Brown-Forman, he was responsible for the company's spirits and wine business in more than 140 countries across the globe. Prior to joining Brown-Forman as Director of U.S. sales in 1994, Mr. Bareuther was Executive Vice President of Sales and Marketing for the Seagram Classics Wine Company in New York and California. He previously worked for Beringer Vineyards, a leading wine firm in Napa Valley, California. He is a former three-term Chairman of the Distilled Spirits Council of the United States (DISCUS), a national trade association based in Washington, D.C. representing producers and marketers of distilled spirits sold in the United States and around the world. He has served as a director of First Beverage Group since 2012 and as chairman of its board of directors since April 2014. Additionally, Mr. Bareuther served on the board of directors of Luna Winery from 2013 to 2019 and served on the board of directors of Windy Hill Spirits from 2012 until its sale in 2016. Mr. Bareuther chairs the Advisory Board for the College of Business at San Jose State University. The Company believes that Mr. Bareuther's qualifications to serve on the Board include his extensive expertise experience in the alcohol beverage industry.

**Defendant Dunn**

47.    Defendant Terrence P. Dunn ("Dunn") has served as a Company director since May 2014. He also serves as the Chair of the Nominating and Governance Committee, and as a member of the Audit Committee and Human Resources and Compensation Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Dunn beneficially owned 70,414 shares of

the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Dunn owned approximately $2.71 million worth of MGP stock.

48.    For the fiscal year ended December 31, 2018, Defendant Dunn received $108,000 in compensation from the Company. This included $234 in fees earned or paid in cash and $107,766 in common stock. For the fiscal year ended December 31, 2019, Defendant Dunn received $152,000 in compensation from the Company. This included $121 in fees earned or paid in cash and $151,879 in common stock.

49.    The 2020 Proxy Statement stated the following about Defendant Dunn:

Mr. Dunn served as President and Chief Executive Officer of J.E. Dunn Construction Group Inc. (formerly known as Dunn Industries) from 1989 until his retirement in 2015. From 1989 to January 2020, he served as a director of J.E. Dunn Construction Group. J.E. Dunn Construction Group Inc. is headquartered in Kansas City, Missouri, and is the holding company for commercial contractor and construction company affiliates across the nation, including J.E. Dunn Construction Company. He served as a director of Kansas City Southern from 2007 to 2019. Mr. Dunn served as a director of Commerce Bank of Kansas City from 1993 until 1997, H&R Block Bank from 2007 until 2009, and UMB Financial Corp. from 2003 to 2017. Mr. Dunn brings significant board and governance experience from his service as past director of the board of the Federal Reserve Bank of Kansas City from 1998 until 2003 and from serving on the boards of directors of businesses having operations within the Company's geographic footprint. He also has extensive management skills as the former chief executive of a large construction company having offices throughout the United States, operations experience in project management with responsibilities for budgeting, and in the management of significant growth of his company in geographic scope and volume over the past 20 years. The Company believes that Mr. Dunn's qualifications to serve on the Board include his extensive executive experience in managing a capital intensive business, as well as his experiences and expertise in corporate finance and accounting, strategic planning, executive compensation matters and his board leadership skills.

**Defendant Foglio**

50.    Defendant Anthony P. Foglio ("Foglio") has served as a Company director since May 2014. He also serves as a member of the Audit Committee and Nominating and Governance

Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Foglio beneficially owned 39,284 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Foglio owned approximately $1.51 million worth of MGP stock.

51.    For the fiscal year ended December 31, 2018, Defendant Foglio received $106,500 in compensation from the Company. This included $76,570 in fees earned or paid in cash and $29,930 in common stock. For the fiscal year ended December 31, 2019, Defendant Foglio received $147,000 in compensation from the Company. This included $82,019 in fees earned or paid in cash and $64,981 in common stock.

52.    The 2020 Proxy Statement stated the following about Defendant Foglio:

> Mr. Foglio's career spans over 40 years in the alcohol beverage industry. From 2010 to 2017 he served as a partner of Anchor Brewers and Distillers, and has served as chairman of and partner its successor entity, Hotaling & Co., since 2017. From 2008 until 2010, he served as the Chairman of Preiss Imports, which merged into Anchor Brewers and Distillers. He served as the Chairman of Skyy Spirits, LLC from 2006 to 2008 and as the President and CEO of Skyy Spirits from 1998 to 2006. Mr. Foglio helped Skyy Spirits become a multi-brand portfolio, spanning a variety of categories, including vodkas, tequilas, rums, gins, whiskeys, cordials, liqueurs and distinctive Campari brands. During his career, Foglio has fostered profitable growth and development of world-renowned brands including SKYY Vodka, 1800 Tequila, Smirnoff Vodka, Bailey's Irish Cream, Jose Cuervo Tequila, and J & B Scotch, and is now leading the focus within the craft spirits world via Hotaling & Co. The Company believes that Mr. Foglio's qualifications to serve on the Board include his extensive expertise and experience in the alcohol beverage industry and management of the growth and development of multi-brand portfolios.

**Defendant Jenkins**

53.    Defendant Lynn H. Jenkins ("Jenkins") has served as a Company director since January 2019. She also serves as a member of the Audit Committee, Human Resources and Compensation Committee, and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Jenkins beneficially owned 2,604 shares of the

Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Jenkins owned approximately $100,462 worth of MGP stock.

54.     For the fiscal year ended December 31, 2019, Defendant Jenkins received $158,975 in compensation from the Company. This included $32,550 in fees earned or paid in cash and $126,425 in common stock.

55.     The 2020 Proxy Statement stated the following about Defendant Jenkins:

Ms. Jenkins was elected to the Board of the Company on January 31, 2019. Ms. Jenkins is a certified public accountant who served nearly 20 years in elective office. Her professional career began in public accounting. She represented the 2nd Congressional District of Kansas in the U.S. House of Representatives from 2009 until her retirement at the end of her term in 2019. She previously served as the Kansas State Treasurer from 2003 to 2008, in the Kansas Senate from 2000 to 2002, and in the Kansas House of Representatives from 1999 to 2000. The Company believes that Ms. Jenkins accounting background as well as her extensive experience in government qualify her for service on the Board.

**Defendant Page**

56.     Defendant George W. Page, Jr. ("Page") served as a Company director from 2014 until he resigned on April 9, 2019.

57.     For the fiscal year ended December 31, 2018, Defendant Page received $103,500 in compensation from the Company. This included $73,570 in fees earned or paid in cash and $29,930 in common stock. For the fiscal year ended December 31, 2019, Defendant Page received $40,000 in compensation from the Company, which consisted entirely of fees earned or paid in cash.

58.     The Company's Schedule 14A filed with the SEC on April 9, 2018 (the "2018 Proxy Statement") stated the following about Defendant Page:

Mr. Page has, since 2013, served as an independent consultant for valve marketing and engineering design at Page Solutions. He has extensive general management

experience, as well as experience leading product development, engineering, manufacturing, operations, and sales. From 1998 until 2012, he served as the Engineering Director of Spence Engineering at Circor International Inc., a company that designs, manufactures, and markets valves and other highly-engineered products used in the energy, aerospace and industrial markets. He also held various management positions at Fisher Instruments / H.D. Baumann Assoc. Ltd., a global designer, manufacturer and supplier of control valves and regulators, from 1992 until 1998. Mr. Page served as the President and Chairman of the Board of Center for Graphic Communications, Inc., a commercial printing company, from 1988 until 1992. Mr. Page is the cousin of Karen L. Seaberg. The Company believes that Mr. Page's qualifications to serve on the Board include his business and educational experiences.

**Defendant Seaberg**

59.     Defendant Karen L. Seaberg ("Seaberg") has served as the Chairman of the Board since December 2014, and as a Company director since May 2009. She also serves as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Seaberg beneficially owned 3,632,869 shares of the Company's common stock, which represented 21.5% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Seaberg owned approximately $140 million worth of MGP stock.  Additionally, as of May 4, 2020, Defendant Seaberg owned 297 shares of the Company's preferred stock, which represented 68% of the Company's outstanding shares of preferred stock on that date. Defendant Seaberg's majority ownership of the Company's preferred stock affords her control over the election of the Company's Class B directors.

60.     For the fiscal year ended December 31, 2018, Defendant Seaberg received $134,500 in compensation from the Company. This included $268 in fees earned or paid in cash and $134,232 in common stock. For the fiscal year ended December 31, 2019, Defendant Seaberg

received $187,250 in compensation from the Company. This included $104 in fees earned or paid in cash and $187,146 in common stock.

61.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seaberg made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 9/25/2018 | 1,546 | $77.75 | $120,201 |
| 9/27/2018 | 2,435 | $60.03 | $146,173 |
| 9/28/2018 | 24,427 | $60.72 | $1,483,207 |
| 12/10/2018 | 3,225 | $79.22 | $255,484 |
| 12/12/2018 | 7,644 | $78.69 | $601,506 |
| 3/15/2019 | 11,175 | $78.33 | $875,337 |

62.     Thus, in total, before the fraud was exposed, she sold 50,452 Company shares on inside information, for which she received over $3.48 million. Her insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

63.     The 2020 Proxy Statement stated the following about Defendant Seaberg:

Ms. Seaberg has been Chairman of the Board of the Company since December 2014 and a director since 2009. Ms. Seaberg is a member of the Heartland chapter of National Association of Corporate Directors and the Kansas City chapter of Women Corporate Directors (WCD). She has been an executive travel agent and minority owner of Travel Center of Atchison for 31 years. Ms. Seaberg is active in civic affairs at both the local and national level. She was instrumental in the creation of Atchison's $4.2 million Riverfront Park in 2004 and was the Kansas Governor's Chair for the national Lewis and Clark Bicentennial Commemoration in 2002-2006, bringing one of 15 national events to Atchison, Leavenworth and Kansas City in 2004. She also served on the Lewis & Clark Trail Heritage Foundation board, a national not-for-profit based in Great Falls, MT, from 2003 to 2007 and as its national president from 2007 to 2008. Ms. Seaberg has been the chair of the annual Amelia Earhart Festival since 1997, which brings over 40,000 people to Atchison every year in July. Ms. Seaberg served on the Atchison Hospital Board from 1990 to 2004, and presently serves on the Board of the Cray Medical Research Organization at the University of Kansas Medical Center, Kansas City, Kansas. She

also serves as a board member of the national Lewis and Clark Trust and is chair of the Atchison Amelia Earhart Foundation. In 2015, she was recipient of the Hall of Fame award from the Chamber of Commerce and the Vision of Excellence award from the Santa Fe Depot Trustees in Atchison, Kansas. The Company believes that Ms. Seaberg's qualifications to serve on the Board include her business and civic experience and organizational skills, her knowledge of the Company and the industries in which it operates, her familiarity with the community in which the Company operates and her significant stock ownership.

**Defendant Strandjord**

64.     Defendant M. Jeannine Strandjord ("Strandjord") has served as a Company director since December 2013. She also serves as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. According to the 2020 Proxy Statement, as of May 4, 2020, Defendant Strandjord beneficially owned 44,210 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 4, 2020 was $38.58, Defendant Strandjord owned approximately $1.70 million worth of MGP stock.

65.     For the fiscal year ended December 31, 2018, Defendant Strandjord received $117,500 in compensation from the Company. This included $65,353 in fees earned or paid in cash and $52,147 in common stock. For the fiscal year ended December 31, 2019, Defendant Strandjord received $159,000 in compensation from the Company. This included $69,298 in fees earned or paid in cash and $89,702 in common stock.

66.     The 2020 Proxy Statement stated the following about Defendant Strandjord:

Ms. Strandjord has over 40 years of financial management experience and was employed in three different and diverse industries after starting in public accounting on the audit staff of Ernst and Whinney in 1968. For 20 years, beginning in 1985, she held several senior financial and related senior management roles at Sprint Corporation. She managed the successful transformation and restructuring of Sprint as Chief Integration Officer from 2003 until 2005 when she retired. She was Senior Vice President and Chief Financial Officer of Global Solutions, a $9 billion division, from 1998 until 2003 and was Controller and Treasurer for Sprint Corporation from 1986 to 1998. Ms. Strandjord served as a director of American

Century Mutual Funds (for six registered investment companies) from 1994 to 2018. From 1996 through May 2012, she was a director of DST Systems, Inc., where she chaired the Audit Committee and sat on the Compensation Committee and Governance and Nominating Committee. Ms. Strandjord has been a director of Euronet Worldwide, Inc. since 2001. Ms. Strandjord was Euronet's Lead Independent Director from 2010 to 2014 and continues to be the Chair of Euronet's Audit Committee. The Company believes that Ms. Strandjord's qualifications to serve on the Board include her experience on the boards of various other public companies, as well as her background in finance, corporate governance, restructuring, talent management, and compensation and benefits.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

67.     By reason of their positions as officers, directors, and/or fiduciaries of MGP and because of their ability to control the business and corporate affairs of MGP, the Individual Defendants owed MGP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGP in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MGP and its shareholders so as to benefit all shareholders equally.

68.     Each director and officer of the Company owes to MGP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MGP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the officers and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MGP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MGP's Board at all relevant times.

72.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73.     To discharge their duties, the officers and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of MGP were required to, among other things:

(a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGP's own Code of Conduct;

(b)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)   remain informed as to how MGP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of MGP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGP's operations would comply with all applicable laws and MGP's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to MGP and the shareholders the duty of loyalty requiring that each favor MGP's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of MGP and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, and directorial positions with MGP, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by MGP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of MGP, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MGP and was at all times acting within the course and scope of such agency.

## MGP'S CODE OF CONDUCT

83.     The Company's Code of Conduct provides that it is "applicable to all of our directors, designated officers (as defined below) and other officers and employees of MGP Ingredients, Inc. ("MGPI") and its subsidiaries."

84.     In a section titled, "Accurate and Timely Periodic Reports," the Code of Conduct states the following:

> MGPI is a public company that is committed to providing investors with full, fair, accurate, timely and understandable disclosure in the periodic reports that it is required to file and in other public communications that it makes. MGPI expects our designated officers and others responsible for such matters to:
>
> - comply with generally accepted accounting principles at all times;
> - maintain a system of internal accounting controls that will provide reasonable assurances to management that all transactions are properly recorded;
> - maintain books and records that accurately and fairly reflect our transactions;
> - prohibit the establishment of any undisclosed or unrecorded funds or assets;
> - maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our periodic reports are being prepared; and
> - present information in our periodic reports and other public communications in a full, fair, accurate, timely, clear and understandable manner.
>
> No one should engage in "off the record" transactions and each of you should report accurately and completely all financial transactions to the appropriate accounting department personnel.

85.     In a section titled, "Compliance with the Law," the Code of Conduct states the following, in relevant part:

> If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and written Company policies that you should be particularly reminded of because of the nature of the Company's business.
>
> * * *
>
> <u>Personal Use of Company Property.</u> Do not use Company property for your own personal interest unless that use has been properly authorized. Company property includes many things such as automobiles, confidential Company information,

26

business opportunities that belong to the Company, and the like. A use is properly authorized only if it has been approved by one or more Company officers who have authority to grant such approval. Do not seek permission from someone whom you know does not have the authority to grant it. As a corollary, do not grant permission if you do not have authority to do so.

* * *

Trading in the Company's Stock. You are subject to the terms of the Company's Insider Trading Policy.

86.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight over the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

87.     Founded in 1941 in Atchison, Kansas, MGP is a producer and supplier of starch ingredients and distilled alcohol. The Company has two reportable segments: Ingredients Solutions, which handles the Company's production and sale of starch ingredients, including wheat starches and proteins for use in a variety of food products, and  Distillery Products, through which the Company produces and sells food grade alcohol, such as bourbon, whiskey, vodka, and gin, as well as distillery co-products, including fuel grade alcohol and corn oil. The Company's

fuel grade alcohol is used in environmentally friendlier gasoline blends. MGP's Distillery Products segment also provides warehouse services for the Company's customers to store and retrieve barrels of purchased products. The Company's distilled products account for over 80% of its overall revenues.

88.    Historically, the Company's distillery business was primarily dependent on producing and selling vodka, gin, and other grain neutral spirits ("white goods"), as well as food grade and industrial alcohol to be used as ingredients in food, personal care products, and pharmaceuticals. Beginning in 2011, in response to changing tastes in the market for spirits, the Company began shifting its focus to the production of darker, premium liquors, such as bourbon and rye whiskey ("brown goods").

**Whiskey Production in the U.S.**

89.    During the 19th and 20th centuries, demand for whiskey in the U.S. was relatively low compared to other hard liquors such as gin and vodka, although it had once been popular during the years of colonial America. Around the turn of the 21st century, however, whiskey began enjoying a resurgence in popularity, in part due to the modern "craft cocktail movement," which has seen many lesser-known liquors rise out of obscurity. In 2019, for instance, 26 million cases of whiskey were sold in the U.S.—approximately double the amount sold in 2002.[2]

90.    The six variations of American whiskey include rye whiskey, rye malt whiskey, malt whiskey, wheat whiskey, bourbon whiskey, and corn whiskey. Much of America's whiskey supply, as well as nearly all of the world's supply of bourbon—an American corn-based whiskey— is produced in the state of Kentucky. Many aspects of Kentucky's natural environment, such as its

---

[2] https://www.distilledspirits.org/wp-content/uploads/2020/04/American-Whiskey-2019.pdf (last visited July 24, 2020).

blue limestone foundation, fertile soil, and mineral-rich water are ideal for distilling whiskey. As a result, Kentucky-produced whiskey is often associated with high quality and exclusivity, with bottles from certain renowned Kentucky-based distilleries selling for as much $1,500 or more.

91.     Unlike white goods, whiskey must be aged in barrels for two or more years before it is ready to drink, which substantially increases the amount of time it takes for distillers to bring newly manufactured whiskey to market. This aspect of the whiskey-distilling process has made it difficult for businesses seeking to enter the whiskey market in the 2010's to capitalize on the ongoing "whiskey boom." The six variations of whiskey mentioned above are also subject to federal regulatory requirements under Title 27 of the U.S. Code of Federal Regulations, which require each type of whiskey to contain a specified percentage of rye, wheat, or corn (51%) and prohibits distillation percentages of alcohol as well—among other restrictions.

92.     To address the aging requirements of whiskey, many whiskey producers entering the market in recent years have resorted to sourcing fully or partially aged whiskey from larger producers as their own whiskey ages. Many of these non-distiller producers, or "NDPs," are small, independently-owned "craft" distilleries that intend to forego sourcing whiskey from larger producers once they have established themselves and accumulated enough capital to begin producing and aging their own whiskey. These small distilleries had opportunities to establish craft brands that appealed to the increasing preference for native whiskey production. The Company itself has been under scrutiny in the past for sourcing whiskey to other distillers who then advertised their products as handcrafted—when those same products were tied to MGP's factories. The tension, described below, between NDPs and sourced whiskey also created a challenge for MGP in its own efforts to launch its aged whiskey business out of its Indiana factory—and to successfully compete in the premium whiskey market where the Individual Defendants knew there

was a consumer preference for the unique "craft" whiskey experience.

**The Company Begins Acting on Plans to Capitalize on the Whiskey Boom**

93.     In or around 2011, MGP's management determined that demand for whiskey and other brown goods had begun to outpace demand for white goods, which at the time accounted for the majority of the Company's business. As noted above, the whiskey market was experiencing a significant boom in the U.S., which had started in the early 2000s and continued through the decade into the 2010s. Seeking to expand its business into this lucrative arena, in November 2011, the Company announced that it had entered into an agreement to acquire a historic whiskey distillery in Lawrenceburg, Indiana, formerly operated by Seagram's. In a Form 10-Q filed with the SEC on November 9, 2011, the Company stated that the Lawrenceburg facility would "add significant new production capacity to our food grade alcohol area and enables us to begin producing premium bourbon and corn and rye whiskeys, while also increasing our gin and grain neutral spirits output."

94.     The Company's acquisition of the Lawrenceburg distillery closed in December 2011, and subsequently, the Company began using the facility to produce unaged whiskey distillate. Part of the Company's expansion strategy involved hiring Defendant Griffin, who had specialized experience in the brown spirits sales market. By 2016, unaged whiskey distillate made up the majority of the brown goods produced by the Company.

95.     During this same period, the Company began sourcing a significant amount of the whiskey distillate produced at the Lawrenceburg distillery to NDPs. Perhaps understandably, many of these NDPs have downplayed, or even attempted to conceal the fact that MGP is the source of their whiskey. Generic, factory-produced Indiana whiskey carries with it none of the appeal or prestige commonly associated with "handcrafted" Kentucky whiskey. In a July 28, 2014 article titled, "Your Craft Whiskey is Probably from a Factory Distillery in Indiana," the Daily Beast

reported on this phenomenon as follows:[3]

> The artisan whiskey industry has a big secret—many of the 'small-batch' distillers are actually buying their product from a large factory in Indiana.
>
> * * *
>
> "I have purchased hundreds of barrels of rye and bourbon from them," John Bernasconi admits when asked about the Indiana factory. A principal in the New Mexico company, Bernasconi says that purchasing whiskey from MGP and bottling it is "a means to develop a brand and help fund the next step" of actually distilling a unique product. It may be a sensible enough business strategy, but as whiskey writer Charles Cowdery points out, "There's no reason to think anyone knows how to make whiskey or can learn how to make whiskey based on buying whiskey." Cowdery has been railing for years against the proliferation of what he calls "Potemkin distilleries," many of which own shiny new copper stills to wow visitors, but actually sell factory-made spirits they've acquired in bulk.
>
> * * *
>
> Some on the long list own up to the source of their whiskies, but many do their best to suggest they've made it themselves. "New companies want to sell product as local or artisanal, and so that's what they claim," says Ury, who has been trying to do something about the practice. By day, Ury is a lawyer, and he has been needling the federal Alcohol and Tobacco Tax and Trade Bureau to be more aggressive in enforcing regulations requiring that whiskey bottles disclose where the spirit inside was distilled.
>
> It isn't just small start-ups using MGP rye. Though Bulleit is owned by drinks behemoth Diageo, the highly touted brand maintains a craft whiskey vibe, especially Bulleit Rye. The brand's website says that "High rye content has always been the signature of Tom Bulleit's distinctive bourbon. It was only a matter of time before he created a rye whiskey." But "creating" isn't the same thing as "distilling," and, as Bulleit Rye properly discloses on its back label, the whiskey in the bottle comes from Lawrenceburg, Indiana.
>
> * * *
>
> Another challenge actual craft distillers face is that the armies of new rye drinkers have come to expect whiskey with a particular flavor—that is, the taste of MGP rye. "If you've tried Dickel rye, Redemption, and Templeton, you'd think that's how rye whiskey should taste," says Clay Risen, author of American Whiskey, Bourbon & Rye. MGP's whiskies are marketed under so many different labels that they "have colored perceptions" of what rye should be.

---

[3]     https://www.thedailybeast.com/your-craft-whiskey-is-probably-from-a-factory-distillery-in-indiana (last visited July 28, 2020).

96.     The above facts also point to the existence of a significant obstacle to MGP's strategy to enter the market for whiskey—namely, the inherent tension between MGP's status as a large, industrial distiller, and the desire on the part of many whiskey consumers for whiskey from small, artisanal distillers, particularly those based in Kentucky. Historically, this presented few difficulties for MGP, as many of the artisanal distillers that MGP would otherwise be competing with were in fact MGP's customers, and were dependent on MGP's distillate. However, as these distillers gradually transitioned from NDP status to being self-sufficient brewers that produced and aged their own whiskey—and as the Individual Defendants certainly would have been aware— MGP's former customers were becoming rivals, making MGP's ability to find success in the aged whiskey market all the more doubtful.

### The Company's Five-Year Aged Whiskey Strategy

97.     In early 2015, the Company announced five new key strategies that the Company would implement to grow its revenue. One of these strategies involved expanding the Company's whiskey business by building up a stock of aged whiskey—as opposed to unaged distillate—to sell to customers. In a Company press release issued on March 12, 2015, Defendant Griffin detailed this, and other strategies as follows:

> The company's new 5 year strategic plan was announced publicly on February 5 and features 5 key strategies. "First, we intend to maximize the value of our current production volumes," explained Griffin. "In particular, we want to take full advantage of favorable macro trends, *such as the growth of the American whiskey category* and the high fiber, high protein and non-GMO trends."
>
> "Second, as we focus our production on higher value products, we will work to develop partnerships that support brand creation and long-term growth. In that way, we believe we will be able to realize the full long-term value of our operational capacity, quality and commitment," he added.
>
> The third strategy encompasses investing to support growth. "We expect capital expenditures in 2015 of approximately $13 million, net of 2014 insurance recoveries. *These will largely focus on supporting our commitment to the rapidly*

***growing whiskey category, including the working capital needed to increase our stock of aged whiskey inventory***, as well as some investments behind improved operational reliability. In addition, as needed to support our plans, we will add staff and capabilities in sales and marketing, as well as research and development," said Griffin.

(Emphasis added.)

98.     In connection with this strategy, during 2015, MGP began barreling and storing a significant amount of its whiskey distillate. The whiskey was expected to age for approximately four years, at which point the Company would begin selling the whiskey on the market, at a higher premium than the Company's unaged whiskey distillate would sell for.

99.     Analysts initially reacted to the Company's aged whiskey strategy with skepticism. For instance, following the announcement of the Company's five-year strategy, TheStreet changed its rating of the Company's stock from "Buy" to "Hold," claiming that MGP's profit margins "have been poor overall." As such, the Individual Defendants knew that they would need to heavily promote the purported value of the Company's aged whiskey inventory in order to convince investors of the wisdom of the Company's strategy.

100.    An early attempt at promoting the Company's aged whiskey strategy was made during an investor presentation held on November 18, 2015. The presentation materials included slides that, among other things, made the first of many representations that the Company would be able to sell its aged whiskey at "3X value."

101.    During a November 2, 2016 conference call, on the subject of the Company's whiskey business, Defendant Griffin stated that "[t]he whiskey category is obviously a very robust category right now," and that  "[w]e are a very large supplier, so we are able to . . . provide high quality consistent product at a good price and that's obviously a big advantage to us. We also have a large inventory of aged whiskey that we're putting down that will help solidify our positioning

in the market long term and we think that will be very valuable to our customers and strengthen our position in the market."

102.    The Individual Defendants continued to prime the market with positive outlooks on MGP's market positioning. On March 8, 2017, the Company issued a press release announcing its fourth quarter and full year financial results for the 2016 fiscal year and it's purported projections, stating "our conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory becomes a more significant factor." During a conference call held on April 6, 2017, by which point the Company's barreled whiskey had already been aging for several years, Defendant Griffin stated that the Company's aged whiskey inventory had the potential to sell at "3x the price we could sell the new distillate now." During the same call, on the subject of the aged whiskey strategy, Defendant Pigott represented that "Stage 2 features leveraging the aged whiskey sales, the $50 million of costs that Gus talked about, which we believe will be very margin-accretive that we start—as we start to deploy that whiskey, and we've just started to do that. . . . We are very confident that we will drive strong margin growth, executing this strategy in the future."

103.    Defendants Griffin and Pigott reiterated these sentiments during a conference call held roughly one year later, on June 7, 2018. During that call, Defendant Griffin also commented on demand for the Company's aged whiskey, and on the Company's expected customer base as follows:

> [W]e continue to believe the demand is very strong, the pricing is very strong[,] and we continue to believe that 4-year-old whiskey has the potential to sell at 3x the price of new distillate. . . . [A]s we get closer to 2019, we'll have more whiskey turning 4 years old and we're ready to start deploying that in a more significant way. . . . We have taken a very aggressive approach to putting away aged whiskey with the goal of being able to provide consistent, not unlimited, but consistent availability of the different mash bills at different ages.

* * *

Who are we going to sell this to? Two different types of targets. First, established industry players . . . . On the craft side . . . we're going to be able to help those craft producers launch more new products because of the wider range of mash bills, aged mash bills, and also help them secure full value when they go to sell. So they will be having a full and secure supply chain[, which] is crucial for a brand to realize its full value in terms of being an M&A target. . . . We will be optimizing our customer mix between the large established players and the craft producers . . . .

104.    Analysts' expectations were largely buoyed by the Individual Defendants' statements during these and other conference calls. For instance, following the Company's June 7, 2018 conference call, an analyst from SunTrust Robinson Humphrey ("SunTrust") reported on the Company's prospects as follows:

Earlier today, we attended MGPI's analyst day at its distillery in Lawrenceburg, Indiana. . . . ***We came away from the day with greater conviction that MGPI will be able to more than double its earnings over the next several years as its aged inventory starts to play a more significant role in its portfolio beginning in 2019.***

(Emphasis added.)

105.    Concurrent with each of the Company's earnings releases and guidance updates during this period leading up to the Relevant Period, the Individual Defendants provided steadily increasing valuations of MGP's aged whiskey inventory. On May 4, 2017, the Individual Defendants valued the Company's aged whiskey inventory at $53.2 million—this figure increased by $3 million the following quarter, and by an additional $2 million the next quarter. By March 2018, the Individual Defendants valued the aged whiskey inventory at $65.7 million, and by June 2018, at $67.9 million.

### Increasing Competition and Related Trends Begin to Threaten the Company's Aged Whiskey Strategy

106.    During 2018 and 2019, as the Individual Defendants continued to tout the Company's aged whiskey inventory with largely unbridled optimism, certain material trends began bearing down on the whiskey market—making the Individual Defendants' stated goals with

respect to the Company's aged whiskey all but unattainable.

107.    These trends in large part concerned the movement of NDPs—many of which were historically MGP's customers—away from sourcing distillate from large producers like MGP, and towards producing and aging their own whiskey. In early 2015, when the Company first announced its five-year aged whiskey strategy, MGP was one of the only sources of distillate for new entrants seeking a foothold in the whiskey market. As the years went by, however, and NDPs began growing their businesses and building up their own stockpiles of newly aged whiskey, the Company began to rapidly lose its hegemony over whiskey distillate.

108.    By way of example, at the end of 2018, Templeton Rye, one of MGP's former customers, opened a 34,500 square-foot distillery in Iowa, allowing the company to manufacture most if not all of its own distillate. Two other former MGP customers, Arizona Distilling Company and Bozeman Spirits, followed suit around the same time period, and now produce distillate at their own facilities.

109.    Furthermore, during 2018 and 2019, a number of new, large distilleries that—like MGP—offered sourced whiskey distillate to smaller NDPs began entering the market. Such entrants included Bardstown Bourbon Company, which began operations in Kentucky in 2016, and as of 2018, produces more than 7 million gallons of spirit per year, or over 300 barrels per day. Another large distillery, O.Z. Tyler Distillery, also began operations in Kentucky during 2016, and began selling Kentucky whiskey in 2018. Today, O.Z. Tyler Distillery produces approximately 72,000 barrels of whiskey per year, which it sells directly to consumers as well as to NDPs.

110.    By 2019, the Company also began facing increasingly steep competition from well-established industry fixtures such as LuxCo, Inc., Michter's Distillery, and Bacardi Limited, each of which had begun ramping up their production of whiskey at around the same time as MGP. All

three of these distillers—which had previously sourced some of their whiskey from MGP and other large distillers—opened up new facilities in Kentucky between 2016 and 2019, and today pump out millions of gallons of Kentucky whiskey each year.

111.    Moreover, not only did MGP's business prospects suffer from the loss of NDPs as customers, but many of the former NDPs and other whiskey distillers entering the market during this period possessed certain competitive advantages that MGP could not replicate—namely, the reputational benefits associated with being an independently-owned "craft" brand, or with having distilling operations based in Kentucky. As an illustration, a bulk alcohol sales manager cited to in the Securities Class Action indicated that a customer she received purchase orders from historically purchased 200–700 barrels of whiskey from the Company each month. However, by 2019, this customer instead began purchasing its whiskey from Bardstown Bourbon Company, specifically because that distiller, unlike MGP, was based in Kentucky.

112.    An additional source of competition came from a number of MGP's customers who had purchased barrels of whiskey from MGP in 2014 and 2015, and had left these barrels to age in MGP's warehouses. As such, these barrels became ready to sell around 2019—the same time that MGP's own stock of aged whiskey had largely finished aging. Ultimately, when these former customers and MGP began selling their aged whiskey at around the same time, many of the former customers determined that they had purchased too much aged inventory and therefore began selling the aged whiskey they had purchased at a significant discount, undercutting MGP's prices. Specifically, MGP offered its aged whiskey stock at about $2,100 per barrel, whereas these customers were offering the same product for approximately $1,400–$1,500 per barrel.

**The Individual Defendants Were Aware that the Company Would be Unable to Successfully Transact its Aged Whiskey Inventory**

113.    The Individual Defendants, who controlled the Company by way of their positions

as senior executive officers and/or directors of MGP, had access to detailed internal Company documents and communications regarding the Company's business prospects and any relevant trends or risks facing the Company. Producing and selling whiskey is unquestionably vital to the Company's overall financial performance, and is therefore a core operation that the Individual Defendants—who held themselves out as being knowledgeable about the Company, its operations, and its long-term business plans—would have been well-informed about during the Relevant Period. Between 2017 and 2019, for instance, sales of brown goods, including whiskey, made up approximately 31.8% of the Company's total net sales, as compared to the approximately 17.5% of the Company's net sales accounted for by white goods during that same period.

114.    Moreover, had the Company actually sold its aged whiskey inventory for as much as "three times" the price of the Company's unaged whiskey distillate—as the Individual Defendants misleadingly represented that the Company would—such sales would have dramatically boosted the Company's profit margins, underscoring the particular significance of the aged whiskey inventory to the Company's business prospects. As an illustration, an analyst report issued by Craig-Hallum Capital Group ("Craig-Hallum") in May 2016 commented on the potential impact of MGP's aged whiskey inventory on the Company's profits as follows:

> MGP has been and will be investing ~$20M per year in new distillate (i.e. un-aged bourbon) that could be sold at a low profit margin today, but instead is being aged in barrels *to be sold for 3x the price as aged whiskey in 3-5 years. This sets up a step-function increase in revenue and gross margin when aged inventory starts being sold in large quantities in 2019 . . .*

(Emphasis added.)

115.    Certain of the Individual Defendants' public statements also indicate that the Individual Defendants were knowledgeable about sources of growing competition in the market for aged whiskey—including from MGP's former customers—yet specifically declined to disclose

detailed information about the impacts of such competition to the public. For instance, with respect to competition in the marketplace, the Company's annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by Defendants Griffin, Pigott, Colo, Bareuther, Dunn, Foglio, Jenkins, Page, Seaberg, and Strandjord, merely stated that "[o]ur brands compete with the brands of our bulk alcohol customers."

116.    Moreover, in a May 7, 2019 investor presentation released by the Company, the Individual Defendants remarked positively on new entrants into the market for aged whiskey, stating the following:

CAPACITY & CAPABILITY PROVIDE STRONG COMPETITIVE POSITION

- Industry is adding capacity

    - Existing producers to support growth of existing brands

    - New producers to support growth of new brands

- Customers building capacity

    - To expand product offerings and marketing efforts

    - Continue to understand our value and role as their brands grow

117.    Further underscoring the Individual Defendants' awareness of the state of the aged whiskey market is the extensive media coverage of the whiskey boom over the course of the past decade, which—as executives and directors of a company that deals primarily in whiskey and other spirits—could not have escaped the Individual Defendants' notice. Particularly, following the news in mid-2014 that many NDPs sourced their whiskey from MGP, a significant number of media outlets suggested that such reliance on the part of NDPs would be short-lived. For example, an article published on July 7, 2015 by Eater commented on MGP's role in sourcing whiskey to

NDPs as follows:[4]

> Many small brands who are opening their doors for the first time often source whiskey so they have a product to sell immediately *while their own stuff ages.* It's a fiscal necessity, since it's impossible for most of these brands to sit around for years, not generating revenue, while their whiskey is left maturing in the barrel.
>
> ***Therefore, they buy somebody else's whiskey as they begin the process of putting away their own stock***. Along the way, these new brands may begin incorporating their own juice into the purchased whiskey, or they may simply wait until their whiskey is fully of age and release it separately

(Emphasis added.)

118.   Additionally, throughout the 2010s, numerous analysts, market commentators, and industry groups touted the growth of rival whiskey distilling companies such as Brown-Forman Corporation, Bacardi Limited, and Diageo plc, and frequently noted that the whiskey industry was experiencing dramatic growth in the U.S.—leading to significant competition that would predictably encroach on the Company's standing in the market.

119.   Defendant Griffin, in particular, discussed the Company's aged whiskey inventory extensively in public statements both during and prior to the start of the Relevant Period. For instance, in a press release issued on March 10, 2016 discussing the Company's financial results for the fourth quarter and fiscal year ended December 31, 2015, Defendant Griffin was quoted as follows, in relevant part:

> "We are starting to see the benefits of our targeted investments, which should ensure that we can fully support the growth of the whiskey category," Griffin noted. "Strong tailwinds for our business include spirits gaining share from beer, the continued strong demand for bourbon and rye whiskeys, and the overall premiumization of the beverage alcohol industry."

120.   During the Company's 2019 annual meeting of shareholders, Defendant Griffin

---

[4]https://www.eater.com/drinks/2015/7/7/8903167/sourcing-labeling-lawsuits-why-american-whiskey-should-improve-its (last visited July 29, 2020).

stated the following, in relevant part:

> 2019 marks the next phase of our deployment of this inventory. We are beginning to sell both, more aged whiskey and older aged whiskey. We will continue to work with current and prospective customers in all tiers of the market, including the craft segment, multinational and national brand owners as well as the export market. Due to the sustained robust growth of the American whiskey category, we continue to see strong demand for aged whiskey. Existing customers seek aged whiskey to fill inventory gaps driven by higher-than-expected consumer demand for their current brands as well as to help get new brands to the market sooner.

121.    Defendant Griffin also provided detailed information regarding the Company's aged whiskey inventory and the growth of the Company's customers during conference calls held before the Relevant Period. For example, the following exchanges took place between Defendant Griffin and an analyst during an earnings call held on August 3, 2017:

> [Analyst:] [T]hinking about just the launch of an aged bourbon brand, do you have sufficient quantities of whiskey aged beyond just what you've been putting away since 2015 to be able to hit the market quickly with a brand like that? Or do you need a few years to let your own inventory age into a launch like that?
>
> [Defendant Griffin:] In terms of whiskey, we even – when we bought the distillery, there was some there, and we've been very judicious about what we've hung on. So obviously, this Remus Repeal Reserve we're coming out with is going to have some old whiskey in it. And so we have the whiskey to come out with products like that. And as we've said before, the last thing we want to do is short our own brands. And so we are making sure that we hang on to the whiskey we have and are putting away the right amount of whiskey to support all of our brands initiatives, whatever they may be.
>
> * * *
>
> [Analyst:] [A] lot of your customers that have been growing nicely themselves for the last couple of years. Some of them are seeing accelerating growth even the last few years. To the extent that you're getting interest in having conversations with customers about selling lightly-aged whiskey. Just trying to get a sense of the pricing that will be seen in the market for whiskey that is 12, 18 months old, not necessarily fully-aged bourbon, but would be curious to the extent that you can comment on the supply and demand dynamics for the more lightly-aged bourbon.
>
> [Defendant Griffin:] Yes. Alex, there continues to be a very strong demand for it, not a very transparent and visible market for it. But we are seeing – there's nothing to diminish our view, outlook of what that whiskey will be worth. And we're seeing, for the lighter-aged whiskey, we are seeing things in line proportionately with that

longer-term view.

122.    Importantly, Defendant Griffin discussed the Company's aged whiskey inventory during practically all of the Company's quarterly earnings calls held during the Relevant Period, and held himself out as an expert on the Company's position in the market, on the Company's relationships with customers and competitors, and on the Company's related business prospects. For example, during the Company's conference call held on August 2, 2018, Defendant Griffin commented on "positive discussions" with the Company's customers as follows:

> Longer term, we are assessing the best approach to provide structure to very unstructured market for aged whiskey. We continue to have positive discussions with existing and prospective customers about the potential for this product. Despite the lower growth we experienced in the first half of the year, our projections for sustainable growth in premium beverage alcohol remain in line with our strategic plan.

123.    During the Company's conference call held on November 1, 2018, specifically in response to an analyst questioning the value of the Company's aged whiskey, Defendant Griffin stated that "we're feeling increasingly confident in both the demand for that inventory and the pricing for that inventory," and that he had not "seen anything that would change our view of the value of that inventory."

124.    Also during the November 1, 2018 conference call, in response to a question regarding Defendant Griffin's confidence in "where the market is going to be 2 or 3 years from now," Defendant Griffin stated the following, in relevant part:

> Let me be very clear. We have – *there's certainly no lessening in our confidence*, in our bullish outlook for the – both the distilled spirits industry, and obviously, American whiskey industry or the bourbon category. And so any fluctuation our quarter-to-quarter put-away has no reflection of our long-term view. . . . ***Because we believe the long-term potential is very, very strong. The underlying fundamentals of the market are very, very strong***. If you look at the growth over the last 5 years, or whether you look at the growth of the last 12 weeks or the last 4 weeks, everything is pointing in the right direction.

(Emphasis added.)

125.    Furthermore, during the November 1, 2018 conference call, Defendant Griffin

represented that the Company had done "very detailed forecasting" on its customers, which had

been "reviewed by management," stating the following:

> Now just looking at the next 60 days, we have done very detailed forecasting on
> the customers, very disciplined approach to this. ***They've been reviewed by
> management, and that's why we have the confidence that we'll be able to deliver
> those numbers.***

(Emphasis added.)

126.    During the Company's October 31, 2019 conference call, even after the truth as to

the Individual Defendants' misleading representations and omissions had begun to reach the

market, Defendant Griffin emphasized his insight into the whiskey market and the Company's

footing within that market, stating the following:

> ***While the overall American whiskey market remains robust and our position
> within that market is still very strong***, timing and volatility of customers' orders
> continue to be a challenge this year.  As in previous quarters this year, we saw
> forecasted orders delayed due to customer funding issues and their desire to delay
> purchasing as long as possible.  These issues have affected sales of both new
> distillate and aged whiskey inventory throughout the year. . . . While we are behind
> where we'd like to be at this point in the year, we're off to a strong start to the
> fourth quarter and ***we are confident in our line of sight to sales required to deliver
> against our full year guidance.***

(Emphasis added.)

127.    An additional fact emphasizing the Individual Defendants' knowledge is the timing

of Defendant Griffin's resignation as CEO on May 21, 2020. Defendant Griffin's departure, which

was first announced in February 2020, came shortly after the Company's disclosure of largely

disastrous preliminary financial results for fiscal 2019, including a failure to sell much of the

Company's aged whiskey inventory. Defendant Griffin had specifically been hired by the

Company to guide MGP's expansion into the market for aged whiskey, and the timing of his

resignation suggests that he and the rest of the Individual Defendants were aware, and likely had been aware for some time that the Company would fail to execute on its stated business strategy. Moreover, Defendant Griffin's own employment contract may have also motivated him to conceal the Company's aged whiskey-related shortfalls. As his employment contract was set to terminate on May 31, 2020, Defendant Griffin may have intentionally misrepresented the Company's prospects during the Relevant Period in order to create the illusion of success—thereby persuading the Company to renew his employment as CEO.

128.    Lastly, the short period of time between the Individual Defendants' positive representations on October 31, 2019 and the revelations on January 17, 2020—as described in greater detail herein—also supports the inference that the Individual Defendants were aware of the falsity of their statements. During the Company's conference call held on October 31, 2019, with respect to sales of aged whiskey, Defendant Griffin represented that he and the rest of the Individual Defendants were "confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales." Yet, in the Company's press release issued on January 17, 2020, amidst the disclosure of substantial earnings shortfalls, Defendant Griffin conceded that the Company had been "ultimately [] unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter." It is highly implausible that the Company's prospects could have changed so greatly in those three months. The far more likely explanation is that the Individual Defendants were aware of the true state of the Company's prospects throughout the Relevant Period, and consistently, intentionally misrepresented the Company's prospects up until the point when the truth could no longer be concealed.

129.    For these reasons, the Individual Defendants surely would have been well aware of

the above-described trends and market factors that made it highly unlikely that the Company would be able to sell its aged whiskey inventory at anywhere near the rate or at the price points the Individual Defendants promised to investors during the Relevant Period.

**False and Misleading Statements**

***August 2, 2018 Press Release and Conference Call***

130.    On August 2, 2018, the Company issued a press release containing the Company's financial results for the second fiscal quarter of 2018. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release stated that the Company's "conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

131.    The press release also quoted Defendant Griffin, who discussed the Company's aged whiskey inventory as follows:

> We continue to invest to take full advantage of these key consumer trends and are now pleased to announce that based on continued strong demand for our premium American Whiskeys, we are making significant additional capital investments in our barrel warehouse program. Our projected investment in this program has been increased to approximately $51.8 million in capital expenditures, up from approximately $33.8 million. This increased investment will enable us to meet the long-term storage needs of both our new distillate customers and our own aging whiskey inventory. ***Our investment in aged whiskey inventory continues to grow, and has now reached $73.0 million, at cost. A portion of the sizable increase in our inventory from last quarter reflects stronger anticipated sales of our premium American Whiskey products in the second half of the year***.

(Emphasis added.)

132.    That same day, the Company also held a conference call to discuss the Company's financial results. During the call, Defendant Griffin stated that the following, in relevant part:

> Longer term, we are assessing the best approach to provide structure to very unstructured market for aged whiskey. We continue to have positive discussions with existing and prospective customers about the potential for this product. Despite the lower growth we experienced in the first half of the year, our projections for sustainable growth in premium beverage alcohol remain in line with our

strategic plan.

133.    Also during the call, Defendant Pigott stated that "[t]he Company's conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

134.    In a report issued the following day, a SunTrust analyst commented on the Company's prospects as follows, in relevant part:

> MGPI put away $5.1M of unallocated inventory in 2Q18. Unlike prior inventory builds, the company expects a majority of this inventory to be sold in the next few months. Simply put, the orders are close to the finish line and MGPI did not want to run out of capacity in the final 4 months of the year. We don't believe MGPI would have done this without a high level of certainty about 2H orders.

***November 1, 2018 Press Release and Conference Call***

135.    On November 1, 2018, the Company issued a press release containing the Company's financial results for the third fiscal quarter of 2018. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release repeated that the Company's "conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

136.    The press release also quoted Defendant Griffin as follows:

> Our third quarter results exhibit the top-line improvement we expected. However, we did experience some short-term production challenges at our Lawrenceburg facility that impacted our margins. We are confident that the issues have been resolved, and we are poised for further growth in the fourth quarter. ***Based on the improved momentum of our business and the continued solid execution of our strategic plan, we are again reaffirming our operating income growth guidance for the year.***

(Emphasis added.)

137.    That same day, the Company also held a conference call to discuss the Company's

financial results. During the call, Defendant Griffin commented on the Company's aged whiskey inventory, and on demand for the Company's whiskeys as follows:

> We continue to experience strong demand for our bourbon and rye whiskeys, and our new distillate business grew nicely this quarter. *We've been very successful in attracting new customers*, and the additional inventory we put away last quarter supported the increased sales to both new and existing customers this quarter. *We believe our plan for sustainable growth in premium beverage alcohol remains on track*.
>
> * * *
>
> *Our strategy continues to be to build our inventory of barreled whiskey and to leverage this inventory to attract and retain customers for our new distillate products and to support the growth of our own brands*. We believe this library of mash bills and ages will enable us to provide structure to a very unstructured market for aged whiskey. Discussions are ongoing with existing and prospective customers about the potential of these product offerings.

(Emphasis added.)

138.   Defendant Pigott commented on the Company's growth prospects during the call, stating that "the Company's conservative estimate of growth in operating income in 2019 is 15% to 20% as sales of aged whiskey inventory become a more significant factor."

139.   Also during the call, in response to an analyst questioning whether there was any change in the value of the Company's aged whiskey inventory, Defendant Griffin stated that "we're feeling increasingly confident in both the demand for that inventory and the pricing for that inventory," and that the Company had not "seen anything that would change our view of the value of that inventory."

140.   In response to an additional analyst question regarding the Company's expected growth during 2019, Defendant Griffin stated the following, in relevant part:

> [T]he category continues to be very strong, whether it's both the premiumization and the overall growth in the American whiskey category continues to be very strong . . . We continue to add customers. *You've heard us speak repeatedly about our efforts to go out and recruit new customers to be the supplier of choice to all premium beverage suppliers. And so that's going very, very well. We're adding*

*customers*. We don't disclose the actual number of customers, but *we are adding them at a faster clip than we did last year*, which was a faster clip than we did the year before . . . Now just looking at the next 60 days, we have done very detailed forecasting on the customers, very disciplined approach to this. *They've been reviewed by management, and that's why we have the confidence that we'll be able to deliver those numbers.*

(Emphasis added.)

141.    The following day, SunTrust issued an analyst report expressing confidence in the Company's aged whiskey-related prospects, stating the following, in relevant part:

We are maintaining our $100 price target which equates to 21x our 2019 EBITDA including inventory (slight premium to peers). We continue to believe the monetization of [the] company's inventory will allow the company to reach a sustainable $4+ EPS level (at least through 2023). Reiterate Buy.

* * *

[W]e are now two months away from 2019, the year in which the $17M Class of '15 inventory comes of age. We heard no reason why the company can't significantly boost earnings as it monetizes this inventory.

***December 13, 2018 Investor Conference***

142.    On December 13, 2018, the Company held a conference for analysts and investors, during which the Company's management discussed the Company's aged whiskey inventory and sales and growth estimates. Analysts from SunTrust reported that members of MGP's management had asserted that the Company "could sell the entire inventory at the 3x multiple tomorrow if needed," and that the Company had a "good line of sight [in]to the unallocated inventory that is not already spoken for." SunTrust analysts also indicated that Company management claimed that "[i]ndustry demand had outpaced supply for several years and the company has no knowledge of any other independent distiller that was putting away excess inventory four years ago." SunTrust stated the following, in relevant part:

Management was adamant that it could sell the entire inventory at the 3x multiple tomorrow if needed. . . . It plans to sell to new and existing customers who will commit to buying multiple years of the aged inventory (i.e. class of 2016 and 2017).

It is seeing strong interest from larger multinational players that either 1) have a small existing brand that they want to expand or 2) want to create a new entry into the fast-growing US whiskey market. . . .

The company does not view the 3x multiple as exorbitant. In fact, the current spot price for aged whiskey is roughly 4.5x that of unaged (based on prices from whiskey wholesalers). MGPI's goal from the get-go was to sell its aged inventory well below the spot price so it could enhance the prospects of its partners. . . . MGPI should be able to generate gross margins north of 70% on its aged inventory . . . .

### *February 27, 2019 Press Release and Conference Call*

143.    On February 27, 2019, the Company issued a press release containing the Company's fourth fiscal quarter and full year 2018 financial results. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Pigott. The press release disclosed positive sales growth, and announced the Company's guidance for 2019, which exceeded that of the prior year, stating the following:

- Consolidated net sales increased 18.9% to $104.9 million, as a result of double-digit growth in both premium beverage alcohol and the Ingredient Solutions segment.

  * * *

- Consolidated operating income increased 16.9% to $50.1 million, as a result of strong sales growth and improved operating performance in both the Distillery Products and Ingredient Solutions segments.

  * * *

- 2019 net sales growth is projected in the mid-single-digit percentage range versus 2018, subject to some volatility due to the current conditions in the industrial alcohol market.

  * * *

- The Company's estimate of growth in operating income in 2019 is 15% to 20% off of the higher than expected 2018 results.

  * * *

- Earnings per share are forecasted to be in the $2.55 to $2.65 range.

144.    The press release also quoted Defendant Griffin as follows:

"The improved momentum of our business and continued solid execution of our strategic plan allowed us to deliver on all elements of our guidance," said Gus Griffin, president and CEO of MGP Ingredients. "*We saw increased demand for our premium beverage alcohol products in the fourth quarter*, as well as a very strong performance in our Ingredient Solutions segment."

\* \* \*

"*Both of our business segments continue to benefit from favorable consumer trends, and our strategic plan has us well positioned to fully capture the potential these trends offer*.  Our 2018 results reflect both the strength of that positioning and the momentum we are building as we continue to execute against that plan," Griffin added.  "2018 saw strong gross profit growth in both our business segments and significant progress against our key strategic initiatives.  *We increased our aging whiskey inventory to $76.4 million, at cost*, reflecting a 16.2% increase as compared to the prior year. We continued to expand our warehouse capacity to make sure we are well positioned to support the growth of the American Whiskey category and we continued to take a disciplined approach to our MGP brands initiative, adding both new brands and additional markets.  *We are confident that our strategy and investments have us well positioned, and will provide us the resources we need, to deliver strong growth in 2019 and beyond*," concluded Griffin.

(Emphasis added.)

145.    That same day, the Company held a conference call to discuss the Company's financial results. During the call, Defendant Griffin stated the following regarding demand for the Company's aged whiskey:

*Due to the sustained robust growth of the American Whiskey category, we continue to see strong demand for aged whiskey as customers seek to fill inventory gaps driven by higher-than-expected consumer demand*.  Throughout the year, we continue to leverage limited sales of aged whiskey to support our existing partnerships and attract new customers for our new distillate products.

\* \* \*

2019 marks the next phase of our deployment of this inventory.  We will begin selling both more aged whiskey and older aged whiskey.  *We will continue to work with our current and prospective customers and are pleased with our progress implementing this initiative.  As a result of sales already transacted and ongoing discussions with customers in the craft segment, multinational and national brand owners as well as the export market, we are confident that we have visibility*

*to the aged sales we need to deliver against this year's guidance*.

(Emphasis added.)

146.     Also during the call, the following exchange took place between Defendant Griffin

and an analyst regarding the Company's stated guidance:

> [Analyst:] I wanted to ask about the guidance for 2019 and specifically the commentary around this is the year where we're going to start to see some more meaningful deployment of aged whiskey. . . .
>
> [Defendant Griffin:] Right. Alex, you are correct. As I said, 2019 is really the next phase of this deployment. ***Aged -- sales of aged whiskey will be a key driver of our growth in '19. We have started contracting that. We have started transaction-ing it***. In terms of how it will flow out over the year, we will try to provide color on that much as we did with the fourth quarter, where we said the vast amount was due to new distillate, so we'll try to provide color on what's driving our revenue growth**.**
>
> But as you know from our past history, our business can be choppy and this is not going to flow out like a consumer product, but we are -- ***we feel very confident that we have visibility to the aged sales***. We need to deliver the guidance this year and it will continue to be a driver of our growth going forward in future years. We are going to increase our inventory, so we're going to continue to put away whiskey at a strong pace to make sure that we have the incremental inventory in future years to continue to drive that growth from incremental sales of aged whiskey.
>
> *  *  *
>
> [Analyst:] And if I look at your guidance for '19, . . . is it fair to say that . . . covers part of what you've contracted for so far but does not include all . . . of the class of 2015 inventory?
>
> [Defendant Griffin:] ***It includes us selling the aged whiskey we need to deliver our guidance***. . . . And so as opposed to focusing on sweeping out the warehouse of all 4-year-old, that wouldn't be prudent. ***So we will judge the market, use it judiciously, use it to make sure we deliver the guidance and get them*** – if pricing is still great and we can sell more, we will. But we're not going to focus on emptying the warehouse at all costs just to do that. So we'll constantly look at the market. ***We feel confident we have the levers, both for this year and future years, to continue to drive that growth.***

(Emphasis added.)

147.     In response to an analyst question regarding the expected price of the Company's

aged whiskey inventory, Defendant Griffin stated that there was "no change in our expectation."

148.    That same day, SunTrust issued a favorable report on the Company, stating that "[w]e believe the company's initial guidance for 2019 is conservative and still believe in the longer-term profitability upside from aged inventory sales."

### February 27, 2019 Form 10-K

149.    Also on February 27, 2019, the Company filed its 2018 10-K with the SEC. The 2018 10-K was signed by Defendants Griffin, Pigott, Colo, Bareuther, Dunn, Foglio, Jenkins, Page, Seaberg, and Strandjord, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Griffin and Pigott attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

150.    In a section discussing the risks facing the Company, the 2018 10-K detailed various factors that *could* cause the Company to inaccurately gauge demand for its aged whiskey, leading to a surplus of inventory and other negative impacts on the Company's prospects, implying that such risks had not already materialized. The 2019 10-K stated the following:

> There is an inherent risk in determining the quantity of maturing stock of aged distillate to lay down in a given year for future sales as a result of changes in consumer demand, pricing, new brand launches, changes in product cycles, and other factors. Demand for products ***could*** change significantly between the time of production and the date of sale. ***It may be more difficult to make accurate predictions regarding new products and brands***. Inaccurate decisions and/or estimations ***could*** lead to an inability to supply future demand or lead to a future surplus of inventory and consequent write-down in the value of maturing stocks of aged distillate. As a result, our business, financial condition, or results of operations ***could*** be materially adversely affected.

(Emphasis added.)

151.    The 2018 10-K also stated the following with respect to the Company's internal controls:

With the participation of the Chief Executive Officer and Chief Financial Officer, our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission. As a result of this assessment, management has concluded that the Company's internal control over financial reporting as of December 31, 2018 was effective.

\* \* \*

There has been no change in the Company's internal control over financial reporting required by Exchange Act Rule 13a-15 that occurred during 2018 that has materially affected, or is reasonably likely to materially affect MGP Ingredients, Inc.'s internal control over financial reporting.

### April 9, 2019 Proxy Statement

152.    On April 9, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

153.    The 2019 Proxy Statement stated that the Company's Code of Conduct was one of the Company's "key governance documents," and that the Company's Audit Committee was responsible for monitoring compliance with the Code of Conduct.

154.    The 2019 Proxy Statement was false and misleading because the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

155.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

156.    The statements in ¶¶ 130–133, 135–140, 142–147, and 149–151 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further

impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Gradually Emerges as False and Misleading Statements Continue**

*May 1, 2019 Press Release and Conference Call*

157.    On May 1, 2019, the Company issued the Company issued a press release containing the Company's financial results for the first fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed disappointing results for the quarter, including a decrease in gross profits, despite an increase in sales, stating the following:

- Consolidated sales increased 1.3% to $89.1 million, reflecting growth in both the Ingredient Solutions and Distillery Products segments.

- Consolidated gross profit decreased 12.1% to $16.7 million, as gross profit declined in both the Ingredient Solutions and Distillery Products segments.

- Consolidated operating income decreased 18.1% to $8.5 million.

158.    Despite these results, the press release confirmed the Company's previously issued 2019 guidance, stating the following, in relevant part:

MGP is confirming the following guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018, subject to some volatility due to the current conditions in the industrial alcohol market.

\* \* \*

- The Company's estimate of growth in operating income in 2019 is 15% to 20% off of the higher than expected 2018 results.

\* \* \*

- Earnings per share are forecasted to be in the $2.55 to $2.65 range.

159.    The press release also quoted Defendant Griffin as follows:

"Our results for the quarter are lighter than we would have liked and reflect both order timing and headwinds to our business. ***However, we do not believe they are the result of any changes to underlying consumer trends or our position in the market,***" said Gus Griffin, president and CEO of MGP Ingredients. "***We have reviewed our outlook for the remainder of the year and are confidently confirming our previous guidance***."

"***Aged sales reflect lower volumes but higher pricing as we transition from selling lighter aged whiskey inventory to older whiskey inventory.  We expect both parts of our brown goods business to return to growth over the remainder of the year as a result of stronger demand and continued strong pricing***," continued Griffin.

(Emphasis added.)

160.    The press release also indicated that the Company's investment in aged whiskey inventory "has now reached $79.5 million, at cost."

161.    That same day, the Company held a conference call to discuss the Company's financial results, during which Defendant Griffin continued to reaffirm the Company's 2019 guidance. Defendant Griffin stated the following, in relevant part:

Sales of premium beverage alcohol were down 4.7% for the quarter. ***The softness in premium beverage alcohol sales was driven by a decline in our brown goods with sales of new distillate and aged whiskey declining at similar rates***. Sales of new distillate for the quarter were soft due to order timing with multinational and national brand owner customers. 2019 is the year when we expect to ramp up sales from our inventory of aged whiskey, selling both more aged whiskey and older aged whiskey.

This ramp-up will accelerate over the balance of the year. Aged sales for the quarter reflect lower volumes but stronger pricing as we transition from selling lightly aged whiskey inventory to older whiskey inventory. ***We expect both parts of our brown goods business to return to growth over the remainder of the year as a result of stronger demand and continued strong pricing***. Despite the year-over-year decline for brown goods this quarter, we continued to experience strong demand for our bourbon and rye whiskeys.

(Emphasis added.)

162.    During the call, the following exchange took place between an analyst and

Defendant Griffin:

> [Defendant Griffin:] [O]ur results were lighter than we would have liked. Our results for this quarter reflect both headwinds to our business and customer order timing. *However, we do not believe they are the result of any changes in underlying consumer trends or our position in the market. As a result and after a detailed review of our outlook for the remainder of the year, we are confidently confirming our previous annual guidance*.

* * *

> [Defendant Griffin:] *We continue to see strong demand and pricing for our products and are confident in our ability to deliver against our annual guidance*.

* * *

> [Analyst:] [D]oes that also tie into – I know a big tranche of what was put away 4 years ago occurred in the second quarter. So does that in part say we're holding back on selling that until it gets to full aged and there's more to come kind of in 2Q and beyond that?

> [Defendant Griffin:] Yes. First of all, we are very confident in the plan we have to sell that. And as we've mentioned in the past, we don't give a number of how much we're going to sell. *That is our lever to make sure we deliver our annual guidance. And we're comfortable that both the volume demand and pricing is there for us to be able to use that lever to deliver on it. . . . So we're very comfortable that this aged whiskey will fill out over the year*. We talked about the ramp-up accelerating. *And we're very comfortable and confident that it will ramp up over the year as we planned*.

* * *

> [Defendant Griffin:] [B]oth on what we have seen for the pricing for a product that's less than four years old, we've been getting above the three times when you extrapolate it out. And for the product that we've sold, the four-year-old product we have sold, we've been getting better than that. *So we are very confident that the three times pricing will hold.*

(Emphasis added.)

163.     On this news, the price of the Company's stock dropped from $87.87 per share at the close of trading on April 30, 2019, to $67.79 per share at the close of trading on May 1, 2019 on heavy volume, representing a loss in value of approximately 23%.

164.     Following the call, SunTrust issued a report echoing certain of the Individual

Defendants' attempts to assuage the market, stating the following:

> ***Based on the commentary on the conference call, the weakness in brown spirits this quarter can be explained by timing impacts on unaged sales and a mix shift on aged barrels***. . . . For the aged sales decline, we believe this has more to do with the mix of sales. Recall the company sold some lightly aged barrels in the year ago period to help lock in longer term customers. In 1Q19 it pulled back on the number of barrels [of aged whiskey] sold, but because they are now fully aged barrels the pricing has gone up . . . ***This gives us confidence in the profitability potential of the model, and that the company can place its aged sales in the market (i.e. market pricing is not eroding).***

(Emphasis added.)

### May 7, 2019 Investor Presentation

165.    On May 7, 2019, the Company posted slides from an investor presentation on its

website. In a section titled, "Why Invest," the presentation stated the following, in relevant part:

- Proven success of implementing long-term strategy to maximize growth and expand margins

- ***Well positioned against favorable macro trends with a strong, competitive position***

- ***Sales of aged whiskey sales begin second stage of meaningful sales growth and margin expansion***

- Third growth stage of branded platform in early stages

- Strong cash flows allow for additional investments to deliver long-term shareholder value

(Emphasis added.)

### May 23, 2019 Annual Meeting of Shareholders

166.    On May 23, 2019, the Company held its annual meeting of shareholders. During

the annual meeting, Defendant Griffin stated the following, in relevant part:

> ***The growth of the craft distillery segment has been an important driver of overall category growth***, helping to increase both volumes and customer interest . . . One of our biggest strategic initiatives was the decision to begin aggressively putting away barreled whiskey inventory for aging. We began building this inventory in

earnest in 2015, and we have continued to build this program over the past 4 years. While we have sold some of this inventory over the past few years, as part of a strategic effort to support our existing customer partnerships and attract new customers for our new distillate product offerings, at the end of 2018, we had grown to level of this inventory to $76.4 million, at cost.

***2019 marks the next phase of our deployment of this inventory. We are beginning to sell both, more aged whiskey and older aged whiskey. We will continue to work with current and prospective customers in all tiers of the market***, including the craft segment, multinational and national brand owners as well as the export market. ***Due to the sustained robust growth of the American whiskey category, we continue to see strong demand for aged whiskey***. Existing customers seek aged whiskey to fill inventory gaps driven by higher-than-expected consumer demand for their current brands as well as to help get new brands to the market sooner.

New customers are seeking a trusted partner with both the expertise and inventory to help them launch and grow brands in this fast-growing category.

(Emphasis added.)

### June 28, 2019 SunTrust Report

167.     On June 28, 2019, SunTrust released an analyst report commenting favorably on the Company's 2019 guidance and aged whiskey sales, based on representations made by Defendants Griffin and Gall during investor roadshows. The report stated the following, in relevant part:

> We recently travelled with CEO Gus Griffin and CFO Brandon Gall of MGPI to meet with investors.  We came away from the meetings encouraged that ***1) the issues that tripped up 1Q have not carried over into 2Q*** . . . .
>
> * * *
>
> [W]e continue to believe that the company could have posted $3-$4 in EPS in 2019 if it chose to monetize its entire available inventory ***and it still should easily exceed the current guidance in our opinion***. . . .
>
> * * *
>
> MGPI has not seen any cutbacks in orders from existing customers like it saw in 2Q18 . . . .  This implies that the company should face a highly favorable comp for whiskey sales in the current quarter . . . .   [W]e expect aged whiskey sales to accelerate as the first major tranche of inventory was not put away until 2Q15 (meaning it didn't hit maturity until 2Q19).

(Emphasis added.)

### *July 31, 2019 Press Release and Conference Call*

168.     On July 31, 2019, the Company issued a press release containing the Company's financial results for the second fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed that the Company had again experienced disappointing results for the quarter due to poor aged whiskey sales, stating the following:

- Consolidated sales increased 2.5% to $90.5 million, reflecting growth in both the Distillery Products and Ingredient Solutions segments.

- Consolidated gross profit increased 0.4% to $19.5 million, as a decline in Distillery Products gross profit was more than offset by gains in Ingredient Solutions.

- Consolidated operating income decreased 2.3% to $10.9 million.

169.     The press release also disclosed that the Company would be revising its 2019 guidance, stating the following:

MGP is revising its guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018.

* * *

- The Company's estimate of growth in operating income in 2019 is 10% to 20%.

* * *

- Earnings per share are forecasted to be in the $2.55 to $2.75 range inclusive of our new, lower projected effective tax rate.

170.     The press release also quoted Defendant Griffin as follows:

"While we are pleased with the improved results for most parts of our business, sales of aged whiskey have lagged our expectations. ***We remain confident in both***

60

*the long-term demand for, and the value of this inventory, and expect to see a significant increase in sales of aged whiskey over the remainder of the year*. However, we believe there is some possibility we might have difficulty completing transactions for all of our projected sales of aged whiskey by the close of the year," said Gus Griffin, president and CEO of MGP Ingredients. "As a result, we are revising our guidance for the full year to include that possibility."

"While we are still not where we would like to be in terms of year to date operating income growth, we have seen a significant recovery in most areas of our business. *We remain confident in our long-term strategy and remain well-positioned against strong macro consumer trends*," stated Griffin. "*We expect to report an improved performance over the back half of the year and are off to a strong start in the third quarter*. Our warehouse expansion plan remained on track during the quarter, allowing us to increase our storage capacity and complete the project by the end of 2020. *Additionally, our investment in aged whiskey inventory has now reached $85.5 million, at cost*, an increase of $6.0 million from the first quarter 2019 as we continue to see long-term value in building this inventory.

(Emphasis added.)

171.    That same day, the Company held a conference call to discuss the Company's

financial results, during which Defendant Griffin affirmed the Company's revised 2019 guidance

as follows:

Our operating income declined over 2% as sales of aged whiskey lagged our expectations. *Despite the slow start to the year for sales of aged whiskey, we remain confident in both the long-term demand for and the value of this inventory and expect to see a significant increase in sales of aged whiskey over the remainder of the year*. However, we believe there is some possibility we might have difficulty completing transactions for all of our projected sales of aged whiskey by the close of the year. As a result, we are revising our guidance for the full year to include that possibility.

*  *  *

Sales of aged whiskey were down for the quarter and continue to trail last year. . . . While sales of aged whiskey are below our expectations year-to-date, *we expect to see a significant increase in these sales over the remainder of the year. Several orders failed to transact at the end of the quarter, highlighting both the longer-term demand and the inherent challenges in implementing this strategy.* As we progress through the implementation of this strategy, *we are beginning to better understand the timing of demand and obstacles to transacting customers' orders. Although the demand is solid, and we have consistently achieved pricing at or above our target*, some of our customers struggle with access to credit or financing, which poses a challenge to transacting the sale on a timely basis.

* * *

We continue to see a diverse group of customers for our aged whiskey, **_and our visibility to when those sales will be finalized improves throughout the year_**.  **_We are off to a good start to the back half of the year, having already recorded actual sales or received purchase orders for about 12% of our projected sales of aged whiskey for the remainder of the year.  Additionally, we are in active, ongoing discussions with specific customers for another approximately 60% of those projected sales.  This visibility, coupled with the continued solid trends of the category, gives us confidence for strong aged sales growth in the back half of the yea_**r.

(Emphasis added.)

172.    Also during the call, the following exchange took place between an analyst and

Defendant Griffin regarding the Company's aged whiskey sales:

[Analyst:] Let's dive straight to aged.  Something clearly has happened from last quarter to this quarter in terms of you were very confident that the aged sales would enable you to get to the guidance to now you're adding a lower end to the guidance. And clearly, the stock today tells you people don't believe that you can actually sell the product.  So I'm just trying to understand, best case scenario, . . . the company has been surprised by how complex this process is in terms of placing the barrels and it eventually will happen.  Worst-case scenario, customers are now pushing back and saying, "No, we're not going to pay 3x."  So is there any way to give us comfort in the near term that you're selling anything at 3x?  Or that it's more to the former versus the latter?

[Defendant Griffin:] Yes.  Great question and it's obviously, the crux of the matter. So first of all, we're selling less aged this year so far.  We plan to sell more aged than last year.  We're selling less volumetric **_but we're selling older whiskey and we are consistently hitting our target, which is 3x.  We're consistently achieving to that or above that._**

(Emphasis added.)

173.    In response to an analyst questioning the changes to the Company's guidance,

Defendant Griffin indicated the that the changes were due to "other headwinds," including reduced

sales of industrial alcohol.

174.    On this news, the price of the Company's stock dropped from $67.14 per share at

the close of trading on July 30, 2019, to $49.99 per share at the close of trading on July 31, 2019

on increased volume, representing a loss in value of over 25%.

175. An analyst report issued by Craig-Hallum on July 31, 2019 commented on Defendant Griffin's representations during the conference call as follows:

> [The aged whiskey sales] did not appear to represent any drop off in demand for bourbon or rye whiskey. Management says demand and pricing for aged whiskey continues to be strong and they appear to be putting their money where their mouth is: MGPI is continuing to build its inventory of barreled distillate through 2019 and is continuing to expand its warehouses, neither of which would make sense if it appeared that demand or pricing was in fact slowing down.

***October 31, 2019 Press Release and Conference Call***

176. On October 31, 2019, the Company issued a press release containing the Company's financial results for the third fiscal quarter of 2019. The press release was also attached as an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant Gall. The press release revealed yet more disappointing sales and profits for the quarter, stating the following:

- Consolidated sales decreased 4.6% to $90.7 million, reflecting a decline in the Distillery Products segment, which was partially offset by sales growth in the Ingredient Solutions segment.

- Consolidated gross profit decreased 4.1% to $18.8 million, due to declines in the Ingredient Solutions and Distillery Products segments.

- Consolidated operating income decreased 3.4% to $11.6 million.

177. The press release also confirmed the Company's previously revised 2019 guidance, stating the following:

MGP is confirming the following guidance for fiscal 2019:

- 2019 sales growth is projected in the mid-single-digit percentage range versus 2018.

\* \* \*

- The Company's estimate of growth in operating income in 2019 is 10% to

20%, inclusive of the above described resolution of certain legal matters.

\* \* \*

- Earnings per share are forecasted to be in the $2.55 to $2.75 range.

178.   The press release also quoted Defendant Griffin as follows:

"While the overall American whiskey market remains robust, and our position within that market is still very strong, ***timing and volatility of customers' orders continues to be a challenge this year***," said Gus Griffin, president and CEO of MGP Ingredients.  "***As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible***.  These issues affected sales of both new distillate and aged whiskey inventory.  Despite this, we did have a very strong quarter for sales of aged whiskey, selling both more whiskey and older whiskey, ***as customers continue to need our inventory to launch new brands, fill holes in their inventory and support brand acquisitions***.  We believe these customer needs will be ongoing.  ***While we are certainly behind where we would like to be at this point in the year, we are off to a strong start to the fourth quarter, and we are confident in our line of sight to the sales required to deliver against our full year guidance***."

(Emphasis added.)

179.   That same day, the Company held a conference call to discuss the Company's financial results, during which Defendant Griffin once again affirmed the Company's 2019 guidance and its purported visibility into customer demand for aged whiskey as follows:

While the overall American whiskey market remains robust and our position within that market is still very strong, timing and volatility of customers' orders continue to be a challenge this year.  As in previous quarters this year, we saw forecasted orders delayed due to customer funding issues and their desire to delay purchasing as long as possible.  These issues have affected sales of both new distillate and aged whiskey inventory throughout the year. . . . ***While we are behind where we'd like to be at this point in the year, we're off to a strong start to the fourth quarter and we are confident in our line of sight to sales required to deliver against our full year guidance.***

\* \* \*

And while we experienced some delays earlier in the year, ***we are now seeing the type of demand we anticipated when we initiated this investment.***

Our decision in 2015 to begin investing in putting away whiskey for aging was a key part of our long-term strategy.  While we are now starting to see the sales piece

of this strategy ramp-up, it is important to understand the success of this strategy to date in terms of customer recruitment and financial return.  We believe our willingness to make significant strategic sales of lightly aged whiskey over the past few years has been instrumental in the development of our large and diverse customer base.  And we have achieved pricing in line with our 3x model as we have executed this strategy.

***Our aged whiskey inventory has us well positioned to meet future demand.  We now believe that other than what is reserved to support the future growth of our own brands, we will have very minimal 2015 vintage inventory remaining at the end of the year***.  We are also confident that any remaining inventory from that year will continue to increase in value.  As we have said all year, sales of aged whiskey will be the key determinant of our ability to deliver against our full year guidance and that continues to be the case.  ***We are confident in our line of sight to those sales as we have either transacted sales or are in advanced discussions with specific customers for specific inventories for those required sales.***

* * *

While we are not where we would like to be in terms of year-to-date operating income growth, ***we are confident in our ability to achieve our full year guidance.***

(Emphasis added.)

180.    Also during the call, the following exchange took place between an analyst and

Defendant Griffin regarding the Company's aged whiskey sales:

[Analyst:] Can you give us a sense of how much of your anticipated Q4 sales has already been transacted? And for the sales that you anticipate for the rest of the year, again, can you just give us a sense of what gives you the confidence that you're not going to see this pushed out another quarter or two? Are these maybe larger customers or customers you've had a more long-standing relationship with? Just anything you can tell us about that would be helpful.

[Defendant Griffin:] Sure.  As oppose[d] to after the second quarter when we gave you the percentages by how much had been transacted and how much we're in discussions with and how much had been targeted with, we've progressed that quite a bit.  And so now we're really down to about a dozen customers that we're dealing with.  ***We are in active ongoing discussions with them, specific customers for specific inventory to deliver those sales.  The majority of them, the vast majority of them are existing customers.  We don't need them all to come through.  And we feel -- so we feel very good about that outlook.  And that's why we're so confident in our ability to reconfirm our guidance.***

(Emphasis added.)

181.    On this news, the price of the Company's stock dropped from $48.49 per share at the close of trading on October 30, 2019, to $42.89 per share at the close of trading on October 31, 2019 on heavier than normal volume, representing a loss in value of approximately 12%.

182.    Following the call, Craig-Hallum and SunTrust issued reports on October 31, 2019 commenting on the Individual Defendants' representations as to the Company's prospects. The Craig-Hallum report stated the following, in relevant part:

> Third quarter results were below expectations with similar issues to previous quarters this year, including order delays due to customer funding issues and the desire to delay purchasing as long as possible. This customer behavior impacted both new distillate and aged whiskey inventory . . . . This year, the company says the expected strength in Q4 comes from a combination of sales transacted in October and several large sales anticipated in November and December, and noted that the company does not need all of its anticipated Nov/Dec sales to come through in order to hit its guidance. Importantly, we believe sales are less likely to be delayed from Q4 into Q1 than in other quarters because a meaningful number of customers have annual or semi-annual supply contracts with MGP which specify minimum volumes, and the vast majority of these contracts are on a calendar year basis.

183.    The SunTrust report also noted the Company's disappointing results, and indicated that the results were likely due to poor forecasting by management, stating the following, in relevant part:

> ***Admittedly there are no signs of a slowdown in the brown spirits market and we do not believe the company is losing customers. Instead we think this quarter and the YTD performance is the result of poor forecasting and execution from management.*** Normally we would consider throwing in the towel after another quarter like this, but we believe there is too much underlying value in the distillery (appraised at $350M) and aged whiskey inventory (currently $95.2M at cost) to change course at this point.

(Emphasis added.)

### January 17, 2020 Press Release

184.    On January 17, 2020, the Company issued a press release containing the Company's preliminary full year financial results for 2019. The press release was also attached as

an exhibit to a current report on Form 8-K filed with the SEC, which was signed by Defendant

Gall. The press release revealed that the Company was not even close to meeting the 2019 guidance

that the Individual Defendants had reaffirmed only several months prior, and with only two months

remaining in the Company's 2019 fiscal year at that time. The press release stated the following:

> [MGP], a leading supplier of premium distilled spirits and specialty wheat proteins and starches, reported today that based on preliminary financial information, it expects to deliver the following financial results for the full year ended December 31, 2019:

> - Sales of approximately $362 million.

> \* \* \*

> - Operating income expected to be in the range of $46-$48 million.

> \* \* \*

> - Earnings per share expected to be in the range of $2.20-$2.30.

185.    The press release also quoted Defendant Griffin as follows:

> "*The shortfall versus our previously communicated guidance is the result of us ultimately being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter*," said Gus Griffin, president and CEO of MGP Ingredients.

> "*While this shortfall is disappointing, particularly given the line of sight we believed we had to these aged sales, we do not believe it reflects weakness in the overall American Whiskey category, our overall position in that market or the potential long-term value of our aged whiskey inventory. We are currently conducting additional analysis to better understand the aged whiskey market, and, going forward, we will continue to refine our strategies and tactics to improve the sales predictability and management of this important piece of our business*."

(Emphasis added.)

186.    On this news, the price of the Company's stock dropped from $52.78 per share at

the close of trading on January 16, 2020, to $38.18 per share at the close of trading on January 17,

2020 on heavy volume, representing a loss in value of over 27%.

187.    Analysts reacted strongly over the course of the next several days to the Company's

disappointing results. On January 17, 2020, SunTrust lowered its price target for MGP stock from

$80 to $55, and issued a report on the Company stating the following:

> *We are lowering our rating on MGPI to Hold from Buy following significantly worse than expected preliminary 4Q19 results*.  4Q sales are expected to be $92M (down 12.6% YoY) well below our estimate of $126M.  4Q EPS is expected to be in the range of $0.69-$0.79 vs. our estimate of $1.09.  We are reviewing our estimates but, admittedly, have little faith in our prior estimates following today's announcement.

* * *

> *We cannot fully understand how the company whittled away the opportunity over the past 12 months*.  *We started with the belief that the company would start to sell its fully aged inventory* (first put away in 2015) and easily exceed its $2.50$2.60 EPS guidance. *Instead it missed four consecutive quarters, including today's announcement, and doesn't seem to have sold any of its fully aged inventory in 2019.*

(Emphasis added.)

188.    On January 21, 2020, Craig-Hallum similarly curtailed its price target for MGP

stock from $90 down to $40, and issued a report commenting on the Company's prospects and the

Individual Defendants' representations as follows:

> Year-End Guidance for 2019 Did Not Age Well. Management Reports Preliminary FY19 Numbers Below Analyst Estimates. Downgrading From BUY To HOLD And Reducing Price Target From $90 To $40.

* * *

> Management issued a press release providing preliminary FY19 results which came in well below previously issued guidance and our estimates.  *The shortfall came due to management's unsuccessful attempt at transacting a large portion of the aged whiskey sales they had previously forecasted for 4Q. . . .  During the 3Q earnings call management said it was off to a strong start to Q4 and thus reiterated guidance, implying double-digit growth for Q4.*  This was largely due to expected strength in a combination of sales in October and large sales anticipated in November and December adding they did not need all of its Nov/Dec sales to hit guidance.

(Emphasis added.)

189.    On February 11, 2020, not long after the Company released its dismaying preliminary financial results for the year, the Company announced that Defendant Griffin would be stepping down from the role of CEO effective May 21, 2020, and would be succeeded by Defendant Colo.

190.    The statements referenced in ¶¶ 157–162, 165–166, 168–173, 176–180, and 184–185 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

191.    Finally, on February 26, 2020, the Company issued a press release containing the Company's fourth quarter and full year financial results for 2019, revealing that the Company had indeed fallen significantly short of its 2019 guidance on practically every metric. The press release

disclosed that the Company had failed to complete a significant amount of the aged whiskey sales

that the Individual Defendants had previously forecasted, stating the following:

- Consolidated sales decreased 11.8% to $92.5 million, as a result of a decline in Distillery Products segment sales, which was partially offset by an increase in Ingredient Solutions segment sales.
- Consolidated gross profit decreased 15.8% to $21.6 million, due to lower Distillery Products segment gross profits, partially offset by an increase in Ingredients Solutions segment gross profits.
- Consolidated operating income decreased 2.2% to $16.3 million, due to lower sales and gross profit, partially offset by lower incentive compensation expense.
- Earnings per share ("EPS") increased to $0.76 per share from $0.69 per share, due to lower income tax expense, partially offset by lower operating income.

192.    The press release quoted Defendant Griffin, who indicated that the Company would

be reducing its forecast for aged whiskey sales in the future, stating the following:

"We are certainly disappointed in our results, both for the quarter and the year; however, we do not believe these results reflect significant changes in key consumer trends affecting the categories in which we compete, or significant changes in our competitive position within those categories," said Gus Griffin, president and CEO of MGP Ingredients. "While we remain very confident about the long-term potential of our business, we also realize that we must continually refine the effectiveness of our tactical execution and the pace of our strategic implementation. We believe we have learnings from this year that will help us in both these areas."

* * *

"Despite the lower than anticipated sales of aged whiskey in 2019, we still believe in the long-term value of our aged whiskey inventory. Sales of lightly aged whiskey in earlier years, and older aged whiskey in more recent years, have been both a strong customer recruitment tool and a key profit contributor. We believe sales of aged whiskey will continue to play both those roles going forward. However, *due to the inherent volatility in predicting sales of aged whiskey, and lower projections for the volumetric growth of the aged whiskey market, particularly in the U.S., we are reducing our forecast for predictable ongoing annual volume growth in our sales of aged whiskey*. The reduced outlook does not diminish our confidence in the long-term demand for our aged whiskey inventory but reflects the difficulty in forecasting aged whiskey sales in a particular year."

(Emphasis added.)

193.    That same day, the Company held a conference call to discuss the Company's financial results. During the call, Defendant Griffin disclosed that "we fell significantly short of our guidance due to us being unsuccessful in transacting a large portion of the aged whiskey sales we had forecast for the fourth quarter."

194.    Defendant Griffin also admitted during the call that competition had seriously undermined the Company's ability to sell its aged whiskey, stating the following, in relevant part:

> **We also believe that there is an increase in the number of potential competitors for our target market.**
>
> We think they are competing with us primarily for sales of new distillate currently **but also for sales of aged whiskey going forward.** We do not think we are losing existing customers to these competitors, **but we are competing with them for the new business we require for growth**.

(Emphasis added.)

195.    Also during the call, the following exchange took place between Defendant Griffin and an analyst:

> [Analyst:] I wanted to ask about the aged whiskey transactions that failed to materialize in the fourth quarter.  Can you give us a little bit more color on the nature of those transactions . . . ?
>
> * * *
>
> [Defendant Griffin:] [A]t the end of the third quarter, we've stated very confidently that we thought we were going to transact the required number of sales to hit our guidance for the full year.  We said it was less than a dozen. . . .  [M]ost of them were established customers.  **We were very confident we were further along in the transaction process and so forth.  We learned some hard lessons in December.**
>
> Some of the issues we've had in the past, funding came up, delays, people pushing off, things that we thought they were certainly going to – do happen. We had 1 sale just evaporate. Sometimes, we sell to a company who sells to somebody else. Some of the smaller customers might like to deal only with 1 supplier.  **So in essence, it's a customer of a customer. . . .  [S]ince it was a customer of a customer, was that really a viable sale to begin with?  We certainly thought so.**
>
> And then . . . we had people put off because they'd found other temporary solutions. . . .

> *I think the key takeaway from that was we realized that there's continual things that we can't control, and so . . . we are not going to include things that are unpredictable in our forecast.*

(Emphasis added.)

196.     On this news, the price of the Company's stock fell once more, from $31.80 per share at the close of trading on February 25, 2020, to $28.42 per share at the close of trading on February 26, 2020 on high volume, representing a loss in value of approximately 11%.

197.     Following the call, investor analysts expressed their shock at the Company's disastrous financial results, which they linked to the decline in the Company's stock price. A SunTrust analyst, for instance, questioned "why management didn't see [the disappointing results] coming until December." A Craig-Hallum analyst also commented on the February 26, 2020 disclosures as follows:

> If there were to be any substantial sales of aged whiskey, such as the sales management had previously forecast for Q4 but failed to materialize, we believe that would largely represent upside to our estimates. However, we are concerned that the projection of rising sales of aged whiskey in 2020 appears to be based on growing export sales, which represents a new channel for MGPI and could very well prove to be easier said than done. . . . [W]e think it is far from assured that the company will find it any easier to sell aged whiskey abroad.

### Repurchases

198.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $6.08 million to repurchase approximately 90,814 shares of its own common stock at artificially inflated prices.

199.     According to the Company's quarterly report on Form 10-Q filed with the SEC on November 1, 2018, during September 2018, the Company purchased 1,821 shares of its common stock for approximately $141,746, at an average price of $77.84 per share.

200.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during September 2018 was approximately $89,994.

201.    According to the 2018 10-K, during October 2018, the Company purchased 1,468 shares of its common stock for approximately $109,351, at an average price of $74.49 per share.

202.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during October 2018 was approximately $67,631.

203.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 1, 2019, during January 2019, the Company purchased 45,235 shares of its common stock for approximately $3.04 million, at an average price of $67.32 per share.

204.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during January 2019 was approximately $1.75 million.

205.    According to the Company's quarterly report on Form 10-Q filed with the SEC on May 1, 2019, during February 2019, the Company purchased 31,761 shares of its common stock for approximately $2.42 million, at an average price of $76.25 per share.

206.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during February 2019 was approximately $1.51 million.

207.    According to the Company's quarterly report on Form 10-Q filed with the SEC on July 31, 2019, during April 2019, the Company purchased 6 shares of its common stock for approximately $474, at an average price of $79.14 per share.

208.   As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during April 2019 was approximately $304.

209.   According to the Company's quarterly report on Form 10-Q filed with the SEC on October 31, 2019, during July 2019, the Company purchased 12 shares of its common stock for approximately $760, at an average price of $63.36 per share.

210.   As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during July 2019 was approximately $419.

211.   According to the Company's annual report on Form 10-K filed with the SEC on February 26, 2020, during November 2019, the Company purchased 456 shares of its common stock for approximately $20,469, at an average price of $44.89 per share.

212.   As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during November 2019 was approximately $7,510.

213.   According to the Company's annual report on Form 10-K filed with the SEC on February 26, 2020, during December 2019, the Company purchased 11 shares of its common stock for approximately $506, at an average price of $46.09 per share.

214.   As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during December 2019 was approximately $194.

215.   According to the Company's quarterly report on Form 10-Q filed with the SEC on April 30, 2020, during February 2020, the Company purchased 10,044 shares of its common stock

for approximately $342,199, at an average price of $34.07 per share.

216.    As the Company's stock was actually worth only $28.42 per share, the price at closing on February 26, 2020, the amount the Company overpaid for repurchases of its own stock during February 2020 was approximately $56,749.

217.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $3.5 million.

## DAMAGES TO MGP

218.    As a direct and proximate result of the Individual Defendants' conduct, MGP has lost and expended, and will lose and expend, many millions of dollars.

219.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, and its former CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

220.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

221.    Such losses include the Company's overpayment by approximately $3.5 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

222.    As a direct and proximate result of the Individual Defendants' conduct, MGP has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

223.     Plaintiff brings this action derivatively and for the benefit of MGP to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MGP, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof.

224.     MGP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

225.     Plaintiff is, and has continuously been at all relevant times, a shareholder of MGP. Plaintiff will adequately and fairly represent the interests of MGP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

226.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

227.     A pre-suit demand on the Board of MGP is futile and, therefore, excused. At the time that this action was commenced, the Board consisted of the following nine individuals: Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord (the "Director-Defendants"), along with non-party Kerry Walsh Skelly (together, the "Directors"). Plaintiff needs only to allege demand futility as to five of these nine Directors.

228.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales

based on material non-public information, and, at the same time, to cause the Company to overpay by over $3.5 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

229.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Producing and selling whiskey is a core operation for the Company, and as described herein, the Director-Defendants would have been well-informed about the state of the aged whiskey market and the adverse trends that could, and did impact the Company's sales of aged whiskey during the Relevant Period. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

230.    Additional reasons that demand on Defendant Griffin is futile follow. Defendant Griffin served as the Company's CEO and President from July 2014 until he resigned from his positions with the Company on May 21, 2020. Thus, as the Company admits, he was a non-independent director. The Company provided Defendant Griffin with his principal occupation, and he received handsome compensation as described above, including $2,153,228 during the fiscal year ended December 31, 2018, as well as $1,568,011 during the fiscal year ended December 31, 2019. Defendant Griffin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those made during conference calls and contained in the Company's SEC filings and press releases referenced herein, many of which he either personally

made or signed off on. As described herein, Defendant Griffin specifically held himself out as an expert on the Company's position in the market, on the Company's relationships with customers and competitors, and on the Company's overall business prospects, and he discussed the Company's aged whiskey inventory at practically every earnings call held by the Company during the Relevant Period. As the Company's highest officer and as a trusted director, Defendant Griffin conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Griffin is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Griffin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.    Additional reasons that demand on Defendant Colo is futile follow. Defendant Colo has served as the Company's President and CEO since May 21, 2020, and as a Company director since August 2015. He previously served as the Company's President and COO from March 16, 2020 through May 21, 2020. Thus, as the Company admits, he is a non-independent director. Defendant Colo has received and continues to receive compensation for his roles with the Company as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Colo signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Colo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

232.     Additional reasons that demand on Defendant Bareuther is futile follow. Defendant Bareuther has served as a Company director since May 2016. He also serves as the Chair of the Human Resources and Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. Defendant Bareuther has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bareuther signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Bareuther breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

233.     Additional reasons that demand on Defendant Dunn is futile follow. Defendant Dunn has served as a Company director since May 2014. He also serves as the Chair of the Nominating and Governance Committee, and as a member of the Audit Committee and Human Resources and Compensation Committee. Defendant Dunn has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dunn signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Dunn breached his fiduciary duties, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

234.    Additional reasons that demand on Defendant Foglio is futile follow. Defendant Foglio has served as a Company director since May 2014. He also serves as a member of the Audit Committee and Nominating and Governance Committee. Defendant Foglio has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Foglio signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Foglio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

235.    Additional reasons that demand on Defendant Jenkins is futile follow. Defendant Jenkins has served as a Company director since January 2019. She also serves as a member of the Audit Committee, Human Resources and Compensation Committee, and Nominating and Governance Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Jenkins signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Jenkins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

236.     Additional reasons that demand on Defendant Seaberg is futile follow. Defendant Seaberg has served as the Chairman of the Board since December 2014, and as a Company director since May 2009. She also serves as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. Defendant Seaberg has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Her insider sales, which yielded at least $3.48 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. Furthermore, Defendant Seaberg signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Seaberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

237.     Additional reasons that demand on Defendant Strandjord is futile follow. Defendant Strandjord has served as a Company director since December 2013. She also serves as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation Committee and Nominating and Governance Committee. Defendant Strandjord has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Strandjord signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, too, Defendant Strandjord breached her fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

238.    Additional reasons that demand on the Board is futile follow.

239.    As described above, Defendant Seaberg directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendant Seaberg received proceeds of approximately $3.48 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to her, and excused.

240.    Additionally, each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

241.    Defendants Colo, Bareuther, Dunn, Foglio, Jenkins, and Strandjord (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit

Committee Charter, allowing the Company to issue false and misleading financial statements. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

242.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Griffin and Bareuther both served in a variety of senior roles at Brown-Forman Corporation between 1994 and 2010, including as Senior Vice President and as COO, respectively. Additionally, Defendant Seaberg is the cousin of Defendant Page. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

243.    Demand in this case is excused as to Defendants Jenkins and Strandjord, along with non-party Kerry Walsh Skelly (the "Class B Directors"), because they are beholden to and controlled by Defendant Seaberg, whose 68% ownership of the Company's preferred stock provides her with effective control over the continued employment of the Company's Class B Directors. Thus, the Class B Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Seaberg's control over them.

244.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In

violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

245.    MGP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MGP any part of the damages MGP suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

246.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

247.    The acts complained of herein constitute violations of fiduciary duties owed by MGP officers and directors, and these acts are incapable of ratification.

248.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MGP. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the

"insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MGP, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

249.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MGP to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

250.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

251.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

253.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

254.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

255.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As

a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

256.    Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

257.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including election of directors, ratification of the Company's independent auditor, and advisory approval of executive compensation.

258.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord, which allowed them to continue breaching their fiduciary duties to MGP.

259.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

260.    Plaintiff on behalf of MGP has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

261.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

262.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MGP. Not only is MGP now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon MGP by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially-inflated prices, damaging MGP.

263.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

264.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGP not misleading.

265.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by MGP. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

266.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

267.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

268.    Plaintiff on behalf of MGP has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

269.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

270.    The Individual Defendants, by virtue of their positions with MGP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MGP and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MGP and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

271.     Plaintiff on behalf of MGP has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

272.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

273.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MGP's business and affairs.

274.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

275.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MGP.

276.     In breach of their fiduciary duties owed to MGP, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the

Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

277.   The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

278.   In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

279.   The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while one of them engaged in lucrative insider sales, netting proceeds of approximately $3.48 million.

280.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and disguising insider sales.

281.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities, and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

282.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

283.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

284.     Plaintiff on behalf of MGP has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

285.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

286.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGP.

287.    The Individual Defendants either benefited financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from MGP that was tied to the performance or artificially inflated valuation of MGP, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

288.    Plaintiff, as a shareholder and a representative of MGP, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

289.    Plaintiff on behalf of MGP has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

290.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

291.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused MGP to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

292.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

293.    Plaintiff on behalf of MGP has no adequate remedy at law.

## PRAYER FOR RELIEF

294.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of MGP, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MGP;

(c)    Determining and awarding to MGP the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing MGP and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MGP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of MGP to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding MGP restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

## **DESIGNATION OF PLACE OF TRIAL**

Pursuant to Local Rule 40.2, Plaintiff Mitchell Dorfman designates Kansas City, Kansas as the place for trial.

Dated: August 3, 2020                          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Brent J. LaPointe*
Brent J. LaPointe        KSD Bar No. 78539
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: blapointe@rosenlegal.com
        pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

DocuSign Envelope ID: 03A3B9AD-8170-4736-AD3F-3C7055016283

## <u>VERIFICATION</u>

I, Mitchell Dorfman, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this date of _____7/31/2020_____.

DocuSigned by:

*Mitchell Dorfman*

93D15A2F4683479...

Mitchell Dorfman

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which electronically delivered a copy of the same to all counsel of record.

/s/ Brent J. LaPointe
Brent J. LaPointe