## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MITCHELL DORFMAN, *derivatively and on behalf of* MGP INGREDIENTS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>AUGUSTUS C. GRIFFIN, et al.,<br><br>        Defendants,<br><br>    and<br><br>MGP INGREDIENTS, INC.,<br><br>        Nominal Defendant. | Case No. 20-2239-DDC-JPO |

---

### MEMORANDUM AND ORDER

Too much whiskey is the crux of this lawsuit.  And, in this case's context, that's a bad thing.[1]  The matter comes before the court on defendants' Motion to Dismiss (Doc. 19), which they've supplemented with of a Memorandum in Support (Doc. 20).  Plaintiff filed a Response in Opposition to defendants' motion (Doc. 26).  And defendants fired back with a Reply (Doc. 29).

But that's not all.  Defendants also filed a Motion for Judicial Notice in Support of their Motion to Dismiss (Doc. 21).  Last August, and again in October, plaintiff secured an extension of time to respond to defendants' Motion to Dismiss and Motion for Judicial Notice (Docs. 23,

---

[1]        "Too much of anything is bad, but too much good whiskey is barely enough."  MARK TWAIN, MARK TWAIN ON COMMON SENSE:  TIMELESS ADVICE AND WORDS OF WISDOM FROM AMERICA'S MOST-REVERED HUMORIST 37 (Stephen Brennan ed., Skyhorse 2014).

25).  However, plaintiff's Response addresses only their Motion to Dismiss.  So, the court

considers defendants' Motion for Judicial Notice unopposed.

For reasons explained below, the court grants defendants' Motion for Judicial Notice

(Doc. 21).  The court also grants defendants' Motion to Dismiss (Doc. 19), but only in part.  The

court explains its reasoning, below.

## I.      Procedural History and General Background

### A.      Procedural History

Plaintiff Mitchell Dorfman owns common stock in MGP Ingredients, Inc. ("MGP").

Doc. 17 at 10 (Am. Compl. ¶ 31).  He's suing a handful of MGP's current and former directors

and officers on behalf of himself and other MGP shareholders.[2]  His action is a derivative

lawsuit.

A derivative lawsuit "is a suit by a shareholder to enforce a corporate cause of action,"

which, in turn, requires that "the corporation is a necessary party to the suit."  *Price v. Gurney*,

324 U.S. 100, 105 (1945).  That's why MGP appears—at least ostensibly—as both a plaintiff

and nominal defendant in this lawsuit.  *See* Doc. 17 at 1 (Am. Compl.).  If this case survives

defendants' Motion to Dismiss, Mr. Dorfman is "allowed to act in protection of [MGP's] interest

somewhat as a 'next friend' might do for an individual," on the theory that "wrongdoing officers

. . . possess the control which enables them to suppress any effort by the corporate entity to

remedy such wrongs."  *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522–23

(1947).

---

[2]      The individual defendants named in plaintiff's lawsuit are:  Augustus C. Griffin, Thomas K.
Pigott, Brandon M. Gall, David J. Colo, James L. Bareuther, Terrence P. Dunn, Anthony P. Foglio, Lynn
H. Jenkins, George W. Page, Jr., Karen L. Seaberg, and M. Jeannine Strandjord.  *See* Doc. 17 at 1. (Am.
Compl.).

Plaintiff filed his original Complaint (Doc. 1) in the spring of 2020.  About two months later, in July, defendants filed a Motion to Dismiss (Doc. 11) and a Motion for Judicial Notice (Doc. 13).  Then, in August, plaintiff filed his Amended Complaint (Doc. 17).  Accordingly, the court dismissed as moot both of defendants' motions, but without prejudice (Doc. 18).  Later that month, defendants refiled their Motion to Dismiss (Doc. 19) and Memorandum in Support (Doc. 20).  They also refiled their Motion for Judicial Notice (Doc. 21), which incorporates by reference the arguments provided in their earlier Memorandum in Support of their Motion for Judicial Notice (Doc. 14).  The parties engaged in motions practice—filing responses and replies—and this matter is now ready for resolution.

Plaintiff's lawsuit is all about brown liquor—American whiskey, to be exact.  His Amended Complaint alleges that certain current and former directors and officers at MGP violated federal and state laws by "breach[ing] their fiduciary duties [and] personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects."  Doc. 17 at 7 (Am. Compl. ¶ 18).  Plaintiff identities five pieces of information that defendants allegedly failed to disclose:

> (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's inventory and further impair the Company's ability to achieve sales on favorable terms; and (5) the Company failed to maintain internal controls.

*Id.* "As a result of the foregoing," he alleges, "the Company's public statements were materially false and misleading at all relevant times."[3] *Id.*

These misstatements, plaintiff alleges, summon liability under the Securities Exchange Act of 1934, related rules from the Securities and Exchange Commission ("SEC"), and via several common law claims (though he never specifies which state's common law he has in mind).[4]

## B.    General Background

The following facts come from the allegations set forth in plaintiff's Amended Complaint (Doc. 17). The court accepts as true "all particularized allegations of fact" and gives plaintiff "all reasonable inferences logically flowing from them." *City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912, 918 (10th Cir. 2019).

American whiskey is a big industry. "In 2019," plaintiff explains, "26 million cases of whiskey were sold" in the United States. Doc. 17 at 28 (Am. Compl. ¶ 89). And the big business of American whiskey is the heart and soul of this action. MGP plays in the big leagues. It's is a full-fledged, publicly owned corporation with a footprint so large that its assets are valued in terms of publicly traded stocks. *MGP Ingredients, Inc. (MGPI)*, NASDAQ,

---

[3]    Plaintiff's filings identify the relevant time period using slightly different language. *Compare* Doc. 17 at 2 (Am. Compl. ¶ 1) (defining the "relevant period" as "August 2, 2018 through the present (the 'Relevant Period')") *with* Doc. 26 at 13 n.7 (Pl.'s Mem. Opp'n) ("The Relevant Period herein refers to August 2, 2018 through February 26, 2020."). The court adopts plaintiff's most recent framing. So, it defines "the relevant period" to encompass August 2, 2018 until February 26, 2020. *See id.*

[4]    Plaintiff alleges: "This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act." Doc. 17 at 9 (Am. Compl. ¶ 24). The court agrees that it has federal question jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

https://www.nasdaq.com/market-activity/stocks/mgpi (last visited Feb. 16, 2021); *see also* Doc. 17 at 10 (Am. Compl. ¶ 32) ("MGP's shares trade on the NASDAQ Global Select Market ('NASDAQ') under the ticker symbol 'MGPI.'").

Still, MGP might be an unknown force to readers who aren't cocktail connoisseurs or industry insiders.  That's because MGP's efforts, until recently, emphasized so-called "sourced whiskey" for companies who don't produce the spirit themselves.  Doc. 17 at 2 (Am. Compl. ¶ 3) ("Prior to 2015, the Company's whiskey offerings predominantly consisted of unaged rye whiskeys, which the Company's customers would barrel and age themselves.").  In plaintiff's view, MGP dominated the American whiskey market by producing unaged whiskey for its *business* consumers.  These businesses source their whiskey through MGP and then slap their own branded label on it.  *Id.*; *see also id.* at 31 n.3 (citing Eric Felten, *Your 'Craft' Whiskey is Probably From a Factory Distillery in Indiana*, DAILY BEAST (May 20, 2019), https://www.thedailybeast.com/your-craft-whiskey-is-probably-from-a-factory-distillery-in-indiana (explaining MGP's whiskey production facility is "a one-stop shop for marketers who want to bottle their own brands of spirits without having to distill the product themselves").

MGP wasn't always a power player in the whiskey industry.  "Historically," says plaintiff, "the Company's distillery business was primarily dependent on producing and selling vodka, gin, and other grain neutral spirits . . . as well as food grade and industrial alcohol to be used as ingredients in food, personal care products, and pharmaceuticals."  Doc. 17 at 28 (Am. Compl. ¶ 88).  So, how and why did things change for MGP?

Plaintiff says it all started with a boom—a "whiskey boom."  *Id.* at 29 (Am. Compl. ¶ 91).  He describes the 21st century as a period of "resurgence" for American whiskey.  *Id.* at 28 (Am. Compl. ¶ 89).  During the 19th and 20th centuries, he says, "demand for whiskey in the

U.S. was relatively low compared to other hard liquors." *Id.* Today, says plaintiff, it's soaring. *Id.* In line with consumer demand, innovators sought to capitalize on the "craft cocktail movement." *Id.* at 28–30 (Am. Compl. ¶¶ 89–92).

Breaking into the American whiskey market isn't easy. Among other obstacles, "whiskey must be aged in barrels for two or more years before it is ready to drink, which substantially increases the amount of time it takes for distillers to bring newly manufactured whiskey to market." *Id.* at 29 (Am. Compl. ¶ 91). According to plaintiff, these details make commercial whiskey production easier said than done. *Id.* ("This aspect of the whiskey-distilling process has made it difficult for businesses seeking to enter the whiskey market in the 2010's to capitalize on the ongoing 'whiskey boom.'").

Around 2011, plaintiff asserts, MGP's leadership spotted a lucrative opportunity with whiskey. *Id.* at 30 (Am. Compl. ¶ 93). In the same year, MGP purchased a whiskey distillery located in Lawrenceburg, Indiana. *Id.* It's a small town nestled alongside the Ohio River where that waterway and its tributaries define the boundaries between Indiana, Kentucky, and Ohio. In Lawrenceburg, MGP "began using [its] facility to produce unaged whiskey distillate." *Id.* (Am. Compl. ¶ 94). And, the Company began selling a significant amount of its inventory to smaller whiskey shops who hadn't yet managed to produce their own batches—non-distiller producers ("NDPs"). *Id.* (Am. Compl. ¶ 95). Since these market newcomers wanted to capitalize on consumer trends faster than they could produce the product, MGP's sourced whiskey was a "stopgap, while their own whiskeys aged." *Id.* at 3 (Am. Compl. ¶ 3).

A few years later, in 2015, MGP announced major strategic developments. Central to this case, MGP declared that it would begin "expanding the Company's whiskey business by building up a stock of aged whiskey—as opposed to unaged distillate—to sell to *customers*." *Id.*

6

at 32 (Am. Compl. ¶ 97) (emphasis added).  Company leadership decided that MGP ought to sell its own brand of the brown liquor direct-to-consumers, in addition to their existing operations with NDPs and other whiskey brands.  *Id.* at 32–33 (Am. Compl. ¶ 97).  According to plaintiff, MGP's "whiskey was expected to age for approximately four years, at which point the Company would begin selling the whiskey on the market, at a higher premium than the Company's unaged whiskey distillate would sell for."  *Id.* at 33 (Am. Compl. ¶ 98).

These details set the stage for plaintiff's lawsuit.  As he sees things, MGP built a business strategy equipped with three obvious and substantial obstacles that should've grounded the initiative before takeoff.  *First*, he says, there's the "inherent tension between MGP's status as a large, industrial distiller, and the desire on the part of many whiskey consumers for whiskey from small, artisanal distillers, particularly those based in Kentucky."  *Id.* at 32 (Am. Compl. ¶ 96).  *Second*, plaintiff asserts, MGP's branded whiskey idea meant the company would unveil its new line of liquor simultaneous to its NDP clients aging off of MGP's whiskey distillate and selling their own batches of the brown liquor.  *Id.*  In other words, MGP's plans would convert its business customers into rivals.  *Id.*  And *third*, plaintiff alleges, all of this was playing out "in a market now saturated with strong competitors[.]"  *Id.* at 54 (Am. Compl. ¶ 155).  According to plaintiff, MGP just couldn't compete.  Defendants knew it all along, he claims.

As told through the allegations in plaintiff's Amended Complaint, MGP fell short of its goals by wide margins.  Plaintiff asserts that MGP, initially, increased "the valuation of its aged whiskey inventory from $73 million to $95 million."  *Id.* at 4 (Am. Compl. ¶ 6).  But, he alleges, those figures were always a fraud.  He claims the "truth emerged gradually in a series of press releases and conference calls beginning in May 2019 and continuing through the beginning of 2020."  *Id.* at 5 (Am. Compl. ¶ 7).  Stated simply, MGP wasn't going to make its target

projections or come anywhere close to them. *Id.* at 5–7 (Am. Compl. ¶¶ 7–17).  By the end of the relevant time period—that is, by February 2020—the company announced it had failed to meet its goals. *Id.* at 6 (Am. Compl. ¶ 16).  MGP stock—which was valued at $87.87 per share in April 2019—dropped to a mere $28.42 per share by February 2020. *Id.* at 5–6 (Am. Compl. ¶¶ 8, 17).  Plaintiff alleges these figures correspond with a related reduction of more than $1 billion for the company's market capitalization. *Id.* at 6–7 (Am. Compl. ¶ 17).

MGP's plans were an ambitious strategy that didn't work.  But, were those plans illegal?  Plaintiff thinks so.  He alleges defendants' "optimistic representations" about MGP's forecasted performance were belied by "the simultaneous increase in competition that would foreseeably impact the Company's planned expansion into the aged whiskey market[.]" *Id.* at 4 (Am. Compl. ¶ 6).  The defendants' positive outlook, he says, was part of a "fraudulent scheme . . . intended to make the Company appear more profitable and attractive to investors." *Id.* at 77 (Am. Compl. ¶ 229).

## II.    Legal Standard

Plaintiff's lawsuit is a derivative action brought "for the benefit of MGP to redress injuries suffered, and to be suffered[.]"  Doc. 17 at 76 (Am. Compl. ¶ 223).  There are two main species of corporate litigation:  direct and derivative actions.  In a direct action, "a stockholder 'must allege more than an injury resulting from a wrong to the corporation,'" *i.e.*, that the *plaintiff stockholder* was directly harmed by corporate wrongdoing. *Grogan v. O'Neil*, 307 F. Supp. 2d 1181, 1188 (D. Kan. 2004) (quoting *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988)).  In contrast, a derivative action involves a plaintiff stockholder bringing suit based on a cause of action that "belongs to the corporation," *City of Cambridge Ret. Sys.*, 921 F.3d at 918.  In other words, the plaintiff in a derivative action "step[s] into the corporation's shoes . . .

to seek in its right the restitution he could not demand on his own." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

Defendants think the court should dismiss plaintiff's lawsuit in its entirety under Fed. R. Civ. P. 23.1 and 12(b)(6).[5] *See* Doc. 19 (Mot. to Dismiss) ("Defendants and Nominal Defendant hereby respectfully move to dismiss this case pursuant to Federal Rules of Civil Procedure 12(b)(6) and 23.1."). Rule 23.1 applies because it governs lawsuits involving "one or more shareholders . . . bring[ing] a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). Rule 23.1 emphasizes "particularity." A plaintiff shareholder's complaint must "state with particularity" the details of plaintiff's efforts "to obtain the desired action" from the corporation's directors and, if necessary, its shareholders. Fed. R. Civ. P. 23.1(b)(3)(A). The "desired action" referenced in Fed. R. Civ. P. 23.1 is the directors' agreement to bring the suit. In other words, plaintiff must state with particularity his efforts to "obtain"—*i.e.*, demand—the board's approval for the lawsuit, or his reasons "for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3)(A)–(B). Defendants here contend that plaintiff's allegations fall short of the requisite particularity required under Fed. R. Civ. P. 23.1. *See* Doc. 20 at 11 ("Plaintiff does not plead with particularity facts sufficient to excuse demand.").

Derivative lawsuits are "an extraordinary process" because they permit a shareholder to assume control of legal rights belonging to a corporate entity. *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2010) (internal quotation marks and citation omitted). Given "the extraordinary nature of a shareholder derivative action, Rule 23.1 establishes stringent conditions

---

[5]     Although defendants' Motion to Dismiss (Doc. 19) references Fed. R. Civ. P. 12(b)(6), their Memorandum in Support of their Motion to Dismiss (Doc. 20) makes no reference to Rule 12(b)(6). Instead, they ground their legal arguments entirely on Fed. R. Civ. P. 23.1.

for bringing such a suit." *Id.* (citation omitted).  Those "stringent conditions" include so-called pre-suit demand and demand excusal.  *Id.*; *see also City of Cambridge*, 921 F.3d at 918.

These concepts apply in derivative actions because "the cause of action belongs to the corporation," not the plaintiff himself.  *City of Cambridge*, 921 F.3d at 918.  So, "shareholders, as a 'precondition for the suit,' must make a pre-suit demand on the corporation's board of directors to pursue the litigation, 'unless excused by extraordinary conditions.'"  *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)).  In other words, a plaintiff who wishes to proceed with such an extraordinary cause of action can't fast track his lawsuit.

Instead, he first must seek the board of directors' approval by issuing a demand.  *See id.* ("Rule 23.1 requires the complaint to state with particularity any effort to obtain the desired action from the corporation's directors[.]" (internal quotation marks, citation, and alteration omitted)); *see also Grogan*, 307 F. Supp. 2d at 1190 (explaining that plaintiffs seeking to "assert a derivative action . . . must comply with the demand requirement of Rule 23.1").  "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such a right."  *Kamen*, 500 U.S. at 96 (internal quotation marks, citation, and alteration omitted).  In other words, it's up to the board whether to permit a shareholder plaintiff to proceed in his derivative action.

Typically, a shareholder may bring a derivative action only after he demands that the board of directors bring the suit.  *Id.*  Directors have this discretion, courts have reasoned, to "prevent abuse of this remedy[.]"  *Id.* at 95–96.  It's why "courts established as a precondition 'for the suit' that the shareholder demonstrates 'that the corporation itself had refused to proceed

after suitable demand, unless excused by extraordinary conditions.'" *Id.* (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)).

In this case, plaintiff didn't make a pre-suit demand on MGP's board of directors. This omission means he must allege with particularity that extraordinary conditions existed to make any effort at demand pointless—*i.e.*, futile. *Id.* at 96 ("Ordinarily, it is only when demand is excused that the shareholder enjoys the right to initiate suit on behalf of his corporation in disregard of the director's wishes." (citation and internal quotation marks omitted)). That condition commonly is called demand futility. Demand futility is a firm requirement when shareholders decline to pursue a demand upon the board. *City of Cambridge*, 921 F.3d at 918 (explaining that plaintiff must "plead the reasons such demand would have been futile").

Here, plaintiff didn't issue a demand. *See* Doc. 17 at 76 (Am. Compl. ¶ 227) ("A pre-suit demand on the Board of MGP is futile and, therefore, excused."). Up against defendants' Motion to Dismiss, his case therefore can proceed only if the court agrees with him that demand was futile. To make this decision, the court looks to plaintiff's Amended Complaint in search of particularized factual allegations providing a basis to agree with plaintiff that demand would've been futile. *See City of Cambridge*, 921 F.3d at 918 (explaining that plaintiffs who don't seek demand must demonstrate demand futility in accordance with the particularity requirements described in Rule 23.1). That the court should excuse demand is plaintiff's central argument at this stage of the litigation. He alleges:

> In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of MGP's Board of Directors (the "Board") ***cannot consider a demand to commence***

11

> ***litigation*** against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

Doc. 17 at 8–9 (Am. Compl. ¶ 23) (emphasis added).

This stage of the inquiry relies on state law for guidance. *See Grogan*, 307 F. Supp. 2d at 1190 ("The court applies . . . state substantive law to determine whether demand on the board would have been futile."). Specifically, the court considers the state law of the entity's state of incorporation. *City of Cambridge*, 921 F.3d at 918 ("Whether the complaint's particular allegations suffice depends upon the substantive law of the state in which the entity is incorporated[.]"). MGP incorporated in Kansas, and its principal place of business is in Kansas as well. *See* Doc. 15-1 at 3. Accordingly, Kansas state law governs the question whether demand should be excused as futile. *Kamen*, 500 U.S. at 108-09 (holding that the demand inquiry turns on "the law of the State of incorporation").

"Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code." *Arnaud v. Stockgrowers State Bank of Ashland, Kan.*, 992 P.2d 216, 218 (Kan. 1999); *see also* Doc. 20 at 9–10 ("Here, that state law is Kansas law—which in turn 'look[s] to the decisions of the Delaware courts involving corporation law.'" (quoting *Welch v. Via Christi Health Partners, Inc.*, 133 P.3d 122, 143–44 (Kan. 2006)). In the next section of this Order, the court evaluates these issues under the relevant state laws.

As for plaintiff's Amended Complaint, the court must "accept as true all particularized allegations of fact and give [plaintiff] all reasonable inferences logically flowing from them." *City of Cambridge*, 921 F.3d at 918 (citing *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55–56 (Del. 2017)). However, the benefits of this presumption aren't limitless. "'[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences.'"

*Id.* (quoting *White v. Panic*, 783 A.2d 543, 549 (Del. 2001)).  The court is obligated to give plaintiff the benefit of any doubts, but only when doing so is reasonable—*i.e.*, because those inferences "logically flow" from the particularized facts alleged in his Amended Complaint.  *Id.*

This isn't the typical motion to dismiss under Fed. R. Civ. P. 12(b)(6).  It's quite different.  "Rule 23.1's rigorous pleading requirements . . . [are] '*more onerous*' than Rule 12(b)(6)."  *Id.* at 918 n.7 (quoting *McPadden v. Sidhu*, 964 A.2d 1262, 1269 (Del. Ch. 2008)) (emphasis added).  It's for this reason that courts in Delaware, the heartland of corporate conflicts, "often cite Rule 23.1's particularized-pleading standard in contradistinction to" Rule 12(b)(6).  *Id.* (internal quotation marks and citations omitted).

To bring things full circle and summarize before moving on to the main attraction:  *First*, plaintiff's cause of action isn't so much his own as it is the corporation's.  *Kamen*, 500 U.S. at 95 ("[T]he purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." (internal quotation marks and citation omitted)).  *Second*, it's an "extraordinary" way for shareholders to take the reins of the company.  *Quinn*, 620 F.3d at 1012.  *Third*, and because of this, plaintiff can't swing open the courthouse doors without making a particularized showing that he obliged Fed. R. Civ. P. 23.1.

He can do that in one of two ways.  Plaintiff can initiate a pre-suit demand upon the board of directors, in which case his complaint must allege those efforts with "particularized" details.  Fed. R. Civ. P. 23.1.  In this case, plaintiff didn't issue a demand to the board.  He must therefore demonstrate that a demand to the board would've been futile.  And he must do so through particularized allegations.  *Id.*

What counts as enough particularity in this type of dispute?  The "function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of 'substance,' not 'procedure.'"  *Kamen*, 500 U.S. at 96–97 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 543–44 (1984) (Stevens, J., concurring in judgment)).  And, "federal procedural rules cannot establish substantive law."  *In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1227 (10th Cir. 2016).  So, the court must identify the governing substantive law and apply it to resolve this dispute.

In keeping with "the rigorous pleading standard" established under Rule 23.1, the court's review of plaintiff's Amended Complaint isn't nearly as generous as it would be under Fed. R. Civ. P. 12(b)(6).  *City of Cambridge*, 921 F.3d at 925.  Instead, the court views plaintiff's Amended Complaint through a lens that "requires substantially more than notice pleading and the 'liberal pleading requirements' do not apply."  *Grogan*, 307 F. Supp. 2d at 1190 (quoting *Kaufman v. Kan. Gas & Elec. Co.*, 634 F. Supp. 1573, 1578 (D. Kan. 1986)).  Of course, his allegations must be "particularized" in the first place.  *City of Cambridge*, 921 F.3d at 918 ("In evaluating the Shareholders' pleading, we accept as true all *particularized allegations* of fact and give the Shareholders all reasonable inferences logically flowing from them." (emphasis added and citation omitted)).

At this stage of the action, the court must "decide only whether such demand would have been futile."  *Id.* at 917.  That task sounds simple enough, but, in fact, it's a tall order.

## III.   Analysis

Before turning to the parties' arguments for and against dismissal, the court addresses defendants' Motion for Judicial Notice (Doc. 21).  The court then turns to defendants' Motion to Dismiss (Doc. 19).

### A.      Defendants' Motion for Judicial Notice

Defendants ask the court to take judicial notice of three documents submitted alongside a declaration from MGP's Corporate Secretary, Thomas Lynn.  Doc. 14 at 2; *see also* Doc. 15 (Lynn Decl. at 1–2).  These materials comprise MGP's Articles of Incorporation (Doc. 15-1 at 3–8), the results of MGP's June 30, 2020 board election (Doc. 15-2 at 2–4), and MGP's 2019 SEC Form 10-K (Doc. 15-3 at 2–68).

As the basis for their request, defendants invoke Fed. R. Evid. 201.  That Rule governs judicial notice of adjudicative facts.  It specifies that the "kinds of facts that may be judicially noticed" are those not subject to any reasonable dispute because they involve:  (1) information generally known in the court's territorial jurisdiction, or (2) details that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)–(2).  "The court may take judicial notice at any stage of the proceeding."  Fed. R. Evid. 201(d).  The court *must* do so "if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Last, when "ruling a motion to dismiss, a court may consider facts subject to judicial notice without converting the motion to dismiss into a motion for summary judgment."  *Hastey v. Welch*, 449 F. Supp. 3d 1053, 1059 (D. Kan. 2020) (citing *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006)).

Defendants have made a request for judicial notice.  But, have they supplied the "necessary information" required by Rule 201(c)(2)?

### 1.   MGP's Articles of Incorporation

Defendants state that Exhibit A, attached to Mr. Lynn's declaration, "is a certified version of MGP Ingredients' amended articles of incorporation, obtained from the State of Kansas."  Doc. 14 at 2; *see also* Doc. 15-1 at 2–8.  Indeed, Exhibit A to Mr. Lynn's declaration includes

those Articles of Incorporation, as well as a letter from the state's Office of the Secretary of State confirming as much.  Doc. 15-1 at 2.

In *Hastey*, this court ruled similar corporate governing documents admissible "because they are matters of public record not subject to reasonable dispute."  *Hastey*, 449 F. Supp. 3d at 1059–60.  Here, plaintiff had an opportunity to argue that *Hastey* was decided wrongly—or that it doesn't apply to the current case.  But, he didn't.  In fact, he didn't respond to the judicial notice motion at all.  For this reason alone, the court could grant the motion.  *See* D. Kan. Rule 7.4(b) (explaining that unopposed motions are "ordinarily" granted "without further notice").  But in addition, the court agrees with the substance of defendants' motion.  Accordingly, the court grants defendants' motion because it is unopposed and because MGP's Articles of Incorporation are verifiable public records therefore not subject to dispute.  The court considers this document when ruling the other pending motion.

## 2. MGP's June 2020 Board Election Results

Next, defendants propose the materials attached to Mr. Lynn's declaration as Exhibit B— that is, "an SEC filing showing that on June 30, 2020, MGP Ingredients' shareholders held an election for all members of the board"—is a public record meriting judicial notice.  Doc. 14 at 2; *see also* Doc. 15-2 at 13–15.  On this point, they rely on the same portions of the *Hastey* ruling described above.  *Id.*

They're right.  SEC filings are a matter of public record.  One easily can verify their contents and they aren't easily subject to dispute.  *Hastey*, 449 F. Supp. 3d at 1059–60; *see also Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 930 n.43 (D. Kan. 2014) ("A court may take judicial notice of the SEC's filings because they are a matter of public record." (citation omitted)).

16

The court takes judicial notice of Exhibit B to Mr. Lynn's declaration.

### 3.   MGP's 2019 SEC Form 10-K

Last, defendants request judicial notice of Exhibit C to Mr. Lynn's declaration, *i.e.*, the company's annual SEC Form 10-K.  Doc. 14 at 2; *see also* Doc. 15-3 at 2–68.  Just like the SEC filings described above, these too are matters of public record.  As with the other materials defendants wish to submit via their Motion for Judicial Notice, plaintiff hasn't uttered a syllable to suggest he opposes the request.

The documents are publicly available records.  So, the court will take judicial notice of them.

### B.   The Court Grants Defendants' Motion to Dismiss Plaintiff's Federal Claims

"The thrust" of plaintiff's lawsuit, defendants say, "is that MGP's directors and officers misled investors about MGP's performance, in violation of the Securities Exchange Act of 1934 and Kansas state law."  Doc. 20 at 6.  In plaintiff's view, his Amended Complaint provides particularized allegations demonstrating that MGP's board couldn't exercise independent business judgment—if presented with a demand—because they "face a substantial likelihood of liability for breaching their fiduciary duties."  Doc. 26 at 18.  As he sees things, "the Complaint alleges particularized facts establishing a reason to doubt that a majority of MGP's Board . . . were disinterested because they face a substantial likelihood of liability for breaching their non-exculpable duties of loyalty, candor, and good faith[.]"[6]  *Id.*

---

[6]     Plaintiff argues, albeit incorrectly, that he "needs only to establish a reasonable doubt, not a probability, that MGP's board could be disinterested in responding to a demand."  Doc. 26 at 16 (emphasis omitted).  He's got the lingo down, but not the technical definitions.  "In essence, [plaintiff] argue[s] that the necessary quantum of liability risk is anything more than zero."  *City of Cambridge*, 921 F.3d at 920 n.11.  That's incorrect, the Tenth Circuit has explained.  "Instead, a 'reasonable doubt' as to directors' impartiality 'should only be found where a substantial likelihood of personal liability exists.'"  *Id.* (quoting *Wood v. Baum*, 953 A.2d 136, 141 n.11 (Del. 2008)).

Not so fast, defendants say.  They contend plaintiff hasn't alleged "a single fact showing that a majority of MGP's board faces a substantial likelihood of personal liability for knowingly engaging in fraudulent or illegal conduct or breaching their fiduciary duties in bad faith[.]"  Doc. 20 at 6 (emphasis and internal quotation marks omitted).  To bolster defendants' point, they spotlight the company's Articles of Incorporation.  Specifically, Article XI of those Articles exculpates directors from breaches of their duty of care.  Doc. 15-1 at 6; *see also* Kan. Stat. Ann. § 17-6002(b)(8) (permitting Kansas corporations to include within their articles of incorporation "a provision eliminating or limiting the personal liability of a director . . . for breach of fiduciary duty as a director" so long as the provisions do not eliminate or limit a director's liability for breaches of their duty of loyalty).

Defendants contend that plaintiff's only navigable route around their Motion to Dismiss requires him to "plead with particularity facts establishing a substantial likelihood of a breach of each director's duty of loyalty."  Doc. 20 at 11 (citing *City of Cambridge*, 921 F.3d at 920).  "That is not an easy task," they say.  *Id.*  The "complaint needs to plead 'particularized facts that . . . show that a majority of the defendants knowingly engaged in fraudulent or illegal conduct or breached in bad faith' their fiduciary duties."  *Id.* (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)) (emphasis omitted).

### 1.   What test does the court apply to determine whether demand was futile?

The demand futility inquiry is a two-step process, with most of the action occurring at the second step.

*First*, courts turn to Fed. R. Civ. P. 23.1.  It mandates that plaintiffs in a derivative suit allege *with particularity* their efforts to secure demand from the board, or their reasons for not doing so.  Fed. R. Civ. P. 23.1(b)(3)(A)–(B).  But, "the federal procedural rules cannot establish

substantive law." *In re ZAGG, Inc.*, 826 F.3d at 1227.  "Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, [but] it does not *create* a demand requirement of any particular dimension." *Kamen*, 500 U.S. at 96.  So, *second*, "federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit." *In re ZAGG, Inc.*, 826 F.3d at 1228.  Rule 23.1 provides a blueprint, but state law gives the test its teeth.

Here, Kansas law supplies the law controlling for the futility analysis.  Specifically, Kan. Stat. Ann. § 60-223a(b)(3) provides the rules for derivative actions and demand.  But, those rules mimic what Rule 23.1 provides.  Kan. Stat. Ann. § 60-223a(b)(3); *see also Kaufman*, 634 F. Supp. at 1576 (explaining that Kan. Stat. Ann. § 60-223a "is virtually identical to Rule 23.1").  Where can the court find a test for determining demand futility?  All roads lead to Delaware, it seems.  *See Arnaud*, 992 P.2d at 218 (collecting cases from Kansas elaborating on the closely mirrored relationship between corporations laws in Kansas and Delaware); *see also Kan. Heart Hosp., L.L.C. v. Idbeis*, 184 P.3d 866, 878 (Kan. 2008) ("Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." (citations omitted)).

This court thus "follows two landmark decisions of the Supreme Court of Delaware on demand futility:  *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993)." *In re ZAGG, Inc.*, 826 F.3d 1229.  The *Aronson*[7] and *Rales* tests each boast a bit of nuance, but those distinctions don't matter here.  As the Tenth Circuit said in *City of Cambridge*, "the distinction between *Aronson* and *Rales* is immaterial in this case" because the

---

[7]     *Aronson* was overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

plaintiff shareholder claims the directors face liability from suit and are therefore incapable of impartially acting on demand.  921 F.3d at 919 n.9 (citations omitted).

Reason being, either test would excuse demand if the directors are shown to face a substantial likelihood of liability.  *Compare Aronson*, 473 A.2d at 815 (finding that, if director conduct was "so egregious" that it failed the business judgment test, it would also expose the directors to liability and therefore provide a basis for demand excusal), *with Rales*, 634 A.2d at 936 (finding directors' failure to act created a risk of personal liability, which, in turn, evidenced the directors' inability to exercise independent business judgment).

That "a majority of MGP's Board (or at least five members) . . . face a substantial likelihood of liability" is exactly what plaintiff alleges in this case.  Doc. 26 at 18.  Accordingly, the court considers whether plaintiff's Amended Complaint voices these allegations with the requisite particularity contemplated by Rule 23.1 and Kansas state law, and in light of the Tenth Circuit's synthesis of the *Aronson* and *Rales* tests.  *City of Cambridge*, 921 F.3d at 919 n.9; *see also United Food & Commercial Workers Union v. Zuckerberg*, No. 2018-0671-JTL, 2020 WL 6266162, at *18 (Del. Ch. Oct. 26, 2020) (reflecting an emerging trend in Delaware jurisprudence rejecting the *Aronson*/*Rales* distinction, calling the *Aronson* test "broken," and advocating a "hybrid of *Aronson* and *Rales*" similar to the framework established by the Tenth Circuit in *City of Cambridge*).

### 2.  Has plaintiff alleged with particularity that a majority of MGP's board faces a "substantial likelihood" of personal liability?

The court admires plaintiff's diligence.  Both his Amended Complaint and Response to defendants' Motion to Dismiss reflect a thorough review of pertinent statutes and precedent.  However, it simply isn't true that "the facts Plaintiff alleges support a strong inference that the Director Defendants each face a substantial likelihood of liability."  Doc. 26 at 18; *cf. La. Mun.*

*Police Employees' Ret. Sys. v. Hesse*, 962 F. Supp. 2d 576, 587–91 (S.D.N.Y. 2013) (granting

motion to dismiss because plaintiff was "unable to identify particularized facts of Defendants'

knowledge or conduct, actual or constructive, evidencing a breach of fiduciary duties").  To be

sure, plaintiff tells a compelling story about a business venture gone awry.  But, business

ventures often fall short or fail altogether.  They're a gamble of sorts.  Indeed, the stock market is

a gamble.  And winners and losers are essential components of every gamble.

Plaintiff says MGP shareholders were the losers when the company gambled on its aged

whiskey strategy.  But, that doesn't necessarily mean their gamble was fraudulent and, therefore,

an illegal "scheme."  Doc. 17 at 88 (Am. Compl. ¶ 262).  Plaintiff must allege particularized

facts because "the court is not obligated to accept as true bald assertions, unsupported

conclusions and unwarranted inferences" when evaluating defendants' Motion to Dismiss under

Rule 23.1.  *DiBattista v. Greco*, No. 20-590-RGA, 2021 WL 327399, at *5 (D. Del. Jan. 31,

2021) (explaining United States Magistrate Judge's Report and Recommendation that plaintiff's

action be dismissed for failure to plead demand futility and lack of subject matter jurisdiction

(citing *In re Caterpillar Inc. Derivative Litig.*, No. 12-1076-LPS-CJB, 2014 WL 2587479, at *7

(D. Del. June 10, 2014))).

To the contrary, the court also could infer from these events that defendants, despite their

good faith efforts, failed to recognize a strategic failure looming on the horizon.  *See Stone ex*

*rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 373 (Del. 2006) (affirming Delaware

Chancery Court's dismissal of plaintiff's derivative action and explaining plaintiff's argument

failed to "recognize that the directors' good faith exercise of oversight responsibility may not

invariably prevent employees from . . . causing the corporation to incur significant financial

liability").  The hurdle is remarkably high in this case.  Plaintiff must allege—with

particularity—that a majority of the directors who would have considered a demand from plaintiff couldn't do so independently because they acted with conscientious disloyalty to MGP and its shareholders.  *See City of Cambridge*, 921 F.3d at 921 (affirming district court's dismissal for failure to plead demand futility and explaining that demand futility is typically assessed in comparison to the directors who would've been faced with demand, had plaintiff presented it).

The court won't belabor the point.  The court has reviewed the parties' filings thoroughly, and here's how things shake out for each of the named defendants, grouped according to plaintiff's allegations.

### a.  Director Compensation

Most of the named defendants are or were compensated for their board positions. Plaintiff argues this fact provides a basis for the court to conclude these directors aren't independent when it comes to considering a demand upon the board.  He names defendants Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord.  Doc. 17 at 77–81 (Am. Compl. ¶¶ 230–37).  Plaintiff seems to suggest that compensation signals a bias.

But, "directors have the power, authority and wide discretion to make decisions on executive compensation."  *Brehm v. Eisner*, 746 A.2d 244, 262 n.56 (Del. 2000).  "The essence of Plaintiff's argument is that the directors are not independent because they receive compensation as directors and wish to continue to do so."  *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Lundgren*, 579 F. Supp. 2d 520, 535–36 (S.D.N.Y. 2008).  However, this argument "for excusing demand has been repeatedly rejected under Delaware law."[8]  *Id.* at

---

[8]      The court recognizes that Kansas's laws, not Delaware's, govern this case.  But, "Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code."  *Arnaud*, 992 P.2d at 218.

536 (citing *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988)).[9]  "This Court's view of the disqualifying effect of such fees might be different if the fees were shown to exceed materially what is commonly understood and accepted to be a usual and customary director's fee."  *Orman v. Cullman*, 794 A.2d 5, 29 n.62 (Del. Ch. 2002) (declining to infer disabling interest in board director on the basis that director would have a financial interest through his compensation from the surviving corporation of a corporate merger).

Plaintiff's Amended Complaint "does not allege . . .  that the compensation . . . was extraordinary or excessive."  *Ryan v. Gursahaney*, No. CV 9992-VCP, 2015 WL 1915911, at *8 (Del. Ch. Apr. 28, 2015), *aff'd* 128 A.3d 991 (Del. 2015).  It also doesn't "identify any reason why, in the particular circumstances of this case, the [c]ourt should conclude that the compensation package unduly influenced . . . the director's decisionmaking."  *Id.*  Looking back to Delaware for guidance, the "law [there] is clear that absent particularized factual allegations indicating such a disabling conflict, 'ordinary director compensation alone is not enough to show demand futility.'"  *Id.* (quoting *A.R. DeMarco Enterprises, Inc. v. Ocean Spray Cranberries, Inc.*, No. Civ.A. 19133-NC, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002)).

Plaintiff asks the court to infer from their compensation that each director was nefariously motivated to perpetuate an illegal and fraudulent scheme.  Here, his suggestion is predicated upon another suggestion:  that each of these directors participated in the scheme to ensure their continued compensation.  Case law is clear that plaintiff's logic could suffice only if he provided particularized factual details demonstrating a basis for a reasonable factfinder to infer a link between compensation and disloyal motives.  He hasn't alleged such detailed facts, which means this argument can't carry the day.

---

[9]      *Grobow* was overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

### b.  MGP's Financial Filings

Plaintiff argues that some of the named defendants knowingly facilitated a fraudulent scheme by signing or soliciting financial paperwork submitted to the SEC.  He identifies MGP's SEC Form 10-K for the year 2018.  It "was signed by Defendants Griffin, Pigott, Colo, Bareuther, Dunn, Foglio, Jenkins, Page, Seaberg, and Strandjord."  Doc. 17 at 39 (Am. Compl. ¶ 115).  Plaintiff also argues the company's April 2019 Proxy Statement, which defendants "Griffin, Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord solicited . . . contained material misstatement and omissions."  *Id.* at 53 (Am. Compl. ¶ 152).

As plaintiff sees things, the 2018 Form 10-K was materially and illegally misleading because, in part, it only described "factors that *could* cause the Company to inaccurately gauge demand for its aged whiskey . . . implying that such risks had not already materialized."  *Id.* at 52 (Am. Compl. ¶ 150).  To demonstrate this alleged fraudulent implication, plaintiff directs the court to the following passage from the 2018 Form 10-K:

> There is an inherent risk in determining the quantity of maturing stock of aged distillate to lay down in a given year for future sales as a result of changes in consumer demand, pricing, new brand launches, changes in product cycles, and other factors.  Demand for products ***could*** change significantly between the time of production and the date of sale. ***It may be more difficult to make accurate predictions regarding new products and brands***.  Inaccurate decisions and/or estimations ***could*** lead to an inability to supply future demand or lead to a future surplus of inventory and consequent write-down in the value of maturing stocks of aged distillate.  As a result, our business, financial condition, or results of operations ***could*** be materially adversely affected.

*Id.*  Plaintiff wants the court to hold that, because these defendants signed the Form 10-K at issue, they endorsed "the issuance of . . . false and misleading statements while they were serving as a senior executive and/or director of the Company[.]"  *Id.* at 89 (Am. Compl. ¶ 266).

Even drawing all reasonable inferences in plaintiff's favor, the court can't agree.  "A mere statement that the Defendants caused the filing of the allegedly misleading financial

statements with the SEC is not, without more, a particularized allegation of fact." *In re China Auto. Sys. Inc. Derivative Litig.*, No. CV 7145-VCN, 2013 WL 4672059, at *8 (Del. Ch. Aug. 30, 2013) (granting defendants' motion to dismiss (citing *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 133 n.88 (Del. Ch. 2009))).  That's because the board's "execution of . . . financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality." *Wood*, 953 A.2d at 142 (affirming Delaware Chancery's Court's dismissal of plaintiff's derivative action for failure to plead demand futility).  The Amended Complaint must plead "specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow [the court] to reasonably conclude that the director defendants face a substantial likelihood of personal liability." *Citigroup*, 964 A.2d at 134 (granting dismissal of all but one claim (citing *Wood*, 953 A.2d at 142)).  This is so for two reasons.

*First*, the language in the Form 10-K plaintiff highlights plainly acknowledges the possibility that MGP's performance could fluctuate.  *Second*, and as defendants note, plaintiff's allegation involves a substantial leap in logic.  He argues the defendants were misleading the investing public about something and *knew* it.  Doc. 20 at 13.

Plaintiff doesn't supply particularized factual allegations to demonstrate his point.  *See China Auto. Sys., Inc.*, 2013 WL 4672059, at *8 ("A mere statement that the Defendants caused the filing of the allegedly misleading financial statements with the SEC is not, without more, a particularized allegation of fact." (citation omitted)).  Plaintiff's allegation mirrors what courts rejected in *China Auto Sys., Inc.*, 2013 WL 4672059, at *8, *Citigroup*, 964 A.2d at 134, and *Wood*, 953 A.2d at 142.  This theory doesn't advance plaintiff's case against the defendant directors.

25

But, plaintiff says there's more.  He highlights the company's 2019 Proxy Statement.

Plaintiff alleges it was "false and misleading," and the defendant directors used it to get

themselves reelected to MGP's board.  Doc. 17 at 87 (Am. Compl. ¶ 258) ("The false and

misleading elements of the 2019 Proxy Statement led to the reelection of Defendants Griffin,

Colo, Bareuther, Dunn, Foglio, Jenkins, Seaberg, and Strandjord[.]").  How exactly was the 2019

Proxy Statement false and misleading?

Because, plaintiff alleges, it provided assurance that MGP followed a so-called Code of

Conduct.  *Id.* at 53 (Am. Compl. ¶¶ 153–54).  He alleges they didn't.  *Id.*  Plaintiff says the Proxy

Statement:

> failed to disclose, *inter alia*, that: (1) the Company was facing heightened
> competition in the market for aged whiskey, including from former customers and
> from new, large distillers; (2) as a result, consumer demand for the Company's
> products, including its aged whiskey, as well as the Company's overall position in
> a market now saturated with strong competitors were far weaker than what
> Defendants represented to the public; (3) due to the foregoing, the Company would
> struggle to find customers interested in the Company's aged whiskey inventory,
> and would ultimately fail to make any significant sales of its aged whiskey at the
> prices that the Individual Defendants repeatedly touted; (4) also due to the
> foregoing, the Company would build up a surplus of unsold aged whiskey, which
> would lower the value of the Company's inventory and further impair the
> Company's ability to achieve sales on favorable terms; and (5) the Company failed
> to maintain internal controls.

*Id.* at 53–54 (Am. Compl. ¶ 155).

Defendants see multiple reasons to reject plaintiff's argument.  Doc. 20 at 15–16.  For

instance, plaintiff doesn't "point to any misrepresentation involving internal controls."  *Id.* at 16.

He also doesn't "allege the directors had any knowledge at the time the proxy statement was

issued that MGP would later fail to meet its earnings estimates."  *Id.*

Plaintiff's point is conclusory.  That is, knowing *now* that the plan fell short, he argues

the defendants must have known *then* it would have that outcome.  The Delaware Supreme Court

rejected a similar argument in *Stone*. 911 A.2d at 373 ("With the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith."). Without particularized allegations pushing the claims past the point of being conclusory and into a realm of reasonable inference, the *Stone* court agreed that "the Court of Chancery properly . . . dismissed the plaintiffs' derivative complaint for failure to excuse demand by alleging particularized facts that created reason to doubt whether the directors had acted in good faith in exercising their oversight responsibilities." *Id.*

Plaintiff doesn't allege any details about each directors' involvement in preparing the Proxy Statement. How could the court logically infer—in plaintiff's favor—that the statement reflects bad faith by specific directors if it can't determine, at the outset, the role those directors played in preparing the statement? *See City of Cambridge*, 921 F.3d at 918 ("In evaluating the Shareholders' pleading, we accept as true all particularized allegations of fact and give the Shareholders all reasonable inferences logically flowing from them." (citation omitted)). It's plaintiff's burden to connect those dots. He didn't.[10]

There are other reasons this argument fails. For instance, plaintiff's assertions about the Proxy Statement mirror what this court rejected in *Hastey*. 449 F. Supp. 3d at 1065 (granting motion to dismiss). There, as here, the "Amended Complaint alleges that the false and misleading elements of the proxy statement[] led to the re-election of [defendant] directors, which allowed them to continue breaching their fiduciary duties[.]" *Id.* But there, as here, "this allegation can't suffice to state a claim for the wrongdoing asserted in the Amended Complaint" for several ancillary reasons. *Id.* Most of all, and accordingly the only reason worth reviewing is

---

[10]     *See Brehm*, 746 A.2d at 267 (affirming dismissal of derivative action and explaining "there is a very large—though not insurmountable—burden on stockholders who believe they should pursue the remedy of a derivative suit instead of selling their stock or seeking to reform or oust these directors from office").

this one:  plaintiff doesn't state with particularity *what* made the Proxy Statement false and misleading.

Instead, he resorts to the same conclusory logic that permeates his Amended Complaint. In plaintiff's view, because the Proxy Statement didn't specifically forecast that MGP ultimately would fail in its aged whiskey endeavor, the statement was materially false and misleading.  But, there's a rather obvious link or two missing.  The court can't accept this allegation as true because it isn't particularized in its details.  *See Stone*, 911 A.2d at 373 (affirming dismissal of plaintiff's derivative action and rejecting plaintiff's "hindsight" logic for director liability).

Before it could agree with plaintiff, the court would have to infer the directors' knowledge of the future based on present understandings of specific market factors.  But, plaintiff doesn't allege—with particularity—any facts making that inference possible.  On top of that, and even assuming the directors *did* know as much, plaintiff must allege with particularity that they disregarded such knowledge in bad faith as part of a disloyal effort to get rich while the company faltered.  Again, plaintiff doesn't supply any particularized facts to support that inference.

So, the court can't agree with plaintiff.  Contrary to his arguments, he hasn't provided particularized allegations demonstrating bad faith actions by the defendant directors relating to the 2019 Proxy Statement.

### c.  The Directors' Committee Memberships

A majority of named defendants served on MGP's Audit Committee, says plaintiff.  Doc. 26 at 14.  Accordingly, he alleges they were "responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's significant risk exposures, and the Company's compliance with legal and regulatory compliance."  Doc. 17 at 82

(Am. Compl. ¶ 241).  He asserts merely that they "failed in their oversight duties."  Doc. 26 at 14.

How did they fail?  Plaintiff argues in his Response that, "under the facts of this case it is reasonable to infer the Director Defendants' knowledge about the problems with the Company's core operations and, therefore, the inaccuracy of the statements about competition, MGP's standing in the aged whiskey market, and the value and prospects of its aged whiskey inventory." *Id.* at 43.  Contrary to defendants' framing of his argument, plaintiff contends his point here isn't that committee membership proves bad faith, per se.  *Id.* at 43–44.  Rather, because "the Audit Committee's knowledge may be inferred," plaintiff argues each director member therefore "failed in their Audit Committee duties of oversight as it relates to the Company's internal controls."  *Id.*  He says each of those directors "face a substantial likelihood of liability for the failure to fulfill their Audit Committee-specific duties, in addition to their general fiduciary duties as members of the Board."  *Id.*

As defendants put it, plaintiff "does not plead any facts about the audit committee's operations—what its members learned, how they performed their duties, or what decisions they made."  Doc. 29 at 21.  They're right.  And, they argue Tenth Circuit precedent precludes plaintiff from relying "on the 'core operations inference.'"  Doc. 20 at 14 (quoting *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016)).  According to defendants, that's what plaintiff argues here.  Doc. 29 at 21 ("Rather, [plaintiff] argues only that their responsibilities as audit committee members enables an inference of knowledge.").  Right again.

Plaintiff cites Judge Lungstrum's opinion in *Yellowdog Partners, LP v. CURO Group Holdings Corp.*, 426 F. Supp. 3d 864 (2019).  There, plaintiffs argued the importance of the

defendants' challenged business operation was so central to its overall functioning that it created an inference that defendants "would have been closely monitoring the impact and thus would have appreciated the true short-term financial effect of the transition (thus supporting an inference of scienter)." *Id.* at 874.  In response, defendants in *Yellowdog* argued that "the Tenth Circuit has rejected such a 'core operations' theory." *Id.*  However, the "Tenth Circuit did no such thing in the cases cited by defendants," Judge Lungstrum held. *Id.*  In *Yellowdog*, the court agreed with plaintiffs "that the importance of the business does support an inference that defendants closely monitored the transition and its effects, and thus supports an inference of scienter." *Id.* at 875.

To be sure, *Yellowdog* involved a similar context as the present action:  securities fraud. *Id.* at 868 ("Plaintiffs initiated this putative class action under the federal Securities Exchange Act of 1934 . . . against defendant CURO Group Holdings Corp. . . . and various executives and owners of Curo.").  However, *Yellowdog* differed in a few important ways.  For one thing, the case only involved corporate officers, not directors.[11]  *Id.* at 869 ("Plaintiffs assert claims against Curo and three corporate officer defendants[.]").  Also, the alleged wrongdoing involved defendants' failure to disclose material information known to them at the time and which was likely to have a substantial impact on the business's operations. *Id.* at 868 ("In fact, defendants had already decided to accelerate the transition[.]").  In addition, Judge Lungstrum wasn't reviewing the *Anderson* holding when he opined that defendants' arguments about a core operations inference fell short of their aims. *Id.* at 874–75 (discussing defendants' reliance on

---

[11]     In this case, four of the eleven defendants serve currently or previously served as corporate executives:  Defendants Griffin, Pigott, Gall, and Colo.  Doc. 17 at 10, 11, 12 (Am. Compl. ¶¶ 33, 36, 38, 41).  Even if the court inferred bad faith knowledge for all of them based on a core operations inference, plaintiff falls short of the board majority needed to prove demand futility under his theory that a majority of the board faced a substantial likelihood of liability therefore rendering them incapable of exercising reasonable business judgment if presented with demand.  *See* Doc. 17 at 8–9 (Am. Compl. ¶ 23).

*Weinstein v. McClendon*, 757 F.3d 1110 (10th Cir. 2014) and *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493 (10th Cir. 2014)).  Neither of those cases cites the *Anderson* opinion.  *See id.* Most of all, and even despite any topical relationship between these cases, Judge Lungstrum did not propose a general rule that scienter necessarily follows from committee memberships.  *Id.* (agreeing that Tenth Circuit precedent holds that "the executive's position, standing alone could not give rise to the necessary inference of scienter" but concluding nonetheless that this detail is "a fact relevant to the court's weighing of the totality of the allegations").  It was a case-specific determination.  *See id.*

Judge Lungstrum found from "the totality of the allegations in the complaint" that the plaintiff's arguments were "not merely based on predictions or projections of financial performance that proved inaccurate."  *Id.* at 870.  He based his conclusion on the specific defendants at issue, particularly corporate executives—not directors, as well as the specific facts of that case.  That is, because corporate executives "would have been closely monitoring that impact and thus would have appreciated the true short-term financial effect of the transition," and because the transaction was already ongoing before it was announced generally, an inference of scienter was possible.  *Id.* at 874.

Here too, the court considers the totality of circumstances in light of the allegations provided in plaintiff's Amended Complaint.  *See Harris v. Carter*, 582 A.2d 222, 798 (Del. Ch. 1990) (considering, under *Aronson*, "whether the accumulation of all factors creates the reasonable doubt" needed to prove demand futility).  Specific to this allegation, the court also considers the Tenth Circuit's remarks in *ZAGG*:  "Delaware cases do not infer knowledge of detail (factual or legal) merely from committee membership or execution of SEC filings, but require specific allegations from which one can infer knowledge."  826 F.3d at 1234 (affirming

dismissal because plaintiffs "failed to adequately plead that presuit demand on the Board would have been futile"). And, the Delaware Supreme Court, in *Wood*, "held that to infer knowledge from membership on an audit committee would run 'contrary to well-settled Delaware law.'" *Id.* (quoting *Wood*, 953 A.2d at 139). "In short, '[a]s numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors of that committee knew of and consciously disregarded the problem.'" *Id.* (quoting *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012)).

These findings are instructive because Kansas courts consider Delaware cases when examining conflicts involving Kansas corporations. *See Kan. Heart Hosp.*, 184 P.3d at 878 ("Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." (citations omitted)). Plaintiff finds a solid analog with *Yellowdog*, but not a direct hit. Defendants, on the other hand, identify cases that apply to this issue directly and provide a dispositive conclusion. *See Owens v. Mayleben*, No. CV 12985-VCS, 2020 WL 748023, at *8 (Del. Ch. Feb. 13, 2020) (granting dismissal and holding the "core operations doctrine is not sufficient *on its own* to satisfy the heightened pleading burden imposed by Rule 23.1 in the context of generally plead allegations to establish scienter." (quoting *In re Fitbit, Inc. S'holder Derivative Litig.*, 2018 WL 6587159, at *15 n.179 (Del. Ch. Dec. 14, 2018) (internal quotation marks and brackets omitted))).

Plaintiff's argument closely resembles the premise rejected by the Tenth Circuit in *In re ZAGG, Inc.*, 826 F.3d at 1234. He doesn't present enough information—in the form of particularized allegations—for the court logically to infer what he claims it can. Even if the

court obliged plaintiff by assuming these defendants knew the company's strategy faced an uphill battle, that assumption still wouldn't demonstrate bad faith knowledge of certain doom. And, even if the court were to disregard the holding in *ZAGG*—which it can't—plaintiff's allegation would fail for the independent reason that it lacks the particularity required in a derivative lawsuit to allege viably bad faith dealings. Those details are needed to support an inference of substantially likely liability.

Plaintiff's Amended Complaint also alleges that many of the director defendants currently serve (or once served) on additional board committees, particularly the Human Resources and Compensation Committee and the Nominating and Governance Committee. *See* Doc. 17 at 79–81 (Am. Compl. ¶¶ 232–37). However, it isn't clear whether plaintiff presents this information as general background or as part of a broader allegation of illegality. For instance, he notes that demand on "Defendant Dunn is futile as follow[s]." *Id.* at 79 (Am. Compl. ¶ 233). What follows, however, tells the court nothing about a basis for finding demand futility. Instead, plaintiff overviews the fact that Mr. Dunn "serves as the Chair of the Nominating and Governance Committee, and as a member of the Audit Committee and Human Resources and Compensation Committee." *Id.* On this basis, plaintiff apparently believes the court should hold that, as "a trusted Company director, he conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets." *Id.*

Plaintiff needed to show his work. Here hasn't. The above quoted language, which mirrors his allegations against the other defendants, shows the opposite. That is, plaintiff's argument is a bit like penciling in numbers on a math test without indicating the mathematical

logic producing the answer.  That's not how logical inferences work generally, and certainly not under "Rule 23.1's rigorous pleading standard." *City of Cambridge*, 921 F.3d at 925.  This pleading standard "isn't satisfied absent particularized allegations as to *what* each Director knew and *how* they acted on that knowledge." *Id.*  Plaintiff needed to show his work to support this argument, but he hasn't.  As a consequence, the court can't find that his arguments survive defendants' arguments to the contrary.

### d.  The Directors' Control Over One Another

Plaintiff asserts that demand is futile for directors Jenkins and Strandjord "because they are beholden to and controlled by Defendant Seaberg, whose 68% ownership of the Company's preferred stock provides her with effective control over [their] continued employment."  Doc. 17 at 83 (Am. Comp. ¶ 243).  He alleges one couldn't trust these directors to consider his demand to initiate suit fairly.

This claim requires a two-step showing from plaintiff.  The first step he must satisfy via particularized factual allegations is that defendant Seaberg had a disabling conflict of interest.  However, "even directors with 'substantial personal wealth invested in their related companies'" haven't been deemed conflicted on that basis alone.  *In re Dow Chemical Co. Derivative Litig.*, No. CV 4349-CC, 2010 WL 66769, at *8 (Del. Ch. Jan. 11, 2010) (granting dismissal (quoting *In re J.P. Morgan Chase & Co. S'holders Litig.*, 906 A.2d 808, 821–22 (Del. Ch. 2005))).  Also, voting power on a board—without more—isn't enough to infer a bad faith motive.  *See Beam v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004) (rejecting a similar bias argument despite the alleged control person holding 94% of the corporation's voting power and having prior social relationships with the other directors at issue).  If *Beam* wasn't the case to turn the tables, this one certainly isn't.

Plaintiff alleges that defendant Seaberg *is* conflicted because she sold company stock during the relevant period, which amounted to "insider sales."  Doc. 17 at 18–20 (Am. Compl. ¶¶ 60–62).  However, this logic hits a dead end, too.  For example, defendants note that "Seaberg's sales represented less than 1.4% of her common stock, and none of her preferred stock."  Doc. 29 at 22.  In *Smallen v. The Western Union Company*, our Circuit affirmed dismissal of a derivative suit and found defendants' stock sales weren't inherently suspicious where they "constituted only a fraction of their respective holding."  950 F.3d 1297, 1310–11 (10th Cir. 2020).

Most of all, plaintiff doesn't allege particular facts giving rise to the reasonable inference that these stock sales were nefariously motivated.  "Although insider sales are (rightly) policed by powerful forces . . . it is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed, material, non-public information."  *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) (granting dismissal).  The court faces a similar allegation here.  To depart from *Guttman* "would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed."  *Id*

The court could draw plaintiff's proposed inference only if he offered particularized allegations about defendant Seaberg's stock sales "that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition."  *Id.*  Plaintiff's allegations against defendant Seaberg aren't particularized when it comes to her knowledge of material, non-public details.  Instead, plaintiff asks the court to infer from her status as director that she knew material information unknown to the public which influenced her decision to sell MGP stock.  This argument mirrors what the

court rejected in *Guttman*. *See id.*; *see also Dow*, 2010 WL 66769, at *7 (granting motion to dismiss and rejecting plaintiff's insider trading claim because the "complaint fails to identify any specific knowledge of inside material information on the two relevant trade dates").

That's just the first step, and plaintiff comes up short. Even if the court agreed with him on the first step—that defendant Seaberg had a conflict of interest—plaintiff stumbles at the second step, too. Next, he needed to provide particularized facts about defendants Jenkins and Strandjord. *See* Doc. 17 at 83 (Am. Compl. ¶ 243) ("Demand in this case is excused as to defendants Jenkins and Strandjord . . . because they are beholden to and controlled by defendant Seaberg, whose 68% ownership of the Company's preferred stock provides her with effective control over the continued employment of the Company's Class B Directors."). Plaintiff's Amended Complaint describes no particularized facts that either of these defendants acted with a conscious bad faith motivation to disregard materially false or deceptive actions by the company *because* they'd otherwise lose their board seats. "The *Aronson* court noted that a director's nomination or election at the behest of a controlling shareholder is not enough to show a lack of independence because that 'is the usual way a person becomes a corporate director.'" *Kanter v. Barella*, 489 F.3d 170, 179 (3rd Cir. 2007) (affirming dismissal (quoting *Aronson*, 473 A.2d at 816)). Here too, plaintiff hasn't adduced allegations of this kind.

### e.  The Directors' Prior Relationships

Plaintiff also argues some of the director defendants aren't independent because they previously worked together or share a familial connection. For example, defendants "Griffin and Bareuther both served in a variety of senior roles at Brown-Forman Corporation between 1994 and 2010, including as Senior Vice President and as COO, respectively." Doc. 17 at 83 (Am. Compl. ¶ 242). And, plaintiff says, defendants Seaberg and Page are cousins. *Id.* He claims

36

they all share another common bond: a conflict of interest inhibiting their ability to exercise independent business judgment.

Plaintiff rests his claim exclusively on generalized allegations that demand conclusory determinations from the court. This contradicts the legal standard governing his case. As held in *Beam*, "[a]llegations that . . . directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends' . . . are insufficient, without more, to rebut the presumption of independence." 845 A.2d at 1051. As for the cousin directors, "[d]emand is not excused . . . just because directors would have to sue 'their friends, family and business associates.'" *In re Walt Disney Co. Derivative Litig.*, 731 A.2d 342, 354–55 n.18 (Del. Ch. 1998) *rev'd in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (rejecting plaintiff's allegation "that the personal interrelationships among the directors somehow render[s] the Director Defendants interested in the disputed transaction" (quoting *Abrams v. Koether*, 766 F. Supp. 237, 256 (D.N.J. 1991) (applying Delaware law))).

### f. Plaintiff's Remaining Allegations

What remains of plaintiff's allegations involve generalized grievances that MGP's board didn't do more. That is, the board didn't—according to plaintiff—do more to notify shareholders and the investing public that:

> (1) the Company was facing heightened competition in the market for aged whiskey, including from former customers and from new, large distillers; (2) as a result, consumer demand for the Company's products, including its aged whiskey, as well as the Company's overall position in a market now saturated with strong competitors were far weaker than what Defendants represented to the public; (3) due to the foregoing, the Company would struggle to find customers interested in the Company's aged whiskey inventory, and would ultimately fail to make any significant sales of its aged whiskey at the prices that the Individual Defendants repeatedly touted; [and] (4) also due to the foregoing, the Company would build up a surplus of unsold aged whiskey, which would lower the value of the Company's

> inventory and further impair the Company's ability to achieve sales on favorable
> terms . . . .

Doc. 17 at 7 (Am. Compl. ¶ 18).  The court addresses these claims in unison, below, because they share a common defect.  They fail to allege materially false or misleading statements.

To his concerns about "heightened competition" and weakened posture in the eyes of consumers, plaintiff invokes media coverage and market analyst reports.  *Id.*; *see also id.* at 39–40 (Am. Compl. ¶¶ 117–18).  He says the media already was speculating that MGP's grip on its NDP clients would weaken quickly.  *Id.*  And, he alleges, "numerous analysts, market commentators, and industry groups" were long-ago touting "the growth of rival whiskey distilling companies[.]"  *Id.* at 40 (Am. Compl. ¶ 118).

In effect, plaintiff argues the defendant directors misled the public and MGP shareholders because publicly available information discussed the company's competition in greater detail than the board.  It's a curious strategy.  The court can't decipher how one could keep the public in the dark about key details when—at the same time, according to plaintiff's allegations—those same details were widely available to the public.  This argument doesn't support plaintiff's logic. It sinks it.

Plaintiff also references MGP's declining stock value to support his argument.  He seems to think it shows that board directors misled the investing public about the company's true worth. *See* Doc. 17 at 72 (Am. Compl. ¶ 198) (discussing the "common stock at artificially inflated prices").  But, market fluctuations are both typical and significant in the sense that they demonstrate *public* responses to economic phenomena.  For instance, plaintiff documents one market analyst's remarks to defendant Griffin about MGP's stock value: "clearly, the stock today tells you [that] people don't believe that you can actually sell the product."  *Id.* at 62 (Am. Compl. ¶ 172).  If the investing public already doubted MGP's ability to accomplish its stated

goals—which is what plaintiff alleges—it's hard to imagine how defendants deceived *shareholders* about MGP's ability to accomplish its stated goals. It isn't just that plaintiff lacks particularized allegations. His premise is flawed in a fundamental sense.

In sum, none of plaintiff's allegations are sufficiently particularized to support an inference that a majority of MGP's board faced a substantial likelihood of personal liability. For this reason, plaintiff hasn't demonstrated that demand would've been futile. The court thus grants defendants' Motion to Dismiss plaintiff's federal claims.

### C. The Court Denies Without Prejudice Defendants' Motion to Dismiss Plaintiff's State Law Claims

#### 1. Legal Background

According to plaintiff's Amended Complaint, the court may consider his state law claims via supplemental jurisdiction under 28 U.S.C. § 1367(a). Doc. 17 at 9 (Am. Compl. ¶ 26). He's right. That statute provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

District courts don't fly blind when they make the decision whether to exercise supplemental jurisdiction. Instead, several factors guide the inquiry. The Supreme Court has directed district courts to consider "the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). And the Tenth Circuit has instructed courts in this Circuit to survey similar considerations. *See Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy,

convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Our Circuit also has expressed the *preference* that, when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims. *See Smith v. City of Enid ex rel. City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). Still, the decision is committed to the district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

In this Order, the court already has concluded that plaintiff's federal claims fail as a matter of law because he failed to plead demand futility in the fashion required by the particularity standard in Fed. R. Civ. P. 23.1 and the laws of Kansas. Typically, this finding would end the court's inquiry because it would make it more appropriate for a state court to decide plaintiff's remaining claims. This inclination is informed by the requirement that the court consider notions of fairness and comity, among others. *See Cohill*, 484 U.S. at 350; *see also Wittner*, 720 F.3d at 781.

Yet, the court can't decline supplemental jurisdiction—at least not without first addressing a novel holding by the Kansas Supreme Court. *See Stanfield v. Osborne Indus., Inc.*, 949 P.2d 602 (Kan. 1997); *see also Rhoten v. Dickson*, 223 P.3d 786 (Kan. 2010). Twice, the state's supreme court has ruled that a plaintiff may not pursue refiled state law claims after a federal district court—having dismissed all federal claims—declined to exercise supplemental jurisdiction over those state law claims. *Id.* In both cases, the federal district court had dismissed the state law claims without prejudice. *Id.*

In *Stanfield*, 949 P.2d at 612–13, and in *Rhoten*, 223 P.3d at 797–98, the Kansas Supreme Court ruled that the formerly federal court plaintiff couldn't pursue state law claims in state court merely because they *could* have been argued in federal court—even though the federal court had declined to consider the state law claims at all.  In Kansas, the state supreme court held, "[c]laim preclusion prohibits a party from asserting in a second lawsuit any matter that might have been asserted in the first lawsuit."  *Stanfield*, 949 P.2d at 612 (citing *Prospero Assocs. v. Burroughs Corp.*, 714 F.2d 1022, 1025 (10th Cir. 1983)).  Under this Kansas rule, a "legal theory does not even need to be raised in the first action, more or less considered by the court, in order for it to be precluded in a later action under the claim preclusion doctrine[.]"  *Id.* at 612–13; *see also Rhoten*, 223 P.3d at 799 ("Based on the *Stanfield* decision's continued strength, we affirm . . . that claim preclusion barred [plaintiff] Rhoten from renewing her state law claims in state court after they were dismissed *without* prejudice in federal court." (emphasis added)).

According to at least one legal commentator, the combined force of *Stanfield* and *Rhoten* "is contrary to the purpose of claim preclusion" and "contravenes justice[.]"  Patricia J. Kluin, *Kansas' Rationale Is Dust in the Wind:  Why the Dismissed Supplemental Claim Exception to the General Rule of Claim Preclusion Is Necessary (Rhoten v. Dickson, 223 P.3d 786 (Kan. 2010))*, 50 Washburn L.J. 511, 527–31 (2011).  As this commentator explained, the *Stanfield* and *Rhoten* rule "effectively limits the discretionary aspect of supplemental jurisdiction" because its logic "essentially compels a federal court to exercise supplemental jurisdiction."  *Id.* at 532–33.

Nor is criticism of *Stanfield* and *Rhoten* confined to scholarly journals.  In *Herington v. City of Wichita*, Judge Gordon Atcheson of the Kansas Court of Appeals concurred in the result but wrote separately to express his views about the rule in *Stanfield* and *Rhoten*.  479 P.3d 482, 484 (Kan. Ct. App. 2020) (Atcheson, J., concurring).  In Judge Atcheson's words, the "Kansas

Supreme Court fashioned an eccentric and exceedingly unfair rule of res judicata in *Stanfield* . . . and perpetuated that eccentricity and unfairness in *Rhoten*[.]"   *Id.*   Judge Atcheson opined that the *Stanfield* rule "undercuts the purpose of 28 U.S.C. § 1367 . . . and presumably runs afoul of the Supremacy Clause of the United States Constitution as a result."   *Id.*   For these reasons, he urged the Kansas Supreme Court to "consider taking this opportunity to reexamine what was done nearly 25 years ago in *Stanfield* and realign this state's application of res judicata with conventional preclusion principles."   *Id.*

Perhaps Judge Atcheson will get his wish.  A few days ago, the Kansas Supreme Court granted a petition to review the *Herington* decision.  Order, *Herington v. City of Wichita*, No. 120,329 (Kan. Mar. 25, 2021) (granting appellants' Petition for Review).  This development informs this court's thinking about this current federal case.  With the possibility of change on the horizon, the court is mindful of a separate-but-similar judicial doctrine designed to avoid conflicts between federal court decisions on constitutional law and unsettled matters of state law. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 499–500 (1941) (holding the "last word" on the meaning of a state law at issue "belongs" to the supreme court of the state in which the law was enacted); *see also Caldara v. City of Boulder*, 955 F.3d 1175, 1178 (10th Cir. 2020) ("'The *Pullman* concern is that a federal court will be forced to interpret state law without the benefit of state-court consideration and . . . render the federal-court decision advisory and the litigation underlying it meaningless.'" (quoting *Moore v. Sims*, 442 U.S. 415, 428 (1979)) (brackets omitted)).

This court prefers to hear from the Kansas Supreme Court on the issue of claim preclusion in Kansas, rather than risk deciding an issue purely of state law in a framing that

might be rendered "meaningless" upon the state supreme court's review of *Herington*. *Id.* The court explains its decision about Mr. Dorfman's state law claims, below

### 2. Discussion

Against this background, the court has two options available to it.

*First*, it can decline to exercise supplemental jurisdiction over plaintiff's state law claims, under 28 U.S.C. § 1367, and thus dismiss them without prejudice. This option has the virtue that it adheres to the general rule endorsed by the Tenth Circuit. *See Smith*, 149 F.3d at 1156 ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). But this option comes with an unsavory conclusion. It means that plaintiff—should he try to reassert his state law claims in Kansas state court following a dismissal without prejudice here—would encounter the death knell imposed by the current rule in *Stanfield* and *Rhoten*.

To be more specific, the court assumes the defendants in a refiled Kansas state court case would invoke the *Stanfield*/*Rhoten* rule and ask the state court to dismiss the state law claims. While the court can't say for certain how the state court would rule, it seems likeliest—on the *current* state of Kansas law—that the state court would feel duty bound to dismiss the reasserted state law claims with prejudice. But even that prediction comes with a modicum of uncertainty because of the Kansas Supreme Court's recent decision to review *Herington*. Perhaps that discretionary review signals that the supreme court plans to revisit the rule adopted in *Stanfield* and *Rhoten*.

*Second*, and as an alternative, the court could depart from the usual practice, exercise supplemental jurisdiction over plaintiff's state law claims, and proceed to adjudicate them. This option has the advantage of giving Mr. Dorfman his day in court on the merits—whatever they

are—of his state law claims.  But it also has its shortcomings.  Namely, it will insert federal

judicial power into controversies that now are purely matters of state law.  And, it will do so on a

record that is poorly developed.  The parties' papers collectively devoted barely more than a

single page to all the state law claims.  Plaintiff does the most work via his Response to

defendants' Motion to Dismiss.[12]  *See* Doc. 26 at 38–39 (devoting one page to the three Kansas

law decisions).  Meanwhile, defendants devoted six lines of prose, *see* Doc. 20 at 9, and one

footnote, *see* Doc. 29 at 20, to plaintiff's state law claims.

Weighing all these interests on one scale doesn't produce the most appealing outcome.

So, the court chooses instead a third alternative.  It consists of these components:

1.  The court denies, for now, defendants' Motion to Dismiss plaintiff's three state
    law claims.

2.  The court stays the case on its own motion, pending the Kansas Supreme
    Court's decision in its review of *Herington v. City of Wichita*, 479 P.3d 482
    (Kan. Ct. App. 2020).

3.  The court orders the parties to file one Joint Report within seven days of the
    Kansas Supreme Court's decision in *Herington*.  This Joint Report must attach
    a copy of the supreme court's decision in *Herington* and inform the court of the
    next appropriate action for this case in light of the state supreme court's ruling.
    The court also orders counsel to confer about their view of the *Herington*
    decision and determine whether they can develop a consensus about the future
    of plaintiff's state law claims.  Even if they can't, the parties still must file *one*
    Joint Report setting out their competing positions.

The court will review the parties' Joint Report and determine the best path forward.  The

principles embraced in Fed. R. Civ. P. 1 will guide this determination.

---

[12]      However, plaintiff's Amended Complaint doesn't explicitly identify *which* state's common law
he invokes.  His Response to defendants' Motion to Dismiss references Kansas law in the context of
unjust enrichment, but the legal landscape isn't exactly clear.  *See* Doc. 26 at 39.  This ambiguity
manifests another reason why it's unwise for federal courts to supplant the authority, purpose, and
expertise that state courts typically bring to state law claims.

A concluding thought:  the federal court approach to deciding whether to exercise supplemental jurisdiction may seem peculiar from time-to-time.  As one Kansas trial court judge put it, "it is puzzling why federal courts routinely refuse to exercise [supplemental] jurisdiction to resolve state law claims when such courts make findings of fact that effectively dictate the resolution of those [state law] claims."  *Herrington v. City of Wichita*, No. 17-CV-1553, 2018 WL 11277644, at *4 n.2 (Kan. Dist. Ct. Aug. 31, 2018).[13]  The answer in this case is a simple one:  precedent.  Since 1998, our Circuit has instructed our court and its siblings in the Tenth Circuit that they "usually should[ ] decline to exercise supplemental jurisdiction" over state law claims once all federal claims have exited the scene.  *Smith*, 149 F.3d at 1156.  This "usual" outcome stems from the sense that federal courts generally should withhold use of federal judicial power to disputes that only involve state law issues.  Finding no reason here to depart from the usual approach in our Circuit, this court will follow precedent, stay the case, and avoid inserting itself into what is now purely a state law dispute.

### D.    Should the court dismiss plaintiff's claims with or without prejudice?

There's one more squabble to set straight.  Defendants ask the court to dismiss plaintiff's claims with prejudice.  Doc. 20 at 22 ("[T]his case should be dismissed with prejudice pursuant to Rule 23.1.").  Plaintiff disagrees.  Doc. 26 at 9 n.3.  He argues, contrary to defendants' assertion, "Rule 23.1 provides no basis for dismissal with prejudice."  *Id.* (emphasis omitted).  And, he says, because this dismissal turns on demand futility, its very nature is one involving susceptibility to correction.  *Id.*  Below, the court considers the proper approach.

---

[13]    Someone appears to have misspelled plaintiff's name somewhere along the way.  *Compare Herrington v. City of Wichita*, No. 17-CV-1553, 2018 WL 11277644 (Kan. Dist. Ct. Aug. 31, 218), *with Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).  Despite this discrepancy, these cases involve the same parties and conflict.  *See id.*

The court is persuaded by decisions from Delaware courts and other federal districts that it should dismiss *without* prejudice.[14]  To be sure, district courts have disagreed on this point. For instance, "[s]ome courts have dismissed demand-futility complaints with prejudice where Plaintiffs have not suggested that they could cure the defects in the demand futility aspects of their complaint."  *In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 579 (D.N.J. 2011) (collecting cases) (internal quotation marks and citations omitted).  As one of those courts explained:

> If plaintiffs were not already aware of the level of specificity by which they must plead their case in order to establish demand futility, Defendant's Motion to Dismiss certainly put them on notice.  In responding, plaintiffs failed to provide any new factual allegations which might have cured their pleading deficiencies.

*Kenney v. Koenig*, 426 F. Supp. 2d, 1175, 1188 (D. Colo. 2006).  The logic makes good sense. On a different approach, and given the heightened pleading standard under Rule 23.1, it could be "wasteful of the court's and the litigants' resources to have a regime that could require a corporation to litigate repeatedly the issue of demand futility."  *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1150 (Del. 2011).

But, other courts have reasoned that dismissing demand futility complaints with prejudice goes too far.  *See In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d at 579.  And, given the Delaware statutes and precedent informing this court's analysis, it turns back to precedent from the First State.  In *King*, the Delaware Supreme Court noted that the state's courts had permitted defeated plaintiffs to return to court—in the name of a derivative suit—after losing

---

[14]      The parties have not cited any legal authority from the Tenth Circuit or our court addressing this specific issue in the context of derivative actions.  In keeping with long-standing tradition in our jurisdiction, the court considers Delaware decisions on this topic.  *See Arnaud*, 992 P.2d at 218 ("Kansas courts have a long history . . . of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware code.").

their first battle and subsequently initiating a separate-but-related books and records action. *King*, 12 A.3d at 1145–46.

A books and records action allows a shareholder, under state law, "to inspect [a] corporation's books and records." *Id.* at 1145. In Delaware, the law providing plaintiffs this path is Del. Code Ann. tit. 8, § 220. In Kansas, it's Kan. Stat. Ann. § 17-6510. As in Delaware, the Kansas statute permits a stockholder, "upon written demand under oath stating the purpose thereof," to "inspect for any proper purpose . . . [t]he corporation's stock ledger, a list of its stockholders, and its other books and records." Kan. Stat. Ann. § 17-6510(b)(1); *see also Arctic Fin. Corp. v. OTR Express, Inc.*, 38 P.3d 701 (Kan. 2002) (providing a general overview of legal parameters applied to shareholder's books and records action under Kansas state law).

Delaware courts "strongly encourage stockholder-plaintiffs to utilize [a books and records action] before filing a derivative action, in order to satisfy the heightened demand futility pleading requirements" under Rule 23.1. *King*, 12 A.3d at 1145. And—to be fair to plaintiff here—it isn't clear that he didn't already try this route. Erring on the side of caution, this court agrees with Delaware courts that a failure to do so, first, "although ill-advised," shouldn't be "regarded as fatal." *Id.* at 1146; *see also In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d at 579–80 ("In *King*, the Delaware Supreme Court reaffirmed that demand-futility complaints should be dismissed without prejudice and plaintiffs given the opportunity to pursue a books and records action, in state court, in order to buttress their insufficient allegations." (citing *King*, 12 A.3d at 1145–46)).

The court agrees that a rinse-and-repeat legal strategy would waste everyone's time and resources. But, true finality is too much. In any event, plaintiff knows by now that his burden for proving demand futility is remarkably high. Accordingly, the court doubts that any party's

judgment is clouded with illusions.  The court will dismiss plaintiff's complaint without prejudice.

## IV.     Conclusion

As we've learned about derivative actions, particularity is one of two keys to the courthouse.  In light of defendants' Articles of Incorporation, *bad faith* is the other key.  That is, plaintiff needed to allege with particularity that defendants acted in bad faith.  And, by virtue of providing particularized allegations, conclusory reasoning isn't enough.  *See City of Cambridge*, 921 F.3d at 920 (explaining that where corporation's charter exculpated directors from liability for duty of care breaches, plaintiff must show a breach of duty of loyalty, in turn requiring plaintiff show "intentional bad-faith conduct").

Plaintiff is right, however, about one critical detail.  "Although [he] must plead demand futility with particularity, in evaluating the shareholder's pleading, the court accepts as true all facts and all reasonable inferences that flow from them."  Doc. 26 at 17 (citing *City of Birmingham Ret. & Relief Sys.*, 177 A.3d at 55–56).  But, he hasn't pleaded particularized facts capable of supporting a reasonable inference that making a demand was futile.  Instead, plaintiff's arguments could prevail only if the court flipped this reasoning on its head.  Plaintiff's Amended Complaint describes a slew of *generalized* allegations through which he asks the court to infer *particularized*, nefarious conclusions.  So, in a definitional sense, plaintiff wants the court to make conclusory determinations.  It can't.

That isn't how demand futility works.  If it did, and given how often business strategies fall short of their aims, demand futility would provide the lowest of bars to clear.  But that's not what Kansas or Delaware law requires.  It's why derivative actions are "extraordinary," *Quinn*, 620 F.3d at 1012, and why demand is required unless "extraordinary conditions" justify excusal,

*Kamen*, 500 U.S. at 96 (quoting *Ross*, 396 U.S. at 534).  Likewise, "in *rare* cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."  *Aronson*, 473 A.2d at 815 (emphasis added).  If plaintiff could prevail on what he provided, derivative actions would become ordinary, not rare.  *See Brehm*, 746 A.2d at 256 (explaining that "[a]spirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation and can usually help directors avoid liability," but these goals are "not required by the corporation law and do not define standards of liability" (citation omitted)).

Given the extraordinary character of derivative actions manifested by the substantially heightened pleading standard applied to plaintiffs who claim demand futility, the court can't agree that plaintiff here has provided the particularized allegations needed to survive a motion to dismiss.  The court thus grants defendants' Motion to Dismiss plaintiff's federal law claims, and it dismisses those claims without prejudice.  With respect to plaintiff's state law claims, the court denies without prejudice defendants' request to dismiss those three claims.  And, the court stays the case on its own motion, pending the Kansas Supreme Court's decision in its review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Judicial Notice in Support of Motion to Dismiss (Doc. 21) is granted.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Dismiss (Doc. 19) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Dismiss plaintiff's federal claims is granted, and plaintiff's federal claims are dismissed without prejudice.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Dismiss plaintiff's state law claims is denied, pending the Kansas Supreme Court's review of *Herington v. City of Wichita*, 479 P.3d 482 (Kan. Ct. App. 2020).

**IT IS FURTHER ORDERED THAT** this case is **STAYED**, on motion of the court, pending the Kansas Supreme Court's review of *Herington*, 479 P.3d 482 (Kan. Ct. App. 2020).

**IT IS FURTHER ORDERED THAT** the parties shall file one Joint Motion within **seven days** of the Kansas Supreme Court's decision in *Herington*, informing the court of the next appropriate action in this case in light of the state supreme court's ruling, and setting forth counsels' consensus or points of disagreement about the future of this case following the state supreme court's ruling.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2021, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**